MICHAEL KAUFMAN (SBN 254575)
mkaufman@aclu-sc.org
AHILAN T. ARULANANTHAM (SBN 237841)
aarulanantham@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA  90017
Telephone: (213) 977-5232
Facsimile: (213) 977-5297

*Attorneys for Plaintiffs-Petitioners*

*Additional Counsel listed on following page*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XOCHITL HERNANDEZ, CESAR MATIAS, for themselves and on behalf of a class of similarly-situated individuals,<br><br>        Plaintiffs-Petitioners,<br><br>        v.<br><br>JEFF SESSIONS, U.S. Attorney General, et al.,<br><br>        Defendants-Respondents. | Case No. 5:16-cv-00620-JGB-KK<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF CAROL SOBEL IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES FOR  HAVING TO OPPOSE DEFENDANTS' TWO EX PARTE APPLICATIONS**<br><br>Judge:          Hon. Jesus G. Bernal<br>Magistrate Judge: Hon. Kenly Kiya Kato<br>Special Master:  Hon. Rosalyn M. Chapman |

DECLARATION OF CAROL SOBEL IN SUPPORT OF PLAINTIFFS' FEE REQUEST FOR OPPOSING DEFENDANTS' TWO EX PARTE APPLICATIONS

MICHAEL TAN (*pro hac vice*)
mtan@aclu.org
JUDY RABINOVITZ (*pro hac vice*)
jrabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone:   (212) 549-2618
Facsimile:    (212) 549-2654

STEPHEN KANG (SBN 292280)
skang@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone:   (415) 343-0783
Facsimile:    (415) 395-0950

MATTHEW E. SLOAN (SBN 165165)
Matthew.Sloan@skadden.com
DOUGLAS A. SMITH (SBN 290598)
Douglas.Smith@skadden.com
CATHERINE H. THOMPSON (SBN 313391)
Catherine.Thompson@skadden.com
ASHLEY L. PHILLIPS (SBN 318397)
Ashley.Phillips@skadden.com
OLIVIA M. POWAR (SBN 318787)
Olivia.Powar@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

*Attorneys for Plaintiffs-Petitioners*

# DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.      I am an attorney admitted to practice in the State of California. I make this declaration in support of Plaintiffs' Motion for Attorneys' Fees for Having to Oppose Defendants' Two Ex Parte Applications. The declaration is based on facts of which I have personal knowledge. If I were called to testify as a witness to these facts, I could and would do so competently.

2.      I was admitted to the California Bar in December 1978, following my graduation from law school in May of 1978. For 20 years, I was employed by the ACLU Foundation of Southern California, including approximately 12 years as its First Amendment attorney. For the last seven years prior to my departure from the ACLU, I served as a Senior Staff Counsel. I left the ACLU to begin a private civil rights practice in late April, 1997. Attached at Exhibit "1" is my current resumé.

3.      My billing rate for 2018 is $990 an hour. I settled the fees in several cases in 2017, applying my 2017 rate of $975 an hour to calculate the lodestar, including the fees in *Schuler v. County of Orange*, 8:17-cv-00259 DOC KES (C.D. Cal. 2017). I did not file a motion for fees in 2016. In 2014 and 2015, several courts approved my rate of $875 an hour. In *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014), the Circuit granted the motion for fees, approved entitlement, and referred the matter to the Appellate Commissioner to determine the final award. The parties then settled the trial court and appellate fees together with only an approximately 5 percent reduction of the appellate lodestar. In a second case in 2015, the Circuit panel approved the full award at $875 an hour. See *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).

4.      In 2012, I was paid my then full rate of $795 an hour by an insurance carrier in a non-contingency case before the Hon. Dean Pregerson of the Central District of California. *Federal Deposit Insurance Company v. Larry B Faigin,* 2:12-cv-03448-DDP-CW (C.D. Cal. 2012). In 2010, I was awarded fees at $725 an hour in

1

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009), a First Amendment case.  In 2009, I was awarded fees by this Court at $710 an hour in *Fitzgerald v. City of Los Angeles*, 2009 U.S. Dist. LEXIS 34803 (CD Cal. 2009), and in *Multi-Immigrant Worker Organizing Network ("MIWON") v. City of Los Angeles*, cv 07-7032 AHM, both police misconduct cases.  In 2008, I was awarded fees at $695 an hour in *Jones v. City of Los Angeles*, cv-03-1142 R. *See* 444 F.3d 1118 (2006), vacated per settlement 505 F.3d 1006 (9th Cir. 2007). The fee award was affirmed on appeal. 2014 U.S. App. LEXIS 1952 (9th Cir. Jan. 31, 2014).

5.      My practice involves complex civil rights litigation and class actions, focusing primarily in the areas of the rights of homeless persons, First Amendment rights and police practices.  I have received several awards for my legal work over the years.  In 2008, I was named a California Lawyer of the Year (CLAY) recipient for civil rights by California Lawyer Magazine and that same year was also named in the Top 75 Women Litigators in California by the Daily Journal Corporation. In 2007, I received an Angel Award from California Lawyer Magazine for pro bono work.  I also was named in 2007 by the Daily Journal as one of the Top 100 Most Influential Lawyers in California. In 2013 and again in 2017, I was named one of the top women lawyers in Los Angeles.  I have been named as a Superlawyer in the area of First Amendment and civil rights litigation for more than a decade. Additional recognition of my legal work is set forth in my attached resumé.

6.      I have been qualified twice as an expert to testify at trial on issues concerning non-profit legal practice: once before the State Bar and once in Los Angeles Superior Court. Recently, in an appeal of a fee award, the Second Appellate District noted my qualification as an expert to opine on reasonable market rates for attorney fees. *See Jochimsen v. County of Los Angeles*, B223518 (2d Dist. June 23, 2011) (unpublished) (approving expert basis for opinion). My declarations and the supporting evidence of reasonable market rates have been repeatedly cited favorably by federal and state courts in awarding fees. For example, in *Nadarajah v. Holder*,

569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of the application of attorneys from the ACLU for fees under the Equal Access to Justice Act ("EAJA"). In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (C.D. Cal. 2008), granting fees pursuant to the federal IDEA statute, 20 U.S.C. §1415(i)(3)(c), the Court cited to my declaration as persuasive evidence of market rates. In *Atkins v. Miller*, CV 01-01574 DDP (C.D. Cal. 2007), this Court awarded fees to a 1975 graduate at $675 an hour, specifically citing to my declaration and that of Barry Litt to support the requested rates. Id. at 8-9 & n.4. Additional cases in which my declarations have been cited favorably include, among others, *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC (C.D. Cal. May 30, 2012); *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 929, 963-964 (C.D.Cal.2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013); *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010); *Dugan v. County of Los Angeles*, cv-11-08145 CAS (C.D. Cal. March 3, 2014); and *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014). The most recent decision approving rates based, in part, on my declaration is *Webb v. Officer J. Ackerman*, 13-cv-01992 PLA (C.D. Cal. Jan. 4, 2018), ECF No. 180, at 5.

7.    In addition, I have litigated statutory fee issues at the appellate level in several of my cases. Most notably, I was lead counsel before the California Supreme Court in *Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued vitality of the "catalyst" fee doctrine in California courts. I was also lead counsel in *Jones v. City of Los Angeles*, 555 Fed. Appx. 659 (2014), establishing entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement that was conditioned on vacatur of the panel decision.

8.    I have been asked to submit this declaration to attest to the reasonableness of the fee rates requested by the counsel in this case. I am not being compensated for my time in this matter.

9.    To prepare my declaration, I communicated with Michael Kaufman of the ACLU of Southern California and reviewed the Court's prior order awarding attorney fees in January 2018, as well as the Declaration of Douglas A. Smith. I am familiar with the qualifications, skill, experience and reputation of Michael Kaufman. I first met him when I interviewed him for a summer law clerk position with the ACLU of Southern California. Since then, I have co-counseled cases with Mr. Kaufman. Although I do not know the Skadden attorneys individually, I am very familiar with the firm and, based on my experience as a lawyer in Los Angeles for four decades, am of the opinion that the firm enjoys an excellent reputation for highly skilled legal representation.

10.    I am informed that the following rates are being sought in this case

| Attorney | Graduating Class | Rate |
|---|---|---|
| Doug Smith - Skadden | 2006 | $620 |
| Michael Kaufman - ACLU | 2007 | $620 |
| Michael Hidalgo  - Skadden | 2015 | $400 |
| John Korevec    -Skadden | 2015 | $400 |
| Olivia Powar   - Skadden | 2017 | $300 |
| Ashley Phillips   Skadden | 2017 | $300 |

11.    It is my opinion that the rates sought are reasonable for these attorneys. I base my opinion on the fee awards and supporting declarations I have reviewed over the course of the past several decades, as described more fully below, and the exhibits attached to my declaration in this instance.

12.    I have extensive experience with the methodology applied to set appropriate market rates for public interest and civil rights attorneys who do not have paying clients. During the time that I was at the ACLU of Southern California, I prepared numerous fee motions under federal and state fee-shifting statutes for cases in which the ACLU represented the prevailing party. I was responsible for

1    preparing these motions in cases in which I was directly involved in the underlying
2    litigation, as well as in cases brought by other staff attorneys and volunteer counsel
3    for the ACLU.

4        13.    In this role, I obtained information on market rates through a variety of
5    sources that I continue to use to evaluate reasonable rates each year. I review
6    current billing rates and fees sought by, and awarded to, attorneys at large,
7    commercial law firms to establish rates for individuals of comparable experience at
8    public interest and civil rights firms. The attorneys at large commercial firms
9    handle similarly complex federal litigation and, in many instances, they are also
10   familiar with the experience levels of various non-profit attorneys because they
11   co-counsel cases with the public interest bar.

12       14.    It is my practice to use rates at large firms to establish market rates
13   for civil rights lawyers based on my understanding that billing rates by lawyers
14   at civil rights firms and public interest organizations at rates even marginally
15   comparable to those of attorneys who do other types of complex litigation is
16   consistent with the decision of the U.S. Supreme Court in *Blum v. Stenson*, 465
17   U.S. 886, 895 (1984) ("The statute and legislative history establish that 'reasonable
18   fees' under [42 U.S.C.] § 1988 are to be calculated according to the prevailing
19   market rates in the relevant community, regardless of whether plaintiff is
20   represented by private or nonprofit counsel"). *See also, Nadarajah v Holder,* 569
21   F3d at 910.

22       15.    To analyze reasonable market rates, I apply several additional
23   principles.   First, when available, I look to rates awarded to the same attorneys in
24   previous cases because the Ninth Circuit has repeatedly held that such awards are
25   strong evidence of reasonable market rates. *See Chaudhry v. City of Los Angeles*,
26   751 F.3d 1096, 1111 (9th Cir. 2014); *U.S. v. $28,000 in U.S. Currency*, 802 F.3d
27   1100, 1106 (9th Cir. 2015); *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 976
28   (9th Cir. 2008).  In this instance, all of the firms have relatively recent fee awards

DECLARATION OF CAROL SOBEL IN SUPPORT OF PLAINTIFFS' FEE REQUEST FOR OPPOSING
DEFENDANTS' TWO EX PARTE APPLICATIONS

approving rates close to the rates now sought.

16.    Next, I look to evidence of billing rates by attorneys engaged in similarly complex business litigation as an approved method of establishing reasonable market rates for civil rights attorneys who do not regularly bill clients on an hourly basis.   This approach, approved in *Blum*, *supra*, recognizes that almost all civil rights attorneys take cases on a contingency basis and are not paid hourly for their services.  In this instance, the ACLU has co-counsel from Skadden Arps, Slate, Meagher & Flom LLP.

17.    Third, I premise my opinion on the rule that the relative "simplicity" or "complexity" of a matter is reflected in the efficiency of hours, not the lodestar rate of the attorney. *See Van Skike v Director, Office of Workers' Compensation Programs,* 557 F3d 1041, 1046 (9th Cir. 2009).

18.    I estimate that I review more than 100 fee motions, fee awards, and supporting declarations in the course of a  year. My practice is to obtain this information from court orders in the past year awarding statutory fees or  awarding fees as a discovery  sanction.  In addition, I subscribe to several websites that report legal news.  If I read about a case where there is likely to have been a fee motion, I review  the docket  and  obtain  a copy  of  any  fee  motion,  supporting declarations and fee award from public sources, including documents  on PACER and state court websites.

19.    My opinion concerning the reasonableness of the rates sought in this instance is based on the fee awards described below and attached to  my declaration, as well as the other documents submitted with my declaration.

20.    Attached at Exhibit 2 is a copy of the order approving final settlement and approval of attorney fees to the Disability Rights Legal Center (DRLC) in *Garcia v. Los Angeles County Sheriff's Dept.*, CV 09-8943 DMG (SHx). ECF No. 452.  Because the order does not enumerate the rates and attorney qualifications, I have attached a true and correct copy of the Declaration of Anna Rivera at Exhibit

6

3.  [ECF No. 443].

21.    In *Garcia*, fees were sought and approved at 2017 rates:

| Umbreen Bhatti | 2005 grad | $640 |
| Carly Munson | 2006 grad | $625 |
| Andrea Oxman | 2007 grad | $600 |
| Eliot Field | 2009 grad | $525 |

The rates sought by this motion are consistent with the rates approved in *Garcia*. Mr. Smith has 12 years of experience in 2018, the same amount of time as Umbreen Bhatti had in 2017.  Smith's rate is $20 lower.  Mr. Kaufman has the same experience as Carly Munson had in 2017.  His requested rate is $5 an hour less than Ms. Munson's 2017 rate and only $20 an hour higher than the 2017 rate approved for Andrea Oxman, also a 2007 graduate.  *Id.,* Ex. 3, ¶¶ 41-47.

22.    Attached at Exhibit 4 is the recent decision in *Webb v. Officer J. Ackerman*, 13-cv-09112-PLA (C.D. Cal. Jan. 4, 2018), ECF No. 180.  In *Webb*, the Court approved the 2017 rate of $650 an hour for Elliot Tiomkin, a 2006 law graduate. I provided a supporting fee declaration for Mr. Tiomkin, as noted in  the court's opinion at p.5.  In my view, based on my professional interaction with Michael Kaufman  and my discussions with Mr. Tiomkin and review of his credentials, Michael Kaufman, with approximately 12 years of experience, is considerably more skilled in complex litigation than Mr. Tiomkin.  I reach the same conclusion on the skill and experience of the attorneys of Mr. Smith based on my general familiarity with the skill, experience and reputation of the attorneys at Skadden.

23.     Applying a three percent increase, Mr. Tiomkin's 2017 rate would be $670 for 2018.  This is slightly below the Los Angeles legal services factor of the Cost of Living increase.  *See*: http://www.bis.gov/news.release/cpi.102.htm. (Table 2. Consumer Price Index for All Urban Consumers (CPI-U): U. S. city average, by detailed expenditure category).

7

24.    Attached at Exhibit 5 is the 2016 award of fees by Judge Staton to Talia Inlender at Public Counsel.  Ms. Inlender is a 2007 law graduate, with similar federal appellate clerking experience and complex litigation experience to Mr. Kaufman.  The Court approved $585 an hour for Ms. Inlender.  Applying a three-percent annual increase, the equivalent rate would now be $621 an hour.

25.    Attached at Exhibit 6 is a true and correct copy of the order approving fees on a lodestar cross-check in *Nozzi v. Housing Authority of the City of Los Angeles,* Case No. 2:07-cv-00380-PA-FFM (C.D. Cal. Feb. 15, 2018) [ECF. No. 331], a class action civil rights case.  Because the order did not set out the specific experience and rates approved, attached at Exhibit 7 is a true and correct copy of the motion for approval filed in the case.  I know all of the attorneys for whom fees were sought in *Nozzi* and provided a supporting declaration.  Included in the motion was a request for fees for Stacey Brown, a 2006 law graduate, at the 2017 rate of $600 an hour.  Ex. 7, p. 19.  This is just $20 an hour less than the rate now sought for Mssrs. Smith and Kaufman, who are comparably, if not more, skilled in my opinion.  I have co-counseled cases with both Ms. Brown and Mr. Kaufman and base my opinion on that experience.

26.    In *Nozzi,* the Plaintiffs also sought fees for Stephanie Carroll, then with 13 years experience, at the 2017 rate of $640 an hour.  (*Id.*, Ex. 7 at 20).  This is $20 an hour higher than the rate sought for Mssrs. Smith and Kaufman.

27.    Attached at Exhibit 8 is a true and correct copy of the Declaration of Raymond P. Boucher submitted in *Skeen v. BMW,* 2016 U.S. Dist. LEXIS 97188, Civ. No. 2:13-cv-1531-WHW-CLW (D. N.J. 2016), in support of the motion for approval of attorney fees in a class settlement.  Mr. Boucher is an attorney in Los Angeles and, based on my review of the State Bar listing, a 1984 law graduate.  I reviewed the entire fee motion in *Skeen*, including the expert declaration of Gerald Knapton, attesting that the rates of the Los Angeles attorneys involved in *Skeen* were reasonable and had been approved repeatedly by the state and federal courts in

8

1   the Central District of California.  Decl. of Gerald Knapton, No. 2:13-cv-01531-

2   WHW-CLW [ECF No. 86-9, ¶¶ 31-34].

3        28.    In his declaration, Mr. Boucher attested that his rate during the *Skeen*

4   litigation was first $925 an hour, then $1100 hours in 2016.  (*Id.*, Ex. 8, at 12-13, ¶

5   36).  The supporting declarant attested that the hourly rates for the attorneys were

6   the same as the then-current rates charged for their services in non-contingent

7   matters and that were accepted and approved in other class action litigation, listing,

8   among others, cases in the Central District of California.  (*Id.*, Ex. 4, ¶ 47).

9        29.    Mr. Boucher's fee declaration also attested to the rates for the other

10  attorneys in his firm.  *Id.*  For each, I reviewed the State Bar listing to determine the

11  length of practice.  Attorney Shehnaz Bhujwala is listed on the State Bar as a 2002

12  law graduate.  The 2015 rate for this attorney was $625 an hour and the 2016 rate

13  was $750 an hour.  At the time of the *Skeen* award,  attorney Bhujwala had 14 years

14  of experience, just two more than Mr. Smith and three more than Mr. Kaufman.

15  The $625 rate for 2015 is more than Mssrs. Smith and Kaufman seek now, with

16  only one and two years less experience, respectively. Attorney Maria Weitz at the

17  Boucher firm is a 2009 law graduate.  With seven years of experience in 2016, her

18  rate was $750 an hour, more than 20 percent higher than the rate now sought for

19  Mssrs. Smith and Kaufman, who have 12 and 11 years of experience now,

20  respectively.

21       30.    In addition to Mssrs. Smith and Kaufman, Plaintiffs seek fees for two

22  2015 law graduates and two 2017 law graduates at Skadden.  The requested pro

23  bono rate for the 2015 law graduates is $400 an hour and for the 2017 law graduates

24  it is $300 an hour.  In my experience, both of these rates are low even by

25  comparison to the civil rights bar.

26       31.    Attached to my declaration at Exhibit 9 is a true and correct copy of the

27  order awarding fees in *Charlebois v. Angels Baseball*, 993 F. Supp. 2d 1109 (C.D.

28  Cal. 2012).  For example, in *Charlebois*, the Court approved the 2012 rate of $375

9

an hour for Courtney Abrams, identified in the decision as a 2009 law graduate, and $325 an hour for Menaka Fernando, identified as a 2010 law graduate. (*Id.*, Ex. 9 at 17). At the time, Ms. Abrams was practicing the same length of time as the 2015 law graduates for whom fees are sought in this motion and Ms. Fernando was practicing only one year longer. The 2012 approved rate for Ms. Abrams is only $25 below the rate requested of $400 an hour for the 2015 law graduates in this case. The 2012 rate approved for Ms. Fernando is only $25 an hour higher than the rate sought five years later for the 2017 law graduates in this motion. Applying an adjustment of 3 percent a year to the base rate of $325 an hour, the equivalent 2018 rate for a second-year attorney would be approximately $365 an hour, more than 20 percent higher than the rate sought for the 2017 law graduates here.

32.    Based on all of the foregoing and the attached exhibits, it is my opinion that the rates sought by Plaintiffs' counsel in this motion are reasonable rates of compensation in this case.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of September 2018, in Los Angeles, California.


CAROL A SOBEL

DECLARATION OF CAROL SOBEL IN SUPPORT OF PLAINTIFFS' FEE REQUEST FOR OPPOSING DEFENDANTS' TWO EX PARTE APPLICATIONS

Exhibit 1

# CAROL A. SOBEL
725 Arizona Avenue• Suite 300 • Santa Monica, CA 90401 •
Tel. 310 393-3055 • Email carolsobellaw@gmail.com

## Employment:

LAW OFFICE OF CAROL A. SOBEL                                        APRIL, 1997 TO  PRESENT
Solo civil rights law firm.

SENIOR STAFF COUNSEL                                               1990 TO APRIL, 1997
*ACLU Foundation of Southern California*

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California;
supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

STAFF ATTORNEY                                                     1985 TO 1990
*ACLU Foundation of Southern Califonria*

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other
First Amendment rights.

ASSOCIATE DIRECTOR                                                 1979 TO 1985
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Under the direction of the Executive Director, responsible for administration of two non-profit organizations,
including working with Boards of Directors on development of policy on civil liberties issues.  Engaged in litigation
and assisted Legal Director in coordination and supervision of pro bono attorneys.

DEVELOPMENT DIRECTOR                                               1977 TO 1979
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a
501(c)(3) and a 501(c)(4).

## Admitted to Practice:

California Supreme Court                                           No vember, 1978

United States Supreme Court                                       Sep tember, 1991

Ninth Circuit Court of Appeals                                     August, 1986

U.S.D.C. Central District of California                           February, 1986

U.S.D.C.  Eastern District of California                          June, 1990

## Litigation Experience:

### Federal courts:   (Partial listing of published opinions and significant cases)

*CPR for SKID ROW,*
779 F.3d 1098 (9th Cir. 2015)
Partial reversal of summary judgment in favor of the Defendant and holding that California Penal Code §403
could not lawfully be applied to criminalize the expressive activity of the Plaintiffs for protesting on Skid
Row.
(Lead counsel and argued on appeal)

*Desertrain v. City of Los Angeles*
754 F.3d 1114 (9th Cir. 2014)
Reversal of summary judgment in favor of the Defendants and holding that Los Angeles Municipal Code §85.02, prohibiting parking a vehicle on public streets or parking lots any time of day or night if a person "lives" in the vehicle, is unconstitutionally vague.
(Lead counsel and argued on appeal)

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012), *affirming* grant of preliminary injunction 797 F.Supp.2d 1005 (C.D. Cal. 2011)
Preliminary injunction barring City from confiscating and immediately destroying the property of homeless individuals on Los Angeles' Skid Row.
(Lead Counsel)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008), as amended July 24, 2009
Upholding and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia,* advance-notice requirements  police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.
(Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)
Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003.
(Co-Counsel)

*Multi-Ethnic Immigrant Worker Organizing Network (MIWON) v. City of Los Angeles*
246 F.R.D. 621 (C.D. Cal. 2007)
Order granting class certification in challenge to police assault on a lawful assembly of immigrant rights supporters by the Los Angeles Police Department on May Day, 2007.
(Class Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006), vacated pursuant to settlement 505 F.3d 1006 (2007)
Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when their was no available adequate shelter.
(Co-counsel)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)
Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately upheld the catalyst fee doctrine under California law.
(Co-counsel*; argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)
Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD).  The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime.
(Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)
First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus.
(Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)
Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)
First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel. The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence. The polices were declared unconstitutional as applied to the professor's speech.

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)
Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated to in settlement following certification of the injunctive relief class.
(Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)
Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction.
(Co-counsel)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)
Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.
(Co-counsel)

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)
First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)
First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The en banc decision was unanimous. (Argued and briefed on appeal)

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*Wallin v. City of Los Angeles*,
1194 U.S. App. LEXIS 2343 (9th Cir. 2004)

Circuit dismissed appeal of defendant City and law enforcement officers from denial of qualified immunity. Appellee, a female officer with the Los Angeles Police Department, alleged that appellants violated her right to equal protection, due process and right to petition the government because they violated LAPD confidentiality regulations and delayed the investigation into her allegations of co-worker rape.

(Lead counsel)

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)
Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim.

(Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*

940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian theme park, Desert Christ Park, owned and operated by San Bernardino County. Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.

(Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*

831 F.2d 1525 (9th Cir. 1986)

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons.

(Argued and briefed on appeal)

*Burbridge v. Sampson*

74 F.Supp.2d 940 (C.D. Ca. 1999)

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*

823 F.Supp. 709 (C.D. Ca. 1993)

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities. Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds. (Lead counsel)

# State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*

34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code of Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law. Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties.

(Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*

22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution

(co-counsel)

*Williams v. Garcetti*

5 Cal.4th 561 (1993), *sub nom Williams v. Reiner*, 13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty on parents of minor children engaged in or at risk of delinquent conduct.

(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*

53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)

225 Cal.App.3d 1385 (1989)

Establishment Clause challenge invalidating prayers at public high-school graduations.

(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*

47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child.  (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*

129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.

(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*

111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retailer against garment worker advocates must be granted as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims.  Garment worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.

(lead counsel at all stages)

*Gonzalez v. Superior Court*

33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment.  "After-acquired evidence" rule applied to require disclosure.

(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*

28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP *§* 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.

(Lead counsel throughout litigation)

*Rudnick v. McMillan*

25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden.  Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*

224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.

(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*

208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.

(Argued and briefed on appeal)

*McCarthy v. Fletcher*

207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections.  Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.

(Argued and brief on appeal)

*Fiske v. Gillespie*

200 Cal.App.3d 130 (1988)

Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.

(Co-Counsel, Argued on appeal)


# Publications:
# (Partial listing)s


*Catalyst Fees After Buckhannon*

Civil Rights Litigation and Attorney Fees Annual Handbook

(January 2006)


*Free Speech and Harassment: An Overview*

*in the Public Employee Sector*

CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS

Institute of Industrial Relations - UC Berkeley

June 1999  No. 136


*Defeating Employer Defenses to Supervisor Liability*

*After* Ellerth *and* Faragher

ADVOCATE, October 1998


*Student Expression Under California Law*

UCLA Journal of Education

Volume 3, pp. 127-137 (1989)


*Should Attorneys Be Disciplined For Gender Bias*

Point/Counterpoint ABA Journal   August, 1995


*Fight Illegal Police Practices in State Court*

Los Angeles Daily Journal

March 6, 1992


*Judicial Oversight Limited by Supreme Court*

Los Angeles Daily Journal

May 6, 1991


*Jury Nullification is Conscience of Community*

Los Angeles Daily Journal

August 31, 1990


*A Basic Right Merits Shield From The Mob*

Los Angeles Times

August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes
deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988    II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D.  May, 1978 |
| Douglass College.For Women, Rutgers University | B.A . June, 1968 |

## Professional and
## Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>Civil Rights Advocacy Practicum | 2007-present |
| Blue Ribbon Panel on LAPD Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| Los Angeles Public Interest Law Journal<br>Advisory Board | 2007-present |

| | |
|---|---|
| Los Angeles Center for Law and Community Action<br>Member, Board of Directors | 2015-present |
| National Police Accountability Project<br>Member, Advisory Board and Board of Directors | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild - National Executive Vice President | 2009-2011 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-2012 |
| NLG National Mass Defense Committee, Co-chair | 2003-2012 |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-2010 |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2014 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |

National Lawyers Guild - Ernie Goodman Award                                    2007

Angel Award - California Lawyer Magazine Award for pro bono work                2007

CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine    2008

Top 75 Women Litigators in California - Daily Journal                    2008, 2013

California Super Lawyers - Top 50 Women Lawyers in Southern California          2014

National Lawyers Guild, Los Angeles Law for the People Award                    2014

ACLU Lifetime Achievement Award                                                2017

Exhibit 2

Case 5:16-cv-00620-JGB-kk   Document 226-2   Filed 10/09/18   Page 24 of 215   Page
ID #:4719
Case 2:09-cv-08943-DMG-SH   Document 452   Filed 07/23/17   Page 1 of 24   Page ID #:18862

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22
23

| | |
|---|---|
| MICHAEL GARCIA, an individual, on behalf of himself and others similarly situated,<br><br>                     Plaintiffs,<br><br>    v.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity, *et al*.,<br><br>                  Defendants. | Case No. : CV 09-8943-DMG (SHx)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT WITH COUNTY OF LOS ANGELES AND PLAINTIFFS' MOTION FOR ATTORNEY'S FEES [441, 449]** |

24
25
26
27
28

Having considered Plaintiffs' Motion for Final Approval of Class Settlement [Doc. # 449], Plaintiffs' Motion for Attorney's Fees and Costs [Doc. # 441], and the proceedings in this action to date, the Court grants the Motions.  The Court hereby finds and concludes that:

1. The form and method of distributing notice to the class, which were approved in the Court's April 7, 2017 preliminary approval order, fully satisfied the requirements of Rule 23, due process, and any other applicable laws, such that class notice was accomplished in all material respects.

2. The Class Settlement Agreement with Los Angeles County Sheriff's Department, the County of Los Angeles, and Sheriff Leroy Baca, in his official capacity (collectively, "Defendants") is fair, reasonable, and adequate in all respects.   The Class Settlement Agreement provides meaningful relief to the certified Class, including:  providing the class with the opportunity to receive appropriate special education and related services while in the Los Angeles County Jail ("LACJ"); creating systems for the identification of eligible students in LACJ; requiring that physical space is provided for the provision of special education services; requiring that eligible students can participate in administrative hearings; requiring training of Sheriff's personnel in conjunction with Class Counsel to instruct on the rights of eligible students to receive special education services; and extensive monitoring for an additional two-year period between the County and Class Counsel.

3. The Class Settlement is reasonably related to the strength of Plaintiffs' and Class Members' claims given the risk, expense, complexity, and likely duration of further litigation.  The Class Settlement is the result of arms'-length negotiations between experienced counsel representing the interests of the Plaintiff Class and Defendants, after thorough factual and legal investigation.  No objections to the settlement were received, and approval

of the settlement is supported by the named Plaintiff and Class Counsel.

4. The time Plaintiffs' counsel expended on this case was appropriate given the length, scope, complexity, and nature of the litigation, and the significance of the litigation.

5. Additionally, Plaintiffs' counsel's requested hourly rates are reasonable and well within the range of market rates that attorneys with similar levels of skills, experience, and reputation in the greater Los Angeles market charge for handling matters of similar complexity.

6. Thus, the Court finds that an award of fees and expenses of $200,000 to Plaintiffs' Counsel as compensation for their work on this lawsuit, as provided for in the Settlement Agreement, is warranted.

IT IS HEREBY ORDERED that:

1. The Court has jurisdiction over the subject matter of this litigation and all matters relating thereto, and over Plaintiff and Defendants.  Venue is proper in the Central District;

2. Pursuant to Federal Rule of Civil Procedure 23(e), this Court grants final approval of the Class Settlement Agreement, incorporates the terms of the Class Settlement Agreement into this Order as though fully set forth herein, and orders all parties to perform all of their obligations thereunder;

3. This Order and the Class Settlement are binding against the parties, their successors in office, and their respective officers, agents, and employees, and all others acting in concert with them;

4. The Court retains exclusive and continuing jurisdiction over this case, the Named Plaintiff, the Plaintiff Class, and Defendants for purposes of supervising and resolving issues relating to administration, implementation, and enforcement of the Class Settlement Agreement, its terms, or the enforcement thereof; and fashioning appropriate remedies for any violation of that Class Agreement, for two years.

5. The Court awards fees and expenses to Plaintiffs' counsel in the amount of $200,000.

**IT IS SO ORDERED.**

DATED: July 28, 2017

_Dolly M. Gee_

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

Exhibit 3

DISABILITY RIGHTS LEGAL CENTER
  Anna Rivera (Bar No. 239601)
  anna.rivera@drlcenter.org
  Maronel Barajas (Bar No. 242044)
  Maronel.barajas@drlcenter.org
350 S. Grand Ave Suite 1520
Los Angeles, CA 90071
Telephone: (626) 389-8277
Facsimile: (213) 736-1428

MILBANK TWEED HADLEY & McCLOY LLP
  Linda Dakin-Grimm (Bar No. 119630)
  ldakin@milbank.com
  Daniel M. Perry (Bar No. 264146)
  dperry@milbank.com
  Samir L. Vora (Bar No. 253772)
  svora@milbank.com
2029 Century Park East,  33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-6063
*Attorneys for PLAINTIFF MICHAEL GARCIA and the Plaintiff Class*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GARCIA on behalf of himself and others similarly situated,<br><br>                              Plaintiff,<br><br>    vs.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity, et al.,<br><br>                    Defendants. | Case No. : CV 09-08943 DMG (SHx)<br><br>DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES RELATED TO CLASS ACTION SETTLEMENT WITH COUNTY OF LOS ANGELES |

### DECLARATION OF ANNA RIVERA

I, ANNA RIVERA, declare:

1.    I am a Senior Staff Attorney at the Disability Rights Legal Center ("DRLC"). The DRLC, along with co-counsel at Milbank Tweed, Hadley & McCloy ("Milbank"), represents Plaintiff Michael Garcia and has been appointed by the Court as Class Counsel. The facts set forth herein are based upon my personal knowledge, my review of documents prepared and/or maintained by DRLC in the ordinary course of business, and information provided to me by employees of DRLC's co-counsel, Milbank. If called as a witness, I could and would testify competently thereto.

2.    DRLC is a 501(c)(3) non-profit public interest organization dedicated to advancing the civil rights of people with disabilities through education, advocacy and litigation. Founded in 1975, DRLC is one of the oldest non-profit, public interest law centers to focus on representing individuals with diverse disabilities. DRLC's mission is to champion the rights of people with disabilities through education, advocacy and litigation.  DRLC accomplishes its work through several programs, including the Civil Rights Litigation Program, Education Advocacy Program, Cancer Legal Resource Center, the Inland Empire Program, and the Community Advocacy Program. DRLC, engages in, *inter alia*, class action, multi-plaintiff and other complex impact litigation on behalf of individuals with disabilities who face discrimination or other violations of civil rights or federal statutory protections. DRLC is generally acknowledged to be a leading public interest organization.  Attorneys in the firm have lectured at local, state, and national legal and professional organizations on the law applicable to individuals with disabilities.

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR
AWARD OF ATTORNEYS' FEES

3. DRLC has litigated complex civil rights and public interest cases for over 40 years with a focus on impact complex litigation affecting the disability community. Examples include: *Willits, et. al. v. City of Los Angeles*, Case No. CV 10-05782 CBM (RZx) (a successfully settled class action challenging the City of Los Angeles' failure to maintain pedestrian right of ways, including sidewalks and curb ramps for people with mobility disabilities); *Ms. Wheelchair California v. Starline Tours*, No. CV11-02620JFW (CWx) (C.D. Cal.) (a successfully settled class action resulting in company-wide change in policy governing accessible tours and seating); *Peter Johnson et al. v. Los Angeles County Sheriff's Department et al.*, USDC Case No. CV 08-03515 DDP (SHx) (a successfully settled class action currently in the monitoring stage on behalf of individuals with mobility impairments to obtain program and physical access while detained in the Los Angeles County Jail); *Casey A., et al. v. Robles, et al.*, Case No. CV10-00192-(GHK) (FMx) (C.D. Cal.) (a successfully settled class action addressing Los Angeles County's failure to provide youth in the County's largest probation camp with basic and appropriate education and rehabilitative services); *Doe2 v. County of San Bernardino, et al.*, (CV ED 02-962 SGL) (a successfully settled class action addressing the County's failure to provide special education and mental health services to children with disabilities in their custody in juvenile detention); *Valenzuela v. County of Los Angeles*, Case No. CV 02-9092 (JWJx) (C.D. Cal.) (a successfully settled class action addressing failure to provide effective communication for people who are deaf and hard of hearing in field and jail settings by Los Angeles County Sheriff's Department); and *Lauderdale v. Long Beach Police Department*, Case No. CV 08-979 ABC (JWJx) (a successfully settled class action addressing police department's failure to provide effective communication for people who are deaf or hard of hearing.).

*//*

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

4.     As a non-profit law firm and a provider of legal services pursuant to grants and other funding, DRLC does not charge fees to its clients for any work undertaken on their behalf. DRLC primarily handles cases in which the client cannot afford to retain a law firm, where other lawyers will not handle the matter, and/or where the injunctive relief is the primary outcome of the litigation. Our legal services are provided free of charge to our clients, with attorneys' fees generally paid pursuant to fee shifting statutes.

### Case History and Settlement with County Defendants

5.     Plaintiff obtained excellent results through the settlement reached with Defendants County of Los Angeles, Los Angeles County Sheriff's Department, Sheriff Baca in his official capacity (collectively, "County Defendants").

6.     As representatives of class, Plaintiffs engaged in thorough discovery to ensure that the parties and the Court had adequate information to assess the barriers to accessing special education in the jail and relief sought for the class—as well as the reasonableness of the Settlement Agreement. The discovery included: substantial written discovery, including interrogatories, requests for admissions, and requests for production of documents, which resulted in the combined production of approximately hundreds of documents. Further, Plaintiffs actively pursued discovery in this matter. Due to disagreements that arose during the discovery process, the parties met and conferred on many occasions and Plaintiffs also filed a discovery motion. In addition to extensive written discovery, Plaintiffs deposed four County of Los Angeles officials and the County of Los Angeles' expert witness. The County of Los Angeles deposed the Named Plaintiff as well as Plaintiff's expert witness.

7.     In addition, the parties filed cross-motions for summary judgment.

8.     In the summer of 2009, the Parties began settlement negotiations. The Parties participated in extensive arms-length settlement negotiations, which

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

included extensive written negotiations, multiple in-person meetings, telephonic settlement negotiations, and multiple in-person settlement conferences with Judge Terry J. Hatter Jr., who acted as a settlement officer in this case.

9.     Concurrently with the Lawsuit, Los Angeles Unified School District ("LAUSD") commenced a civil action ("Related Case") in the United States District Court for the Central District of California, Case No. 2:09-cv-09289-VBF-CT appealing the decision of the California Office of Administrative Hearings ("OAH") which found that, pursuant to California Education Code section 56041, the LAUSD was the entity legally responsible for providing Plaintiff Michael Garcia with a free appropriate public education while he was incarcerated in the LACJ.  The District Court in the Related Case subsequently entered orders affirming the OAH decision. On or about June 3, 2010, LAUSD appealed that order to the United States Court of Appeals for the Ninth Circuit.

10.     Plaintiffs' settlement negotiations with the County Defendants where effectively stayed pending the outcome of LAUSD's appeal in the Related Case in the Ninth Circuit.  On or about January 20, 2012, the Ninth Circuit certified the question to California Supreme Court.  On or about March 28, 2012, The California Supreme Court agreed to take the matter. On or about December 17, 2013, the California Supreme Court issued a seminal decision, holding that the assignment of responsibility for providing special education to eligible county jail inmates between the ages of 18 and 22 years is governed by the terms of California Education Code Section 56041. The Ninth Circuit then issued a final decision on January 28, 2014, finding that the District Court's ruling in the Related Case was consistent with the California Supreme Court's answer to the certified question, the Ninth Circuit Court of Appeals affirmed the District Court's decision affirming the 2009 decision of the administrative law judge.

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION
FOR AWARD OF ATTORNEYS' FEES

11.     Subsequent to this decision, the Parties renewed their settlement negotiations.  The Parties engaged in several in-person meetings, telephonic negotiations, and exchanged multiple written drafts of the Settlement Agreement. The Parties worked diligently to finalize the terms of the proposed Settlement Agreement. On or about February 9, 2017 the Parties entered into a written Settlement Agreement. Attached hereto as Exhibit A is a true and correct copy of the Settlement Agreement.

12.     Plaintiff obtained excellent results through the settlement reached with Defendants County of Los Angeles, Los Angeles County Sheriff's Department, Sheriff Baca in his official capacity (collectively, "County Defendants").

13.     Plaintiff described the terms of that settlement in more detail in his Motion for Preliminary Approval of Class Action Settlement Agreement. (*See* Dkt. No. 424-1 and 424-3).  As part of the settlement agreement, the County Defendants have agreed to do the following: (a) administer a questionnaire to all newly booked 18-22 year old individuals who are processed through the LACJ Inmate Reception Center aimed at identifying those inmates who would like to receive special education services, (b) notify the charter school that currently provides services at the LACJ of those individuals who affirmatively state they would like to receive special education services, (c) create and distribute an informational pamphlet regarding the availability of special education services and how to request them, (d) modify its Inmate Grievance/Service Request Form to include a box titled "Special Education/IEP," (e) designate an employee or employees who will facilitate the provision of special education services, and (f)  train relevant Sheriff's Department staff regarding the provision of special education services to eligible students.

Case 5:16-cv-00620-JGB-KK   Document 226-2   Filed 10/09/18   Page 35 of 215   Page
ID #:4730
Case 2:09-cv-08943-MG-SHx   Document 443   Filed 06/06/17   Page 7 of 21   Page ID #:2548

14.     The qualifications of Class Counsel have been set forth in great detail
in the earlier class certification briefing in this case and are discussed further below
in paragraphs 19-57.  (*See* Dkt. Nos. 81-84).

### DRLC Rates

15.     In setting our rates, DRLC reviews published cases and unpublished
decisions concerning attorneys' fees rates used by comparable non-profit public
interest organizations, awards that DRLC has received for attorneys' fees, and
other information from private attorneys relating to the rates charged by private
firms for comparable litigation.  DRLC also carefully monitors its billing practices
to ensure that courts are able to properly perform the lodestar analysis for a fee
award. We also take into account the experience of the attorneys and staff working
on the case and the complexity of the case.

16.     Several courts have found DRLC's hourly rates reasonable. Examples
of courts finding DRLC's hourly rates reasonable include:

- *Michael Garcia v. Los Angeles County Sheriff's Dept.*, Case No. CV
  09-8943 MMM (SHx), the United States District Court for the Central
  District of California approved DRLC's 2011 historical rates in a class
  action. Attached as Exhibit B is a true and correct copy of that order.

- *California in Communities Actively Living Independent and Free, et
  al. v. City of Los Angeles et al*., Case No. CV 09-0287 CBM (RZx)
  the United States District Court for the Central District of California
  found DRLC's 2012 historical rates reasonable. This included a range
  of $450-$550 for staff attorneys and $230 for law clerks.  And the
  court found a 2012 historical hourly rate of $550 for a 2003 law
  graduate was reasonable. *Id*. at 6:11-14. The court further found that
  the plaintiffs had "provided sufficient evidence . . . supporting the
  reasonableness of their 2012 requested hourly rates" and "that
  requested hourly rates correspond to the prevailing market rates in the

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION
FOR AWARD OF ATTORNEYS' FEES

relevant community, considering the experience, skill, and reputation of the attorneys in question." *Id.* at 2:18-20. Attached hereto as Exhibit C is a true and correct copy of that order.

- *Peter Johnson v. Los Angeles County Sheriff's Department*, Case No. CV 08-03515 DDP (SHx), the United States District Court for the Central District of California granted Plaintiffs' Motion for Attorneys' Fees and Costs in full. Attached as Exhibit D is a true and correct copy of that order. In particular, the motion that was granted sought time billed by DRLC attorneys at 2014 historical hourly rates of $800 for a 1982 graduate, $700 for a 1992 graduate, $500 for a 2005 graduate and an hourly rate of $230 for law clerks. See, Declaration of Richard Diaz in support of Plaintiffs' Motion for Attorneys' Fees, attached as Exhibit E (summary of hourly rates sought by Plaintiffs at para. 38 of Diaz Declaration) (exhibits to Declaration omitted due to length).

- *Willits et al v. City of Los Angeles et al*, Case No. CV 10-5782 CBM (RZx), the United States District Court for the Central District granted Plaintiffs' Motion for Attorneys' Fees and Costs and approved DRLC's 2014 historical hourly rates. Attached as Exhibit F is a true and correct copy of that order. In particular, the motion that was granted sought time billed by DRLC attorneys at 2014 historical hourly rates of $680 for a 1987 graduate, $550 for a 2003 graduate, $375 for a 2010 graduate, and an hourly rate of $230 for law clerks. Id. at pg.6.

- *Greater Los Angeles Agency on Deafness, Inc. et al v. Krikorian Premiere Theaters*, LLC, Case No. CV 13-07172-PSG (ASx), the United States District Court for the Central District of California approved DRLC's 2015 historical rates in a class action which had

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

1    systemic implications regarding access to movie theaters for

2    individuals who are deaf or hard of hearing.  Attached as Exhibit G is

3    a true and correct copy of that order.

4        17.    Experts in the field have also found DRLC's 2016 historical rates to

5    be reasonable.  For example, in a declaration in support of plaintiff's motion for

6    reasonable attorney fees and costs, Mr. Barrett S. Litt opined as to the

7    reasonableness of DRLC's rates in the matter of *Independent Living Center of*

8    *Southern California et al v. City of Los Angeles, et al.*, Case No. CV 12-0551 FMO

9    (PJW), a class action case currently pending in the United States District Court for

10   the Central District of California. Attached as Exhibit H is a true and correct copy

11   of that declaration (exhibits have been omitted due to length).

12       18.    DRLC's current rates have also been found reasonable by Richard

13   Pearl, an expert in the area of attorney fees charged in California and elsewhere.  In

14   a declaration in support of plaintiff's motion for reasonable attorney fees and costs,

15   Mr. Pearl opined as to the reasonableness of DRLC's rates in the matter of *Ochoa*

16   *et al v. City of Long Beach et al*, Case No. 2:14-cv-04307-DSF-FFM, a class action

17   case currently pending in the United States District Court for the Central District of

18   California. Attached as Exhibit I is a true and correct copy of that declaration.

19       19.    DRLC's hourly rates for staff on this case are set forth in the chart

20   below at paragraph 66. This chart lists the billing attorney, year of law school

21   graduation, and pertinent hourly rate for all DRLC staff for whom fees are

22   requested in this matter.  Based on the information that I reviewed in working with

23   the Director of Litigation to set our hourly rates, I believe our rates to be consistent

24   with the current prevailing market rates charged by other attorneys with

25   comparable skills, qualifications, experience, and reputation in the market covered

26   by the Central District.

27   //

28   //

## **DRLC Attorneys and Their Roles**

20.     In addition to the hours expended by Milbank, Plaintiff is seeking compensation for eight DRLC attorneys who billed on this matter: (1) Paula Pearlman, former Executive Director; (2) Shawna L. Parks, former Legal Director of the DRLC; (3) Maronel Barajas, Director of Litigation; (4) Matthew Strugar, former Staff Attorney; (5) Umbreen Bhatti, former Staff Attorney; (6) Carly Munson, former Staff Attorney; (7) Andrea Oxman, former Staff Attorney; (8) Elliot Field, former Staff Attorney.

21.     Paula Pearlman was the Executive Director at DRLC when she worked on this instant matter. As Executive Director, her duties included oversight of DRLC's litigation efforts. She also taught a Disability Rights class at Loyola Law School in Los Angeles. I understand that, prior to joining DRLC, Ms. Pearlman was a former Supervising Attorney at the California Women's Law Center, where she specialized in sex discrimination in employment and education. I understand that Ms. Pearlman graduated from the Southwestern University School of Law in 1982. I understand that she has served on the U. S. Access Board Courthouse Access Advisory Committee, as the board chair of the Employment Round Table of Southern California (ERTSC), as a board member of the Legal Aid Association of California, as co-chair of the Lawyer Representatives of the Central District, Ninth Circuit Judicial Conference, and as a member of the California State Bar Standing Committee on the Delivery of Legal Services.

22.     I understand that Ms. Pearlman has received numerous awards including the 2010 St. Ignatius of Loyola Award, St. Thomas More Society, the 2009 "FEHA 50th Anniversary Civil Rights Award," from the California Department of Fair Employment and Housing, and she was a 2007 Legal Aid Association of California Attorney Award of Merit Recipient. She was named a "Super Lawyer" in 2009 in the area of public interest law and class actions, and

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

she was a 2007 finalist for "Attorney of the Year" for Trial Lawyers for Public Justice.

23. I understand that Ms. Pearlman's experience with the plaintiffs and understanding of public entity work was important to filing this case. I understand that Ms. Pearlman participated in depositions, settlement conferences, and conferred within DRLC to discuss strategy and tasks.

24. A 2014 historical hourly rate of $800 was previously approved for Ms. Pearlman in *Peter Johnson v. Los Angeles County Sheriff's Department*, Case No. CV 08-03515 DDP (SHx); that order and related declaration are attached hereto as Exhibits D and E.

25. DRLC seeks compensation for Ms. Pearlman at an hourly rate of $875, which is DRLC's 2017 billing rate for an attorney of her experience.

26. Shawna L. Parks is a 1999 graduate of U.C. Berkeley School of Law, and a 1995 graduate of U.C. Berkeley. I understand that from 1999-2000 Ms. Parks was a Fulbright Scholar in Budapest, Hungary, where she researched a recently enacted nondiscrimination statute, worked on developing test litigation, and co-organized a conference of Eastern European disability rights advocates.

27. From early 2012 through late 2013 Ms. Parks was a Director of Litigation at Disability Rights Advocates in Berkeley, California. From 2005 through early 2012 Ms. Parks was at the Disability Rights Legal Center where she was Legal Director from 2009 through late 2011. Prior to her work at the DRLC Ms. Parks was a staff attorney and Equal Justice Works Fellow at Disability Rights Advocates from 2000 through 2003. From 2003 through 2004 she was an associate at what was then known as Schonbrun DeSimone Seplow Harris & Hoffman, where she worked primarily on race and gender discrimination employment cases. Ms. Parks has extensive expertise in the substantive areas of disability rights, civil rights and education, including special education. She has litigated numerous

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

Case 5:16-cv-06830-JGB-KK Document 226-2 Filed 10/09/18 Page 40 of 215 Page
ID #:4535
Case 2:09-cv-00843-GMC-SH Document 443 Filed 06/09/18 Page 12 of 21 Page #10
ID #:1535

cases, including both class actions and individual cases, in these fields. Ms. Parks
is currently the principal attorney in the Law Office of Shawna L. Parks, which she
founded in 2014.

28. I understand that in the instant matter Ms. Parks participated in many
aspects of the litigation including discovery, research, settlement, motion work and
engaged in strategy sessions.

29. A 2012 historical rate of $665 was approved for Ms. Parks in *CALIF,
et al., v. City of Los Angeles, et al.*, 2011 WL 4595993 (C.D. Cal. 2011), Case No.
2:09-cv-00287- CBM-RZ. A true and correct copy of that fee order is attached
hereto as Exhibit C. In that Order the Court describes Ms. Parks as "nationally
recognized as a leading disability rights attorney." Order at 4:8

30. DRLC seeks compensation for Ms. Parks at an hourly rate of $745,
which is DRLC's 2017 billing rate for an attorney of her experience.

31. Maronel Barajas is the Litigation Director at the Disability Rights
Legal Center. As the Director of Litigation, she oversees all aspects of DRLC's
litigation program, including supervising and litigating individual, multi-plaintiff,
and class action cases. This includes coordinating, supervising and providing
substantive expertise and support to attorney staff and legal assistants, as well as
law clerks and volunteers in DRLC's two offices. Further, her duties as the
Director of Litigation also include negotiating co-counseling agreements, outreach,
grant writing, retaining experts, and budgeting. She also lectures and provides
training on disability rights issues in various forums and participates in legislative
and regulatory comment on behalf of the organization.

32. Ms. Barajas is a 2003 graduate of Columbia Law School and 2000
graduate of the University of California, Irvine. The majority of her practice has
focused on civil rights matters, including matters on behalf of individuals with
disabilities. Indeed, civil rights has been my primary focus for approximately
twelve years. Approximately, nine of those years have been spent on cases

-11-

Case 5:16-cv-00620-JGB-KK Document 226-2 Filed 10/09/18 Page 41 of 215 Page
ID #:4536
Case 2:09-cv-00843-GMC-SH Document 443 Filed 06/09/18 Page 13 of 21 Page 40
ID #:2536

exclusively on behalf of individuals with disabilities.  During this time, she
litigated various cases in the area of disability rights, including individual, multi-
plaintiff and class action cases. These cases have primarily been against public
entities, and most often with the goal of system reform. Ms. Barajas has also
supervised attorneys in numerous lawsuits affecting the rights of people with
disabilities. As a result, she has developed extensive knowledge in the area of
disability rights cases, cases requiring policy reform, and cases involving public
entities.

33.    After law school, from late 2004 through early 2005, Ms. Barajas
worked as a legal representative for MACS Copy and Interpreting Inc., where her
work focused primarily on worker's compensation matters. In early 2005, Ms.
Barajas joined DRLC and held various positions until she left in late 2008.  These
positions included being an Education Advocate, Staff attorney, Associate Director
and ultimately Director of the Education Advocacy Program. During 2005-2008,
her work was exclusively on behalf of people with disabilities, with a focus on
matters on behalf of students with disabilities.  Ms. Barajas worked on cases at the
administrative and federal court level. She also regularly lectured and trained on
issues relating to individuals with disabilities, including participating in legislative
and regulatory comment on behalf of the organization.  By way of example, Ms.
Barajas was an Adjunct Professor at Loyola Marymount University in Los Angeles
where she taught an upper division Special Education and the Law course; guest
lectured at Loyola Law School's Disability Rights and Special Education Law
class; and wrote articles related to the rights of students with disabilities. In her
capacity as Director of the Education Advocacy program, she also supervised
attorney staff and managed DRLC's Education Advocacy Program's externship
program. In 2007, during Ms. Barajas tenure as the Director, the Education
Advocacy Program along with DRLC's litigation program was recognized as the
Agency Winner at the National Association of Counsel for Children in Keystone,

-12-

Colorado for improving the educational opportunity for students with disabilities held in detention facilities and for improving the access to courts for individuals with disabilities.

34. In late 2008, Ms. Barajas left DRLC to become an associate with the former law firm of Traber & Voorhees, a prominent civil rights litigation firm in Pasadena, California. Traber & Voorhees recently dissolved after one its founding partners, Theresa M. Traber, was appointed to the bench. At Traber & Voorhees, her focused primarily on discrimination cases in the employment, education, and custodial context. Ms. Barajas handled matters at the state, federal and state appellate level. She remained an associate with Traber & Voorhees until early 2011.

35. In early 2011, Ms. Barajas returned to work with DRLC as the sole Senior Staff Attorney in the litigation program. In addition to focusing on impact and complex litigation, she co-authored an article with Paula Pearlman, Esq. for the 2011-2012 Ability magazine issue, titled "a boy and his dog" regarding a case where she was lead counsel from DRLC. To my knowledge, it was the first case of its kind where a federal court judge held that a student with autism had the right to attend school with his service dog. Until approximately 2013, Ms. Barajas also served as an Adjunct Professor at Loyola Marymount University where she taught an upper division Special Education and the Law course. Ms. Barajas also oversaw DRLC's externship program with Loyola Law School until that partnership ended. In 2015, she was promoted to Managing Attorney of the litigation department, and in late 2016, she was again promoted, this time to Director of Litigation, a position that she still holds.

36. I understand that Ms. Barajas participated in settlement and engaged in strategy sessions.

37. A 2012 historical hourly rate of $550 for a 2003 law graduate was previously approved in *California in Communities Actively Living Independent and*

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

1  *Free, et al. v. City of Los Angeles et al.*, Case No. CV 09-0287 CBM (RZx) at

2  6:11-14; that order and related declaration are attached hereto as Exhibit C.

3        38.    DRLC seeks compensation for Ms. Barajas at an hourly rate of $675,

4  which is DRLC's 2017 billing rate for an attorney of her experience

5        39.    Matthew Strugar is a 2004 graduate from the University of Southern

6  California Gould School of Law. When he worked on this matter, he was a Staff

7  Attorney with the litigation department. While at DRLC, Mr. Strugar focused on

8  class action and impact litigation centered on matters in the correctional context.  I

9  understand that Mr. Strugar participated in working with plaintiff and class

10  members.

11        40.    DRLC seeks compensation for Mr. Strugar at an hourly rate of $660,

12  which is DRLC's 2017 billing rate for an attorney of his experience.

13        41.    Umbreen Bhatti graduated from the University of Michigan Law

14  School in 2005. I understand that prior to joining DRLC she was an associate at

15  Latham & Watkins and later a staff attorney at the ACLU of Delaware, where she

16  managed a caseload involving civil rights cases in state and federal court and

17  before state commissions, litigating a wide variety of civil rights issues. While she

18  worked on this matter she was a Staff Attorney with the litigation department.

19  While at DRLC, Mr. Gibson focused on class action and impact litigation centered

20  on physical and programmatic accessibility for individuals with disabilities. In the

21  instant matter, I understand that Ms. Bhatti participated in settlement and engaged

22  in strategy sessions.

23        42.    A 2014 historical hourly rate of $500 was previously approved for a

24  2005 graduate in *Peter Johnson v. Los Angeles County Sheriff's Department*, Case

25  No. CV 08-03515 DDP (SHx); that order and related declaration are attached

26  hereto as Exhibits D and E.

27        43.    DRLC seeks compensation for Ms. Bhatti at an hourly rate of $640,

28  which is DRLC's 2017 billing rate for an attorney of her experience.

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION
FOR AWARD OF ATTORNEYS' FEES

44. Carly Munson is a 2006 graduate from Boston University School of Law. When she worked on this matter, she was a Staff Attorney. While at DRLC, Ms. Munson focused on impact litigation centered with a focus on matters in the educational context. I understand that Ms. Munson participated in drafting, reviewing, and revising documents related to the complaint, investigating the claims, working with the plaintiffs, motion work and settlement. Ms. Munson also participated in regular conference calls with co-counsel to discuss strategy and tasks and conferred within DRLC and with co-counsel.

45. DRLC seeks compensation for Ms. Munson at an hourly rate of $625, which is DRLC's 2017 billing rate for an attorney of her experience.

46. Andrea Oxman is a 2007 graduate from the University of Southern California Gould School of Law. When she worked on this matter, she was a Staff Attorney with the litigation department. While at DRLC, Ms. Oxman focused on class action and impact litigation centered on physical and programmatic accessibility for individuals with disabilities. Ms. Oxman is currently an associate in private practice at Klinedinst PC. I understand that Ms. Oxman participated in drafting, reviewing, and revising documents related to the complaint, investigating the claims, working with the plaintiffs, discovery, motion work and settlement.

47. DRLC seeks compensation for Ms. Oxman at an hourly rate of $600, which is DRLC's 2017 billing rate for an attorney of her experience.

48. Elliot Field is a 2009 graduate from Loyola Law School. When he worked on this matter, he was a Staff Attorney. While at DRLC, Mr. Field focused on impact litigation centered with a focus on matters in the educational context. I understand that Mr. Fields participated in depositions and worked with plaintiffs.

49. DRLC seeks compensation for Mr. Field at an hourly rate of $525, which is DRLC's 2017 billing rate for an attorney of his experience.

50. DRLC law clerks also worked on this matter. DRLC seeks compensation for law clerks at an hourly rate of $250. DRLC seeks a currently

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

hourly rate of $250 for law clerks. DRLC relies on its law clerks primarily to do legal and factual research, and did so in this matter. DRLC's law clerks are law students from local law schools, including Loyola Law School.

51.     In *California in Communities Actively Living Independent and Free, et al. v. City of Los Angeles et al.*, Case No. CV 09-0287 CBM (RZx) the United States District Court for the Central District of California found DRLC's 2012 rates of $230 for law clerks reasonable; that order and related declaration are attached hereto as Exhibit C.

52.     DRLC also seeks compensation for work performed by Legal Assistants at a currently hourly rate of $250.

53.     In *California in Communities Actively Living Independent and Free, et al. v. City of Los Angeles et al.*, Case No. CV 09-0287 CBM (RZx) the United States District Court for the Central District of California found DRLC's 2012 rates of $230 for legal assistants reasonable; that order and related declaration are attached hereto as Exhibit C.

54.     The manner in which DRLC staffed this case is fairly standard for a case of this size and importance.

55.     DRLC made every effort to litigate this matter efficiently by coordinating our work, minimizing duplication, and assigning tasks in a time and cost efficient manner, based on the time keepers' experience levels and talents.

56.     The attorneys at Milbank worked on this matter as co-counsel and as appropriate. It was essential for the DRLC to co-counsel with the attorneys from Milbank in this matter particularly given their expertise and experience with litigation. The specific work that they did on the case and their rates are discussed fully in the Declaration of Samir L. Vora in Support of Plaintiff's Motion for Award of Attorneys' Fees and Expenses that is filed herewith.

//

//

-16-

**Method of Recording Time**

57.     DRLC's method of recording attorneys' fees consists of recording time spent on particular cases as contemporaneously as possible with the actual expenditure of the time, in tenth of an hour increments, and submitting those time records in the regular course of business. DRLC's law clerks and support staff do the same.

**Exercise of Billing Judgment and Determining the Lodestar**

58.     The $200,000 in fees and costs for DRLC and Milbank attorneys combined represents only a portion of the actual hours expended by Plaintiffs' counsel in the nearly eight years this case has been litigated. In determining the reasonable attorneys' fees for work performed DRLC calculated its lodestar based on its current 2017 hourly rates as well as apportioning those fees for work attributable to County Defendants.

59.     DRLC's total actual fees and costs through October 2011 is $810,851. A true and correct copy of DRLC's billing statement is attached here to as Exhibit J.

60.     In order to determine the amount of fees to apportion to County Defendants, I carefully reviewed DRLC's billing statement on an entry by entry basis in order to categorize time spent in the following categories: (a) time related to general furtherance of Plaintiff's claims in the case as a whole; and (b) time related specifically to County Defendants.

61.     This resulted in 869.70 hours of time, for a total value of $538,213.50 for time spent in general furtherance of the litigation.  And, 163.90 hours of time, for a total value of $101,812.50 for time spent related specifically to County Defendants.

62.     I then equally divided the time spent in general furtherance of the litigation among all Defendants in the litigation, for a total amount of

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

approximately 173.9 hours of time per defendant, for a total value of $107,642.70.

63. I then added $101,812.50 (total value for time spent related specifically to County Defendants) and $107,642.70 (the corresponding fraction of time spent in general furtherance of the litigation among all Defendants). This billing discretion resulted in final lodestar of **$209, 455.20** for approximately 338 hours as applied to the County Defendants

64. In reaching the lodestar for determining DRLC's fees and costs, I carefully reviewed all of the DRLC attorneys' billing statements. In reviewing this time spent by DRLC attorneys and law clerks, I exercised billing judgment and in doing so wrote-off certain time, as appropriate.

65. Below is a table of the DRLC time-keepers on this matter, including hours and total fees attributed to its claims against the County Defendants at the time of settlement:

| Attorney Name | Graduation | Billing Rate | Total Hours | Total Fees |
|---------------|------------|--------------|-------------|------------|
| Paula Pearlman | 1982 | $875 | 29.10 | $25,462.50 |
| Shawna Parks | 1999 | $745 | 223.70 | $166,656.50 |
| Maronel Barajas | 2003 | $675 | 20.10 | $13,567.50 |
| Matthew Strugar | 2004 | $660 | 12.00 | $7,920.00 |
| Umbreen Bhatti | 2005 | $640 | 11.80 | $7,552.00 |
| Carly Munson | 2006 | $625 | 143.00 | $89,375.00 |
| Andrea Oxman | 2007 | $600 | 758.60 | $455,160.00 |
| Elliot Field | 2009 | $525 | 49.30 | $25,882.50 |
| Law Clerks | N/A | $250 | 75.90 | $18,975.00 |

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES

| | | | | |
|---|---|---|---|---|
| Paralegals | N/A | $250 | 1.20 | $300.00 |
| DRLC Total Fees | | | 1331.60 | $810,851.00 |
| Subtotal of DRLC Fees Spent in General Furtherance of Litigation | | | 869.70 | $538,213.50 |
| Subtotal of DRLC Fees Spent Specifically Related to County Defendants | | | 169.90 | $101,812.50 |
| **DRLC Fees Apportionment to County Defendants** | | | | **Total: $209, 455.20** |

66.    Since the time of settlement, DRLC has expended additional time negotiating and executing an amendment to the settlement agreement and in preparing the preliminary approval papers as well as the instant attorneys' fee motion.

67.    I have personally reviewed all the entries and calculations in this declaration.  Any calculation errors in the totals of hours, fees, or expenses are inadvertent and mine alone.

68.    In addition to fees, DRLC incurred out-of-pocket costs, as apportioned to County Defendants, which it has not included in its request here. As with time records, costs are recorded in our system as contemporaneously as

-19-

1  possible to when they are incurred or when we are billed by a third party, and are

2  submitted by DRLC staff in the regular course of business.

3      69.    The fees claimed here are for the work necessary to investigate and

4  develop Plaintiffs' claims, secure class certification, secure discovery needed for

5  trial , prepare a motion for partial summary judgment, and to achieve a resolution

6  that remedies violations of the civil rights of students in jail eligible to received

7  special education services

8      70.    In my opinion, the total $200,000 in fees and costs for DRLC and

9  Milbank attorneys combined is a reasonable figure for attorneys' fees and costs

10  particularly given the amount of work invested in this matter.  The amount sought

11  by Plaintiff in this matter represents a fair and reasonable fees and costs award in

12  this case.

13

14      I declare under penalty of perjury of the laws of the United States of

15  America and the State of California that the foregoing is true and correct, and that

16  this declaration was executed on June 8, 2017 in Whittier, California.

17

18

19

20  _____

21                ANNA RIVERA

22

23

24

25

26

27

28

-20-

DECLARATION OF ANNA RIVERA IN SUPPORT OF PLAINTIFF'S MOTION
FOR AWARD OF ATTORNEYS' FEES

# Exhibit 4

Case 5:16-cv-00620-JGB-KK Document 226-2 Filed 01/04/18 Page 51 of 215 Page
Case 2:13-cv-09112-PLA Document 180 Filed 01/04/18 Page 1 of 20 Page ID #:1249
ID #:4746

1
2
3
4
5
6
7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9                         **WESTERN DIVISION**

10

11  RAY WEBB,                              )   No. CV 13-9112-PLA
                                           )
12                Plaintiffs,              )   **ORDER RE MOTION FOR ATTORNEYS'**
                                           )   **FEES AND COSTS**
13           v.                            )
                                           )
14  OFFICER J. ACKERMAN, et al.,           )
                                           )
15                Defendants.              )
                                           )
16  _____   )

17          On May 2, 2017, following a jury trial, a verdict in this civil rights action was returned in favor

18  of plaintiff and against the four named individual defendants.  The jury concluded that each of the

19  defendants had violated plaintiff's Fourth Amendment rights by using excessive force against him,

20  and that punitive damages against the defendants were justified.  The jury awarded a total of

21  $620,000 to plaintiff ($500,000 for past general damages, $100,000 for future general damages,

22  and $20,000 in punitive damages).  Plaintiff has now filed a Motion for Attorneys' Fees and Costs

23  (the "Motion"), in which he seeks attorneys' fees pursuant to Fed.R.Civ.P. 54(d) and 42 U.S.C. §

24  1988 in the sum of $448,760, as well as paralegal fees of $11,300, costs of $4,092.15, and

25  additional fees of $3,185 for work performed in connection with the Motion.  Defendants filed an

26  Opposition to the Motion, and plaintiff then filed a Reply.  The Court has reviewed the documents

27  submitted by the parties in connection with the Motion, and has considered the statements and

28  arguments presented by counsel at the hearing on January 3, 2018.

1  There is no dispute that plaintiff is considered the prevailing party in this action under §

2  1988. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983); <u>see</u> Opposition at 4 ("Plaintiffs' [sic] claim

3  of attorneys' fees is authorized by Section 1988.  This section permits this Court to 'allow the

4  prevailing party . . . a reasonable attorney's fee as part of the costs.' . . . Defendants oppose the

5  fee motion *not because it disputes that counsel is entitled to fair compensation for their efforts*, but

6  because the demand is unreasonable, and beyond what is fair") (emphasis added). "The purpose

7  of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights

8  grievances.  Accordingly, a prevailing plaintiff 'should ordinarily recover an attorney's fee unless

9  special circumstances would render such an award unjust.'" <u>Hensley</u>, 461 U.S. at 429 (citations

10  omitted).  The applicant bears the burden of showing an entitlement to an award and of

11  documenting the hours expended and hourly rates (<u>id.</u> at 437); the opposing party then "has a

12  burden of rebuttal that requires submission of evidence to the district court challenging the

13  accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party

14  in its submitted affidavits." <u>Gates v. Gomez</u>, 60 F.3d 525, 534-35 (9th Cir. 1995).  The question

15  presented in the Motion is whether the requested amounts are reasonable under the statute.

16  Plaintiff contends that he is entitled to the requested fees, based on the nature of the case, the

17  experience of counsel, the work involved, and the outcome of the trial.  Defendants disagree,

18  generally arguing that counsel's billing statements are too vague, and reflect overhead activities,

19  inefficient work and duplication of effort, but mainly contending that the hourly rates sought are

20  excessive.

21  The Court examines the "lodestar" in determining whether the requested fees are

22  reasonable.  The lodestar is obtained, first, by multiplying the number of hours reasonably

23  expended on the litigation by a reasonable hourly rate. <u>Hensley</u>, 461 U.S. at 433-34. Those hours

24  that were not reasonably expended (such as when a case is overstaffed, or based on varying skills

25  of the lawyers involved, or that are excessive or redundant) should be excluded. <u>Id.</u> A reasonable

26  hourly rate under § 1988 is determined "according to the prevailing market rates in the relevant

27  community, regardless of whether plaintiff is represented by private or nonprofit counsel." <u>Blum</u>

28  <u>v. Stenson</u>, 465 U.S. 886, 895 (1984).

1   The factors that may be considered in reaching a lodestar value and possible adjustment

2   are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the

3   skill requisite to perform the legal service properly; (4) the preclusion of other employment by the

4   attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or

5   contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved

6   and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the

7   undesirability of the case; (11) the nature and length of the professional relationship with the client;

8   and (12) awards in similar cases.  Hensley, 461 U.S. at 430 n.3.

9   Here, plaintiff seeks an award of fees of $448,760 based on the work of attorney Tiomkin.

10  He asserts that as of the filing of the Motion, Mr. Tiomkin had spent 690.4 hours working on this

11  case, and that a reasonable hourly rate is $650.  In support of these numbers, plaintiff has

12  submitted a declaration from counsel setting forth his legal experience, as well as his time records

13  from this case.  In sum, Mr. Tiomkin spent a couple of years as a county public defender; since

14  2008, he has managed his own firm and has specialized in criminal defense, personal injury and

15  wrongful death cases; has tried over 50 cases to verdict; has litigated cases involving police

16  misconduct and violations of constitutional rights; and has represented many victims of misconduct

17  by law enforcement.  While the precise nature of Mr. Tiomkin's experience in handling section

18  1983 cases and taking such actions to trial is not at all clear from his declaration, he asserts that

19  prosecuting such cases "was a natural transition for him" in light of his background (Motion, at 6).

20  At the hearing, he represented that he had handled just one civil rights action prior to the instant

21  matter, and that action settled before trial.  Mr. Tiomkin also submitted declarations from attorneys

22  not associated with this case setting forth their opinions as to the prevailing hourly rates for

23  attorneys with similar experience and skills as Mr. Tiomkin, and the reasonableness of the hourly

24  amounts sought by Mr. Tiomkin.  A declaration also represents that the rate of $200 per hour

25  being sought for the paralegal's time in this action is reasonable, based on the paralegal's level

26  of experience.[1]

27

28      [1]   The paralegal spent 56.5 hours in connection with this litigation which, at a rate of $200 per hour, amounts to $11,300.  Counsel spent 4.9 hours preparing plaintiff's Reply to the

1    In opposition, defendants argue that the requested fees are not reasonable, based on

2    counsel's level of experience and the prevailing fees in the Central District, and as this matter was

3    "relatively straight-forward." Defendants submit that the amount sought would result in an

4    unjustified windfall, and a real person in the real world would not pay an attorney the sought-after

5    hourly amount for the type of work here. Defendants also contend that the billing statements are

6    too vague to support the claimed hours. In particular, defendants note that Mr. Tiomkin has not

7    indicated his hourly rate for private clients in criminal cases, or any other sort of compensation he

8    receives for other attorney work. They argue that what is reasonable must be examined in light

9    of what "a reasonable purchaser of the services would actually pay in a competitive market place,"

10   and must reflect the reality that a prevailing attorney has a financial incentive to charge as much

11   as he possibly can. Indeed, according to defendants, those who provided declarations in support

12   of the Motion attesting to the reasonableness of the rates being sought would themselves benefit

13   in their own cases from a high fee award in this case. Further, the Long Beach City Attorney's

14   Office, when it hires outside counsel in civil rights cases, pays less than $300 per hour including

15   for cases that proceed to trial. Counsel thus suggests that a reasonable rate for Mr. Tiomkin,

16   based on his experience, would be $425 per hour at most. Counsel further suggests that the

17   number of hours expended was not reasonable, and that duplicative, unreasonable, unnecessary

18   or unjustified hours should be reduced. Defendants in their pleadings do not question any specific

19   entry of time spent on any task, or any task itself, but instead insist that counsel is seeking

20   compensation "for hours not reasonably expended in the prosecution of this action; just as a

21   private client should not have to pay for overhead activities, inefficient work resulting in excessive

22   billing, duplication of effort, and the like, neither should the defendants." At the hearing, counsel

23   provided examples from Mr. Tiomkin's time sheets of research Mr. Tiomkin engaged in that,

24   according to defense counsel, an experienced civil rights litigator would not have needed to

25   perform.

26

27   _____

28   Opposition to the Motion and attending the hearing, which amounts to $3,185 at a rate of $650 per hour.

Case 5:16-cv-06620-JSB-kk   Document 226-2   Filed 01/04/18   Page 5 of 215   Page
ID #:4750
Case 2:13-cv-09112-PA-kk   Document 180   Filed 05/10/09   Page 5 of 12   Page ID #:1239

The Court must determine a reasonable hourly rate after "considering the experience, skill and reputation of the attorney requesting fees," guided by the rate "prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." <u>Trevino v. Gates</u>, 99 F.3d 911, 924 (9th Cir. 1996) (citation omitted).  After considering the pleadings of the parties and declarations filed in support of their positions, and the statements and arguments of counsel, the Court accepts Mr. Tiomkin's requested rate as falling within the prevailing market rate.  Here, plaintiff has submitted evidence that the rate sought by Mr. Tiomkin is appropriate for attorneys of comparable skill, experience, and reputation.  Mr. Beck, who has substantial experience in civil rights litigation going back almost 40 years, confirms that Mr. Tiomkin has "substantial trial experience in his 11 years in practice"; and, based on his own detailed experience in fee awards and "awareness of fee awards in the Central District," he believes that the market rate in Los Angeles for attorneys in private practice such as Mr. Tiomkin warrants $700 per hour.  Ms. Sobel, who has practiced law for close to 40 years, including 20 years primarily practicing in the area of complex civil rights litigation, and who has made it a practice of surveying firms to obtain relevant billing rates for comparison purposes, states her understanding that Mr. Tiomkin has limited experience in civil litigation, but has extensive trial experience as a criminal defense lawyer.  She believes that $650 per hour is within the range of reasonable rates in the Los Angeles legal market for an attorney of his skill and experience.  She also opines that $200 per hour for paralegal work is reasonable based on the paralegal's level of experience and the range of rates approved for paralegals of comparable skills and experience.  When Mr. Tiomkin's declaration is added to the declarations of outside attorneys attesting to the propriety of the requested rates, the Court will not deviate from that rate as to Mr. Tiomkin.  Neither does the Court find convincing defendants' argument that the rate should be considered in light of the hourly rate charged by law firms retained by the City of Long Beach to defend such cases.  Those firms are guaranteed payment regardless of the outcome of the case, and may be incentivized to charge a lower rate to ensure repeat business.  <u>See</u>, <u>e.g.</u>, <u>Trevino</u>, 99 F.3d at 925 ("[p]rivate attorneys hired by a government entity to defend excessive force cases are not in the same legal market as private plaintiff's attorneys who litigate civil right cases.").

Case 5:16-cv-00620-JGB-KK Document 226-2 Filed 01/04/18 Page 6 of 215 Page
ID #:4751
Case 2:03-cv-09212-PLA Document 180 Filed 05/10/09 Page 6 of 20 Page ID #:1224

Having reviewed all of the time entries of counsel, who is a sole practitioner and thus performed all of the attorney work on this case, the Court rejects defendants' assertions that Mr. Tiomkin's judgment as to the time he needed to prepare for what turned out to be a very successful trial for plaintiff should be questioned. The Court has not been presented with any sound rationale to question his under oath declarations. Defense counsel has not convinced the Court that the hours spent by counsel on the various tasks are much beyond what a reasonable attorney would claim. Further, many hours are claimed based on time spent by counsel reviewing depositions, statements and reports, and meeting with experts and preparing for expert testimony. The Court observed at trial that much of plaintiff's case was based on a careful review and understanding of prior statements made by defendants, both immediately following the incident and at deposition. This review necessarily required many hours to compare, contrast, index and reference those statements. The Court also observed the importance of expert testimony at trial, and the need for a thorough comprehension and understandable presentation of expert opinions. The requested hours are not excessive. The Court also notes that in a contingency fee arrangement, "lawyers are not likely to spend unnecessary time . . . in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning." Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008).

Nevertheless, the Court observes that at the time he started working on this case, Mr. Tiomkin had almost no experience in the area of civil rights litigation, having handled only one other such case prior to his efforts here. His work on this case, including researching and preparing motions and preparing for trial, was with the eye and level of familiarity of an attorney who was new to this field. Indeed, he had not **tried** any federal civil rights cases prior to this one. While Mr. Tiomkin's general trial experience may balance out his inexperience in civil rights matters to some degree, that trial experience was not particular to the issues specific to this area of law. Common sense dictates that an attorney with next to no experience in civil rights litigation, and with no civil rights trial experience, would spend more time preparing a case than would an attorney with years of civil rights experience when faced with the same case. Based on these

1   specific reasons and in the exercise of the Court's discretion, the Court finds it appropriate to cut

2   the requested number of hours by 15%, to 586.84 hours. <u>Moreno</u>, 534 F.3d at 1112 ("the district

3   court can impose a small reduction, no greater than 10 percent -- a 'haircut' -- based on its

4   exercise of discretion *and without a more specific explanation*.") (emphasis added). The same

5   rationale does not apply to the amount of time sought for paralegal assistance, however. Counsel

6   at the hearing represented that Ms. Campros has experience in the area of civil rights litigation.

7   The Court finds no reason to reduce her time or hourly rate.

8       The fees and expenses being sought by plaintiff consist of the filing fee, deposition costs,

9   mediation costs, and witness fees ($40 per day plus mileage). Defendants do not seriously

10   contest the amount of fees and costs being sought here.

11       In sum, taking into account the 15% adjustment in the number of hours spent by Mr.

12   Tiomkin in this action, the Court awards attorneys' fees based on the Motion as follows: 690.4

13   hours, plus 4.9 hours for litigation of the Motion (for a total of 695.3 hours), less a 15% reduction

14   (for a total of 591.005 hours), all at $650 per hour, **for an award on the Motion of $384,153.25**.

15   The Court concludes that the **total award on the Motion** is appropriate and does not amount to

16   a windfall to the attorney involved. The Court further awards $11,300 for paralegal fees (56.5

17   hours at $200 per hour). The Court further awards fees and expenses in the amount of $4,092.15.

18       **IT IS SO ORDERED**.

19

20   DATED: January 4, 2018

21                                    PAUL L. ABRAMS
                                    UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

# Exhibit 5

Case 2:16-cv-00620-JSR-KM   Document 82-2   Filed 10/09/18   Page 59 of 215   Page
Case 2:17-cv-01761-JLS-AFM   Document 86   Filed 07/27/17   Page 1 of 5   Page ID #:4239
ID #:4754

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                           Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.
═══════════════════════════════════════════════════════════════

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  Terry Guerrero                                    N/A
Deputy Clerk                                     Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:    ATTORNEYS PRESENT FOR DEFENDANT:

Not Present                                       Not Present

**PROCEEDINGS:  (IN CHAMBERS)  ORDER GRANTING PETITIONERS'
MOTION FOR ATTORNEYS' FEES AND COSTS (Doc. 76)**

     Before the Court is a Motion for Attorneys' Fees and Costs filed by Petitioners
International Refugee Assistance Project ("IRAP"), John Does I–IV, and Jane Doe.
(Mot., Doc. 76.)  Respondents[1] filed an Opposition and Petitioners filed a Reply.  (Opp.,
Doc. 84; Reply, Doc. 85.)  Having taken the matter under submission and considered the
parties' briefs and oral argument, the Court GRANTS Petitioners' Motion.

## I.  BACKGROUND

     On March 2, 2017, CBP detained an Afghan family of five—a mother, father, and
three small children, ages 8, 7, and 8 months (Jane Doe and John Does I–IV)—at Los
Angeles International Airport.  (Petition at 2, Doc. 1.)  The Does held Special Immigrant
Visas ("SIVs") they acquired based on the father's service to the U.S. government in
Afghanistan.  (*Id.* at 2–3.)  Rather than admit the Does, CBP detained them at LAX for
more than forty hours without access to counsel.  (*Id.* at 3–4.)  On March 4, 2017, CBP
turned over custody of the Does to ICE; Jane Doe and the Doe children were transferred

_____

    [1] Respondents are John F. Kelly, Secretary of the U.S. Department of Homeland
Security; the U.S. Department of Homeland Security; U.S. Customs and Border Protection
("CBP"); Kevin K. McAleenan, Acting Commissioner of CBP; and Mitchell Merriam, Los
Angeles Field Director of CBP.

_____

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                              Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

═══════════════════════════════════════════════════════════════════

to an ICE holding facility in Los Angeles, and John Doe I, the father, was transferred to a different ICE facility in Orange, California.  (Bellis Decl ¶ 4, Doc. 5; Ex Parte App I at 2, Doc. 4.)  ICE then made the decision to fly Jane Doe, who does not speak English, and the Doe children, but not John Doe I, to an ICE facility in Texas and began transporting them to LAX for that purpose.  (Bellis Decl. ¶ 18; Ex Parte App. I at 2–3.)

That same day, Petitioners filed a petition for writ of habeas corpus seeking immediate access to counsel for the Does, their release from Respondents' custody, and a judgment declaring their detention unauthorized by statute and contrary to law.  (Petition at 18.)  Concurrently with the petition, Petitioners filed an *ex parte* application for a TRO enjoining Respondents from transferring any of the Does "to any location outside the jurisdiction of the U.S. District Court for the Central District of California pending a full hearing" on the petition for writ of habeas corpus.  (Ex Parte App. I at 4.)  The Court issued a TRO the same day enjoining Respondents from (1) preventing access between the Does and their attorneys, and (2) transferring the Does to any location outside the Court's jurisdiction.  (TRO at 3, Doc. 6.)  The TRO was to remain in effect pending a hearing on Petitioners' *ex parte* application, which the Court set for Monday, March 6 at 1:30 p.m.  (*Id.*)

At the hearing, counsel for Petitioners revealed that Respondents had agreed to release the Does from detention on parole.  (Transcript at 8:16–18, Doc. 40.)  Upon inquiry as to whether there was anything for the Court to decide at that time, Petitioners' counsel requested the Court further order that Respondents admit the Does pursuant to their valid SIVs.  (*See id.* at 17:2–9.)  Respondents asserted that the inspection process could not be completed so quickly and that deferring the inspection thirty days would be reasonable in light of the Does' release from custody.  (*Id.* at 20:5–16.)  At the conclusion of the hearing, the Court declined to grant Petitioners' request for immediate inspection and admission, but retained jurisdiction over the matter and ordered that a status report be provided to the Court either on April 6, 2017, or 72 hours in advance of any status change to the Does.  (*Id.* at 23:1–6, 27:2–13.)  The Court also ordered the parties to submit a proposed order in accordance with the Court's determination as set forth on the record.  (Hearing Minutes, Doc. 32.)  The parties did so, and on March 20, 2017, the Court issued an order dissolving the TRO, retaining jurisdiction over Petitioners' habeas petition, ordering the filing of a status report pursuant to certain conditions, and directing

_____

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

Respondents to respond to the habeas petition on April 14, 2017.  (March 20 Order, Doc. 39.)

On March 31, 2017, Petitioners filed a motion seeking clarification of the Court's March 20 order and an *ex parte* application seeking expedited consideration of the motion.  (Clarification Mot., Doc. 44; Ex Parte App. II, Doc. 46.)  On April 3, 2017, the Court granted the *ex parte* application and granted in part and denied in part the motion.  (April 3 Order, Doc. 52.)  Specifically, the Court (1) clarified that "[a]t least 72 hours before Respondents take any action to alter the individual Petitioners' immigration status . . . Respondents must file a status report with the Court of their intention to take such action," and (2) ordered Respondents to produce "copies of all non-privileged information in Petitioners' A-Files within twenty-four hours."  (*Id.* at 3–4.)  However, the Court denied Petitioners' request for expedited disclosure of "any communications in the Government's possession regarding any change in Petitioners' status" and their request to have access to counsel during their deferred inspection.  (*Id.* at 4.)

On April 4, 2017, Respondents filed a status report, lodged a proposed protective order regarding the information to be produced from the Does' A-Files, and filed an *ex parte* application seeking extension of the deadline for production of the A-Files.  (Status Report I, Doc. 53; Notice of Lodging, Doc. 57; Ex Parte App. III, Doc. 56.)  The same day, the Court issued a joint protective order and granted Respondents' request for an extension of time.  (Joint Protective Order, Doc. 59; Extension Order, Doc. 60.)

On April 6, 2017, the parties filed a joint status report informing the Court that the Petitioners' deferred inspection had been postponed from April 5, 2017 to April 13, 2017.  (Status Report II, Doc. 61.)  On April 10, 2017, Petitioners filed a motion to compel production of the Does' A-Files and visa applications and an *ex parte* application seeking expedited consideration of the motion.  (Compel Mot., Doc. 63; Ex Parte App. IV, Doc. 65.)  Following full briefing and a telephonic hearing, the Court ordered Respondents to submit the contested documents for *in camera* review by April 13, 2017 at 3:00 p.m.  (April 12 Order, Doc. 70.)

On April 14, 2017, the parties submitted a joint status report informing the Court that the Does were admitted into the United States following their deferred inspection.  (Status Report III, Doc. 72.)  On May 24, 2017, the Court granted Respondents' motion to dismiss the action.  (Dismissal Order, Doc. 82.)

---

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

The Court now considers Petitioners' Motion for Attorneys' Fees and Costs.

## II.    LEGAL STANDARD

Under the Equal Access to Justice Act ("EAJA"), litigants who prevail in a civil action against the United States or any agency or official of the United States may receive reasonable attorneys' fees and costs.  28 U.S.C. § 2412.  The party seeking an award of attorneys' fees must show that it is the "prevailing party" and that the position of the United States was not "substantially justified."  *Id.* § 2412(d)(1)(B).

To qualify as a prevailing party, a litigant must achieve a "material alteration of the legal relationship of the parties" and "that alteration must be 'judicially sanctioned.'" *Carbonell v. I.N.S.*, 429 F.3d 894, 898 (9th Cir. 2005) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 604–05 (2001)). "A litigant need not prevail on every issue, or even on the 'central issue' in the case, to be considered the prevailing party."  *Stivers v. Pierce*, 71 F.3d 732, 751 (9th Cir. 1995) (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790 (1989)).

The United States bears the burden of establishing that its position was substantially justified.  *Gonzalez v. Free Speech Coalition*, 408 F.3d 613, 618 (9th Cir. 2005) (citation omitted).  The "position of the United States" includes both "the position taken by the United States in the civil action" and "the action or failure to act by the agency upon which the civil action is based."  28 U.S.C. § 2412(d)(2)(D).  The United States' position is substantially justified under the EAJA when it is "justified to a degree that could satisfy a reasonable person."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). "That is no different from the 'reasonable basis both in law and fact' formulation adopted by the Ninth Circuit . . . ."  *Id.* (citing cases).

## III.    DISCUSSION

### A.    Prevailing Party

Each of the four orders the Court issued in this action establish Petitioners as the prevailing party.  Each Order materially altered the legal relationship between the parties

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                              Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

by requiring Respondents "to do something directly benefitting the [Petitioners] that they otherwise would not have had to do." *See Wood v. Burwell*, 837 F.3d 969, 974 (9th Cir. 2016) (citation omitted).  First, the March 4 Order prevented Respondents from transferring any of the Does outside of the Central District of California, (TRO at 3), and it specifically prevented Respondents from flying Jane Doe and the Doe children out-of-state as they were about to do when the Order was issued.  (Bellis Decl. ¶ 18.)  That the TRO did not go so far as to order the Does' release from custody does not change the fact that Respondents were required to keep the Does in the Central District of California against their original intention.  There is no doubt that the TRO served the goals of Petitioners' claims by keeping Jane Doe and the Doe children within the Court's jurisdiction.  *See Wood*, 837 F.3d at 975 ("[T]he relief need not be of 'precisely the same character as the relief sought in the complaint' so long as it 'serves the goals of the claim' and 'require[s] defendants to do something they otherwise would not have been required to do.'").

The other Orders also served Petitioners' ultimate goal of securing the Does' admission into the United States.  The March 20 Order required Respondents to file a status report at least 72 hours before taking any action that would alter the Does' immigration status.  In doing so, the March 20 Order ensured that Petitioners would have the opportunity to seek relief from the Court before any adverse action by Respondents could foreclose such relief.  The April 3 Order required Respondents to produce all non-privileged information in the Does' A-Files to Petitioners within twenty-four hours, and the April 12 Order required Respondents to submit purportedly privileged information in the Does' A-Files for *in camera* review.  By requiring Respondents to produce all non-privileged information in the Does' A-Files, these Orders ensured that Petitioners would have relevant information that could be used to more effectively advocate for the Does' release.

Contrary to Respondents' contention, "[p]rocedural remedies can constitute a material alteration in the parties' legal relationship." *Wood*, 837 F.3d at 974 (citations omitted).  "The dispositive question is not whether the plaintiff ultimately obtained some form of substantive relief, but rather whether there is a lasting alteration in the *legal* relationship between the parties." *Id.* at 975.  Respondents cite to *Hanrahan v. Hampton*, *Escobar v. Bowen*, and *All American Distributing Co., Inc. v. Miller Brewing Co.* for the

Case 2:17-cv-01761-JLS-AFM   Document 82-6   Filed 07/27/18   Page 6 of 15   Page
ID #:4759
Case 5:16-cv-00620-JGB-KK   Document 326-2   Filed 10/09/18   Page 64 of 215   Page
ID #:1914

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

proposition that procedural and evidentiary rulings cannot confer prevailing party status,
(Opp. at 16–17), but these cases all predate more recent Ninth Circuit cases that focus,
instead, on whether there has been a judicially-sanctioned material alteration in the
parties' legal relationship with each other.  *See, e.g.*, *P.N. v. Seattle Sch. Dist. No. 1*, 474
F.3d 1165, 1172 (9th Cir. 2007); *Carbonell*, 429 F.3d at 898; *Watson v. Cty. of Riverside*,
300 F.3d 1092, 1096 (9th Cir. 2002).

        That the relief takes the form of a preliminary injunction or an interlocutory order
does not automatically mean that such relief cannot constitute a "lasting" alteration of the
parties' legal relationship.  *See Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 717
(9th Cir. 2013) (citing cases that held a preliminary injunction provided sufficiently
enduring relief as to confer prevailing party status on the plaintiff).  "[T]he question is
whether [Petitioners] achieved relief sufficiently enduring to satisfy the 'material
alteration of the parties' legal relationship' requirement."  *Id.* at 717–18.  Preliminary
relief fails to be sufficiently enduring, for example, when a plaintiff succeeds at procuring
a preliminary injunction but loses on the merits at final judgment.  *Id.* at 717.  Here, the
Does were ultimately admitted into the United States.  There is no concern that the relief
Petitioners obtained through the Court's Orders was ephemeral, and there is no later
Court order ultimately concluding that Petitioners' claims fail on the merits.  In the end,
the Court's Orders "afford[ed] all the relief that proved necessary."  *Id.* at 717.

        Respondents claim that Petitioners cannot be the prevailing party because their
claims were mooted when Respondents released the Does and afforded other relief to
Petitioners voluntarily, independent of the Court's Orders.  (*See* Opp. at 11–12, 14.)
Essentially, Respondents claim that, even without the Court's involvement, all would
have turned out the same.  The facts of the case suggest otherwise.  When the Court
issued its TRO, Jane Doe and the Doe children were about to be put on a plane headed
out-of-state.  (Bellis Decl. ¶ 18; Ex Parte App. I at 2–3.)  Following the Court's April 3
Order, in which the Court reiterated that Respondents must file a status report at least 72
hours before taking any action to alter the Does' immigration status, Respondents
postponed the deferred inspection scheduled from April 5 to April 13.  (Status Report II.)
These actions are inconsistent with an intention to simply admit the Does.

        That Respondents retained discretion during this period to change the Does'
immigration status or to take them into custody during their parole does not mean that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

Petitioners cannot be the prevailing party.  The Court's Orders clearly restrained Respondents from taking certain actions they were intending to take and placed Petitioners in a better position to compel Respondents to exercise their discretion in a manner that Petitioners desired.  And Respondents ultimately exercised their discretion just so—the Does were admitted into the United States.  There is no evidence that Respondents would have done the same or in as timely a manner if the Court had not issued its Orders.  Respondents' citation to *Klamath Siskiyou Wildlands Center v. U.S. Bureau of Land Management*, 589 F.3d 1027, 1033–34 (9th Cir. 2009), is unavailing.  In *Klamath*, it was a court ruling in a separate case that influenced the BLM into aborting its attempted timber sale.  *See id.* at 1029.  Therefore, the plaintiff could not claim prevailing party status because there was nothing it had achieved within the confines of its lawsuit that led to the desired relief.  *Id.* at 1033–34 ("[A] favorable determination on a legal issue, even if it might have put the handwriting on the wall, is not enough by itself.  A favorable judicial statement of law . . . cannot substitute for a form of judicial relief.")

Respondents make two additional arguments directed specifically at the Court's TRO.  The first is that the TRO was not sufficiently based "on the merits" because the Court found only a "serious question" going to the merits of Petitioners' claims and a "fair chance of success on the merits."  (Opp. at 13.)  Although the Ninth Circuit stated in *Higher Taste* that "a preliminary injunction satisfies the judicial imprimatur requirement if it is based on a finding that the plaintiff has shown a likelihood of success on the merits," 717 F.3d at 716, it did not go so far as to hold that the judicial imprimatur requirement is satisfied *only* when there is a likelihood of success on the merits.  Rather, the court stated that the judicial imprimatur requirement is satisfied when a court-approved action "entail[s] a judicial determination that the claims on which the plaintiff obtains relief are potentially meritorious."  *Id.* at 715 (citing *Buckhannon*, 532 U.S. at 606).  The likelihood of success finding merely ensured that the preliminary injunction "was the product of more than merely a 'nonfrivolous but nonetheless potentially meritless lawsuit.'"  *Id.* at 715 (quoting *Buckhannon*, 532 U.S. at 606).  Finding a "serious question" going to the merits of a claim and a "fair chance of success on the merits" similarly ensures that a preliminary injunction is not the product of a "nonfrivolous but nonetheless potentially meritless" lawsuit.  In fact, other district courts have found prevailing parties for purposes of the EAJA when those parties obtained

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                         Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

preliminary injunctions based on the "serious question" test.  *See Cal. Native Plant Soc'y v. U.S. E.P.A.*, No. C 06-3604 PJH, 2013 WL 6700093, at *3 (N.D. Cal. Dec. 19, 2013), *aff'd in part and rev'd in part*, 647 F. App'x 739 (2016) (finding that the plaintiffs raised "serious questions going to the merits . . . thereby ensuring that the preliminary relief . . . was the product of more than merely a '"nonfrivolous but nonetheless potentially meritless lawsuit."'"); *Turner v. Vilsack*, No. 3:13-cv-1900 SI, 2016 WL 1048893, at *5 (D. Or. Mar. 14, 2016).  Here, the Court issued its TRO because there were serious questions going to the merits of Petitioners' claims, those claims were potentially meritorious, and Petitioners had a fair chance of success on the merits.  That the Court did not expressly find their claims likely to succeed does not rob the TRO of its judicial imprimatur.

Respondents' second argument is that the Court's TRO cannot confer prevailing party status because it merely "maintained the status quo."  (Opp. at 15.)  In *Higher Taste*, the Ninth Circuit explicitly "put to one side" so-called "status quo" injunctions. *See* 717 F.3d at 716 n.1.  Respondents argue that because the March 4 Order did nothing more than preserve the status quo, the legal relationship between the parties was not materially altered.  (Opp. at 15.)  First, Respondents' argument rings hollow given the particular factual circumstances of this case: Respondents were taking active steps to transport certain Petitioners out of the district and this Court's order stopped that from occurring.  (Bellis Decl. ¶ 18; Ex Parte App. I at 2–3; TRO.)  It is a stretch to characterize that effect as merely "preserving the status quo."  Second, that *Higher Taste* does not reach "status quo" injunctions does not mean that such injunctions cannot materially alter the legal relationship between the parties.  In fact, requiring that the status quo be maintained may do exactly that by enjoining one party from changing the status quo in a manner that it may otherwise have the right to do.  Respondents cite to *Ora Vaca, Inc. v. Norton* and *Rico-Sorio v. U.S.I.N.S.* but those cases involved different circumstances.  In *Ora Vaca*, the court issued a TRO maintaining the status quo until the contested restrictions were to take effect, whereupon the parties stipulated to preserving the status quo.  55 F. App'x 433, 436 (9th Cir. 2003).  In *Rico-Sorio*, the court issued a TRO preserving the status quo but ultimately denied the petitioner's request for injunctive relief.  552 F. Supp. at 965.  Here, there was no stipulation by the parties at the moment

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

the status quo was about to change, and the Does were ultimately admitted into the
United States.

Therefore, Petitioners qualify as the prevailing party in this action.

## B.    Substantial Justification

Upon reviewing Respondents' actions towards Petitioners in this case, the Court
finds that Respondents' actions were not substantially justified.

First, Respondents fail to substantially justify their attempt to separate the Does
from each other.  Respondents claim that the *Flores* Settlement Agreement required them
to hold Jane Doe and the Doe children in one of three "family residential centers," none
of which are in the Central District of California.  (Opp. at 21–22.)  This does not explain
why only Jane Doe and the Doe children were set to be flown out-of-state.  Considering
that John Doe I was the only one who had any knowledge of English, and Jane Doe and
the Doe children derived their immigration benefits directly from John Doe I, it would
appear that keeping the Does together would have made the most sense.  But
Respondents provide no explanation for why John Doe I was to stay behind.

Second, Respondents fail to substantially justify their detention of the Does for
more than forty hours between their arrival in the United States and their release on
parole.  Respondents rely wholly upon *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir.
2013).  However, just because the Does' detention was shorter than the detention of the
plaintiffs in *Rodriguez* does not mean that the length of the Does' detention was also
reasonable.  The facts of *Rodriguez* are wholly different from this one, and the court in
*Rodriguez* held only that the government's statutory mandatory detention authority is
limited to a six-month period, not that mandatory detentions of a shorter length are
always reasonable.  *See id.* at 1133.

Finally, Respondents fail to substantially justify their postponement of the Does'
deferred inspection for eight days in any way.

Respondents point to several cases and statutory provisions to justify their actions
towards the Does.  (*See* Opp. at 18–21.)  Under 8 U.S.C. § 1225(a)(1), "[a]n alien . . .
who arrives in the United States . . . shall be deemed . . . an applicant for admission," and
under 8 U.S.C. § 1225(a)(3), all such aliens "shall be inspected by immigration officers."

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

Moreover, the issuance of a visa does not confer a right to admission.  8 U.S.C. § 1201(h); *see also Castaneda-Gonzalez v. INS*, 564 F.2d 417, 426 (D.C. Cir. 1977) (stating that a visa "does no more than entitle an alien to present himself at a port of entry to prove his admissibility"); *Hovhannisyan v. U.S. Dep't of Homeland Sec.*, 624 F. Supp. 2d 1135, 1140 n.6 (C.D. Cal. 2008) ("A visa does not permit entry to the United States; it only permits the visa holder to travel to the port-of-entry for a specific purpose."). Subject to certain provisions, "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for [removal] proceeding[s]."  8 U.S.C. § 1225(b)(2)(A). However, the Attorney General may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."  *Id.* § 1182(d)(5)(A).  Respondents also note that their denial of the Does' access to counsel during the inspection process was reasonably based in law.  (Opp. at 23 (citing April 3 Order at 3).)

         However, these statutes and cases, at most, conferred on Respondents the authority to conduct an initial inspection of the Does on March 2, 2017, to release the Does on parole pending completion of their inspection on a later date, and to deny access to counsel during the inspection.  None of the cited statutes or cases go so far as to justify, absent further explanation, separating the Does from each other, detaining them for more than forty hours without explanation, or arbitrarily postponing their inspection date. Respondents attempt to justify their actions by pointing to statutory grants of authority, but they fail to point to any facts showing how the exercise of that authority in this case was substantially justified.  Substantial justification requires a reasonable basis "both in law *and fact*."  *Pierce*, 487 U.S. at 565 (emphasis added).

         As Respondents have failed to offer *any* reason for these particular actions, they have failed to show they were substantially justified.

## C.      **Reasonable Fees**

         Given that Petitioners are the prevailing party, that Respondents' actions were not substantially justified, and the lack of dispute over the other requirements for obtaining

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                              Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

fees, the Court concludes that awarding Petitioners their attorneys' fees is appropriate. However, any award of fees must be reasonable. *Nadarajah v. Holder*, 569 F.3d 906, 910 (9th Cir. 2009). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983)). Here, Petitioners' counsel have reportedly worked 833.72 hours and request the statutory rate of $192.68 per hour for all but one attorney. (*See* Gibson Dunn Timesheet at 5, Doc. 87-3; Rosenbaum Decl., Ex. 4H, Doc. 76-4.)  For that one attorney, Talia Inlender, Petitioners request a rate of $585.00 per hour.  (*See* Rosenbaum Decl., Ex. 4H.) This amounts to a total fee request of $187,103.16.  (*See* Gibson Dunn Timesheet at 5; Public Counsel Timesheet at 14, Doc. 76-4.)

Respondents counter that, should the Court determine that an award of fees is warranted, the award should be no more than $22,141.32.  (Opp. at 7.)  The overarching theme of Respondents' objection to the requested fees is simply that it was "facially unreasonable" for Petitioners  to "expend[] 833.72 hours, utilizing a total of nineteen counsel, to file a habeas petition on behalf of a single family challenging their detention as arriving aliens."  (*Id.* at 23–24.)  We first address this challenge, then turn to Respondent's more specific arguments.

1.      **Reasonable Hours**

This case began as a weekend emergency created by Respondents' conduct.  It is clear that Petitioners' counsel understood the necessity of "frontloading" the work in this case:  had they failed to obtain emergency relief, their clients' position would likely have been materially, negatively altered.  In this particular context, Petitioners' "all hands on deck" strategy was not only understandable, it was likely a necessity.  Hence, while in a typical case, expending 833.72 hours over such a short time period may be deemed excessive, it was not necessarily so here.  Petitioners did not have the luxury of allocating resources as methodically and efficiently as they might otherwise have done.  The Court declines to penalize Petitioners for operating as they did within the rushed timetable Respondents created.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                              Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

     Nonetheless, the Court does find that, even taking into account the urgent nature of the work, Petitioners' counsel's block-billing practices lead to overbilling.  Certain block-billed entries are unreasonable on their face (e.g., 20 hours on March 4 by K.M. Marquart, 18.30 hours on March 5 by L.M. Sturges, etc.).  Moreover, as a general rule, block-billing makes it difficult for the Court to determine the reasonableness of the time spent.  *See Yeager v. Bowlin*, No. CIV 2:08-102 WBS JFM, 2010 WL 1689225, at *2 (E.D. Cal. Apr. 26, 2010) ("Block billing makes it virtually impossible for a court to comply with its requirement to give a clear, reasoned explanation for any fee reductions because those reductions would ultimately be nothing more than guesswork based on an imprecise billing statement."); *see also Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 967 (finding it "impossible to determine whether the time requested for any one task was reasonable" because of block-billing).  Therefore, the Court finds that a 20% reduction of all block-billed hours appropriately balances the need to exclude unreasonable hours with the need to compensate Petitioners' counsel for time spent actually working on the instant action.  *See, e.g.*, *Banas*, 47 F. Supp. 3d at 968 (reducing block-billed fees by 20% because it was impossible to determine how efficiently the case was staffed and the tasks completed); *Huhmann v. FedEx Corp.*, No. 13-cv-00787-BAS(NLS), 2015 WL 6127198, at *8 (S.D. Cal. Oct. 16, 2015) (applying 20% reduction to all block-billed hours due to the difficulty in determining their reasonableness); *Apple, Inc. v. Samsung Elecs. Co.*, Ltd., No. C 11-1846 LHK (PSG), 2012 WL 5451411, at *5 (N.D. Cal. Nov. 7, 2012) (trimming 20% of block-billed hours because the court could not evaluate the reasonableness of the hours).  A 20% reduction of block-billed hours amounts to a reduction of 103.83 hours.

     Respondents also raise several specific arguments as to why Petitioners' billed hours should be reduced.  First, Respondents claim that Petitioners' counsel overbilled by 6.6 hours.  (Opp. at 24–25.)  However, Petitioners have shown that the missing 6.6 hours in their original timesheets were the result of a clerical error, and their updated timesheets now accurately contain all billed hours.  (*See* Gibson Dunn Timesheet at 20.)

     Next, Respondents argue that Petitioners have improperly billed for clerical tasks.  (Opp. at 27.)  Specifically, Respondents point to three time entries where the task description includes "[r]each[ing] out to attorneys across the firm to assist," "service of motion on appropriate individuals," and "draft and file certificates of service."  (*Id.*)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

---

Petitioners do not contest Respondents' characterization of the time entries, but argue that the work was necessitated by the nature of the case.  (Reply at 17.)  However, purely clerical tasks are not recoverable as attorneys' fees regardless of the nature of the case or who is performing them.  *See Nadarajah*, 569 F.3d at 921 ("When clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors."); *Yates v. Vishal Corp.*, No. 11-cv-00643-JCS, 2014 WL 572528, at *6 (N.D. Cal. Feb. 4, 2014) (stating that fees for "purely clerical or secretarial" tasks are not recoverable as attorneys' fees).  Subtracting time spent on clerical tasks, therefore, is appropriate.  Because the clerical tasks are embedded in block-billed time entries, the Court reduces those time entries by an additional 20%, or 2.59 hours.

Respondents also ask this Court to deny any fee award for six other time entries on the grounds that the entries are "not reasonably related to" the case.  (Opp. at 28.)  These time entries include work for "research regarding LAX control tower," "[r]eview and revise petitions . . . file temporary restraining order," "[c]orrespondences and telephone conferences . . . with respect to . . . status of . . . press conference, and securing post-release travel plans," "draft talking points for press," "draft press talking points," and "address press inquiries."  (*Id.*)  The Court finds some of these time entries to be reasonably related to the case but not others.  The "research regarding LAX control tower" appears reasonably related to the case when read in context with the other work Petitioners' counsel was doing at the time and given that the Does were still held in custody at LAX.  (*See* Gibson Dunn Timesheet at 6.)  The March 5 time entry for reviewing and revising petitions and filing the TRO also appears reasonable.  Although the emergency motion for the TRO was filed one day earlier, Petitioners continued to file declarations in support of the TRO thereafter.  (*See, e.g.*, Decls. in Supp. of TRO, Doc. 20.)

However, the time spent handling the press does not appear reasonable for the following reason.  As Respondents note, Petitioners' counsel from Public Counsel did not bill for tasks related to engaging with the media.  (Opp. at 28–29.)  In explaining why similar tasks should be recoverable for Gibson Dunn, Petitioners state only that the entries "rely on the described substantive work for the hours cited or already were reduced by Petitioners before submitting the bill."  (Reply at 18.)  That the media work is related to substantive work on the case or that Petitioners submitted only a fraction of

---

___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  2:17-cv-1761-JLS-AFMx                    Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

___

their time spent engaging the media in no way explains how the media work was reasonably necessary to litigate the case.  Subtracting time spent with the media, therefore, is appropriate.  Because this time is embedded in block-billed time entries, the Court those time entries by an additional 20%, or 3.71 hours.

Respondents further seek to exclude all hours worked that were "related to the deferred inspection."  (Opp. at 30.)  "In order for a court to award fees under the EAJA, it must have jurisdiction over the underlying action."  *Zambrano v. I.N.S.*, 282 F.3d 1145, 1149–50 (9th Cir. 2002) (citations omitted).  Respondents contend that because the Court lacked jurisdiction over the deferred inspection, Petitioners cannot recover attorneys' fees for work performed in relation to it.  (Opp. at 30–31.)  Petitioners contend that the nature of this case—where the Court retained jurisdiction over Petitioners' habeas petition, which was interrelated with the Does' inspection proceedings—precludes application of a blanket rule excluding all work "related" to the deferred inspection.  (Reply at 18–19.)

Although the Court may not have had jurisdiction over the deferred inspection proceedings, it did have jurisdiction over Petitioners' habeas petition.  The deferred inspection and Petitioners' habeas petition were factually intertwined, and the Court issued orders requiring the parties to submit status reports or take other action in consideration of the deferred inspection.  (*See* March 20 Order, April 3 Order, April 12 Order.)  Therefore, the Court finds that simply excluding all hours worked that are "related to" the deferred inspection would be overly broad and would ignore the fact that work "related to" the deferred inspection may also have been related to, and in furtherance of, Petitioners' habeas claims.  Accordingly, for an award of fees to be improper, Petitioners' counsel must have performed work related to the deferred inspection but unrelated to the habeas petition.

Although Respondents fail to identify which time entries fall into this category, the Court notes that certain task descriptions appear to relate solely to assisting the Does with their deferred inspection.  For example, several time entries on Public Counsel's timesheets contain descriptions of "strategy for deferred inspection," correspondence or telephone conferences "re: deferred inspection," and preparing for the deferred inspection by contacting translators, preparing interview outlines, and meeting with the clients "to prepare for deferred inspection interview."  (*See* Public Counsel Timesheet at 7–11.)  Gibson Dunn's timesheets also contain task descriptions that appear to relate solely to the

___

Case 5:16-cv-00620-JGB-KK   Document 826-2   Filed 10/09/18   Page 73 of 215   Page
ID #:4768
Case 2:17-cv-01761-JLS-AFM   Document 88   Filed 07/27/17   Page 15 of 23   Page ID #:1253

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

deferred inspection: "telephone conference and correspondences re preparing for
upcoming immigration meeting," "[c]alls . . . regarding prep for April 5 interview,"
"[r]eview interview prep of family before deferred inspection, "[c]alls and emails . . . to
prepare for . . . family's admissibility interview," and "[c]orrespondence . . . regarding
plans for clients' interview."  (Gibson Dunn Timesheet at 11–14.)  These tasks do not
appear to be in furtherance of Petitioners' habeas claims or any requirement imposed by
the Court's Orders.  Therefore, the Court finds it appropriate to exclude those hours that
pertain solely to assisting the Does with their deferred inspection interview.  For Public
Counsel, this amounts to a reduction of 12.80 hours.  Because Gibson Dunn block-billed
the deferred inspection tasks with other work, the Court reduces those hours by an
additional 20%, or 1.65 hours.

Accordingly, the Court finds Petitioners' counsel's reported hours to be generally
reasonable, but, for the aforementioned reasons, subtracts a total of 124.58 hours from the
total amount.  This reduces the hours worked from 833.72 hours to 709.14 hours.

### 2.      Reasonable Hourly Rate

Typically, the hourly rate for attorneys' fees under EAJA are capped at a statutory
rate.[2]  *See* 28 U.S.C. § 2412(d)(2)(A).  For all but one attorney, Petitioners seek the
statutory rate, and Respondents do not dispute the reasonableness of applying the
statutory rate to Petitioners' counsel's work.  However, a higher rate may be awarded
where the court determines that a "special factor," such as "the limited availability of
qualified attorneys for the proceedings involved," justifies a higher fee.  *Id.*  This
provision has been interpreted to refer to attorneys with "some distinctive knowledge or
specialized skill needful for the litigation in question—as opposed to an extraordinary
level of the general lawyerly knowledge and ability useful in all litigation."  *Pierce*, 487
U.S. at 572 (1988).  Moreover, such attorneys must "not [be] available elsewhere at the

---

[2] Although Section 2412(d)(2)(A) states that this rate is $125 per hour, the actual
statutory rate, adjusted for increases in the cost of living, is $192.68.  *See Statutory Maximum
Rates Under the Equal Access to Justice Act*, https://www.ca9.uscourts.gov/content/view.php?
pk_id=0000000039.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                              Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

statutory rate." *Nadarajah*, 569 F.3d at 912 (citations omitted).  When counsel merits an enhanced rate, that rate is to be the "prevailing market rate[] for the kind and quality of the services furnished." *See Pierce*, 487 U.S. at 571; 28 U.S.C. § 2412(d)(2)(A).

Here, Petitioners seek an enhanced rate for one attorney, Talia Inlender.  (*See* Rosenbaum Decl., Ex. 4H.)  Respondents oppose an award of an enhanced rate, arguing that Ms. Inlender's skills were not necessary for this case and that Petitioners have failed to establish that no other counsel would have taken the case at the statutory rate.  (Opp. at 25–27.)  In opposing an enhanced rate, Respondents do not contest that Ms. Inlender has specialized skills or distinctive knowledge in the field of immigration, particularly with respect to the law governing SIVs, detention at ports of entry, detention of children, and the risk of persecution and torture of refugees.

Contrary to Respondents' contention, the Court finds that Petitioners have established that Ms. Inlender's specialized skills and distinctive knowledge were necessary to the successful resolution of this case.  This case concerned the constitutional and legal rights of aliens detained at a port of entry, who were traveling to the United States with SIVs earned through service to the United States at risk of life and limb.  The aliens included young children, and they faced potential persecution and serious harm should they be returned to their country of origin.  As Petitioners note, "[t]his case could not have been litigated or won without the expertise and distinctive knowledge and specialized skill of an attorney with deep knowledge of not only immigration law and practice, but the intricacies of the law governing detention at ports of entry and the law concerning refugees, asylum seekers, and SIVs in particular."  (Arulanatham Decl. ¶ 8, Doc. 76-4.)  That Respondents take the position that the law in this area is "not more complex" than immigration law generally does not mean that is so.  It is not clear that a SIV holder is "no different" from every other arriving alien, or that the law regarding due process for arriving aliens is as "well settled" as Respondents make it out to be.  Indeed, if that were so, the Court may not have found the "serious questions" necessary to issue a TRO or retained jurisdiction over the action.

The Court also finds that no other attorney with the same knowledge and skills would have substituted in for Ms. Inlender at the statutory rate.  Not only is the Court unaware of any other attorneys with the same specialized skills and distinct knowledge as Ms. Inlender, but there is no evidence that an attorney with such skills and knowledge

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-1761-JLS-AFMx                          Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

would have agreed to litigate at the statutory rate.  Although Respondents' point to
Petitioners' other counsel to argue that other attorneys were available at the statutory rate,
there is no evidence that those attorneys brought the same knowledge and skills to the
case as Ms. Inlender.

Accordingly, an enhanced rate for Ms. Inlender is appropriate.  Petitioners present
evidence that the prevailing market rate in the Central District of California for an
attorney with Ms. Inlender's experience and qualifications is $585 per hour.  (*See* Sobel
Decl. ¶¶ 9–10, 20–35.)  Respondents do not contest this rate as the reasonable market
rate.  Therefore, the Court finds that an hourly rate of $585 per hour for Ms. Inlender's
work is reasonable.

Taking into account the reduced hours and each counsel's reasonable hourly rate,
the Court calculates a total fee award of $160,784.40.

### D.    Costs

Petitioners also seek an award of costs totaling $6,620.32.  (*See* Marquart Decl.,
Ex. 3D, Doc. 76-3; Rosenbaum Decl., Ex. 4J, Doc. 76-4.)  Under the EAJA, "a judgment
for costs . . . may be awarded to the prevailing party in any civil action brought by or
against the United States or any agency or any official of the United States."  28 U.S.C. §
2412(a)(1).  With respect to costs, Respondents contest only Public Counsel's request for
costs, arguing that expenses related to the deferred inspection cannot be recovered
because the Court did not have jurisdiction over the inspection.  (Opp. at 30–31; *see*
Rosenbaum Decl., Ex. 4J.)  Upon reviewing Petitioners' requested costs, the Court finds
only the expenses for Dari interpretation services on April 4, 2017 to be improper.
Considered in context, these services were plainly meant to assist the Does at their
deferred inspection on April 5.  In the preceding section, the Court deducted those fees
that it determined went solely towards assisting the Does with their deferred inspection.
Any associated expenses must be denied as well.

However, the Court finds Public Counsel's travel expenses recoverable as costs in
this action.  The Court recognizes that Public Counsel travelled to Seattle for the deferred
inspections on April 5 and April 13, in part, for the purpose of preparing the Does for
their inspections.  However, the trip served the additional purpose of ensuring compliance

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:17-cv-1761-JLS-AFMx                    Date: July 27, 2017
Title:  International Refugee Assistance Project, et al. v. John F. Kelly, et al.

with the Court's March 20 Order in the habeas action.  That order required, in part, that the parties file a joint status report following the Does' deferred inspection on April 5, 2017.  Although traveling all the way to Seattle simply to confirm the outcome of a hearing for a joint status report may be unreasonable under typical circumstances, the Court finds such expenses reasonable here where Respondents' previous conduct towards the Does raised reasonable concerns over whether Respondents would fully respect the Does' rights and the Court's orders following the deferred inspection.  Indeed, after the Court issued its April 3 Order, in which it clarified that Respondents had to file a status report at least 72 hours before changing the Does' immigration status, Respondents unilaterally postponed the deferred inspection from April 5 to April 13.  (Status Report II.)  There was a reasonable basis, therefore, for Petitioners' counsel to travel to Seattle to confirm the outcome of the deferred inspection.

The Court also finds the remaining costs reasonable.  Courts have awarded costs under the EAJA for, among other things, computer-assisted legal research, telephone calls, travel, photocopying, and transcripts.  *See, e.g.*, *Catholic Soc. Servs., Inc. v. Napolitano*, 837 F. Supp. 2d 1059, 1076–77 (E.D. Cal. 2011); *In re Application of Mgndichian*, 312 F. Supp. 2d 1250, 1266 (C.D. Cal. 2003); *Hajro v. Barrett*, No. C 10-1772 MEJ, 2012 WL 4113203, at *4 n.4 (N.D. Cal. Sept. 18, 2012).  The Court finds the amounts associated with each expense to be reasonable, and Respondents raise no issue on that point.

Accordingly, the Court finds it appropriate to award costs of $6,500.32.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS Petitioners' Motion for Attorneys' Fees and Costs.  Accordingly, the Court AWARDS Petitioners attorneys' fees in the amount of $160,784.40 and costs in the amount of $6,500.32.

Initials of Preparer:  tg

---

Exhibit 6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |
|---|---|

| Kamilla Sali-Suleyman | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES

Before the Court are a Motion for Final Approval of Class Action Settlement (Docket No. 322) and a Motion for Attorneys' Fees and Costs (Docket No. 307) filed by plaintiffs Michael Nozzi ("Nozzi") and Nidia Pelaez ("Pelaez") (collectively "Plaintiffs" or "Named Plaintiffs"). Defendants Housing Authority of the City of Los Angeles ("HACLA") and Rudolph Montiel in his official capacity[1] (collectively "Defendants") do not oppose either motion. A Fairness Hearing was held on January 29, 2018.

## I. FACTUAL & PROCEDURAL BACKGROUND

The Section 8 housing program provides rental assistance to low-income, elderly, and disabled families. See Nozzi v. HACLA, 806 F.3d 1178, 1184 (9th Cir. 2015) ("Nozzi II"). The majority of this assistance is provided through the Housing Choice Voucher Program, which is funded and regulated by the Department of Housing and Urban Development ("HUD") and administered locally by public housing agencies such as HACLA. Id. Under this program, the renter identifies qualifying housing, the public housing agency negotiates the rent with the landlord, the public housing agency pays a rent subsidy to the landlord on behalf of the tenant, and the renter pays the balance of the rent. Id. Within parameters established by HUD, the public housing agency sets a voucher payment standard (VPS) representing the maximum subsidy that it will pay for each type of housing in a particular area. Id. at 1185. Raising the VPS will generally yield larger subsidies, while lowering the VPS will generally yield smaller subsidies. Id. Each renter's eligibility for Section 8 benefits is examined on a yearly basis. Id. "If the public housing agency decides to lower the [VPS], it must provide information about the change to all beneficiaries at their annual reexaminations following the decision, and must further advise these beneficiaries that the change will not go into effect until their following reexamination one year later." Id.

---

[1] The City of Los Angeles was originally named as a defendant, but was dismissed on May 23, 2007. (Docket No. 48.)

Case 2:16-cv-00620-AGR-kk    Document 326-2    Filed 05/15/19    Page 79 of 215    Page
ID #:4774
Case 2:07-cv-00380-PA-FFM    Document 326    Filed 02/15/18    Page 2 of 12    Page ID #:3061

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|---|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

HACLA reduced its VPS in 2004. Under the new standard, an estimated 45% of tenants were required to pay an average of $104 more in rent each month. Id. at 1186. HACLA notified renters of this change in a flyer sent with annual reexamination documents. Id. The flyer provided general information about the new VPS, but did not specify how the changes would affect each renter. Id. An individualized notice was not provided until a second notice sent approximately four weeks before the new subsidy would take effect for each renter. Id.

Plaintiffs, along with the now-defunct Los Angeles Coalition to End Hunger & Homelessness, initiated this action in January 2007. Id. In April 2007, the district court granted in part and denied in part a motion to dismiss. (Docket No. 42.) Plaintiffs filed a First Amended Complaint alleging violations of (1) due process of law under 42 U.S.C. § 1983, (2) rights created by 42 U.S.C. § 1437f, (3) Cal. Gov. Code § 815.6, (4) Art. I, § 7 of the California Constitution, and (5) negligence. (Docket No. 49.) The Court dismissed the second and fifth claims (Docket No. 63) and later granted Defendants' motion for summary judgment on the remaining claims (Docket No. 90). The Ninth Circuit reversed the dismissal of the fifth claim and the grant of summary judgment on the first, third, and fourth claims. Nozzi v. HACLA, No. 09–55588, 2011 WL 1167188 (9th Cir. 2011) ("Nozzi I"). On remand, the district court granted HACLA's renewed motion for summary judgment. (Docket Nos. 190, 192.) The Ninth Circuit again reversed, holding that the flyer sent by HACLA did not provide sufficient notice of the VPS change. The court found that this "failure violated both the requirements of the Voucher Program regulations and the requirements of procedural due process," as well as state law. Nozzi II, 806 F.3d at 1204. The matter was remanded "with instructions for the district court to enter summary judgment in favor of the plaintiffs on the merits of the federal and state law claims at issue on this appeal." Id.

Following remand, this Court certified two classes: (1) the Rule 23(b)(2) "Injunctive Relief Class" and (2) the Rule 23(b)(3) "Damages Class." (Docket No. 245.) The Injunctive Relief Class consists of all Section 8 beneficiaries whose benefits are administered by HACLA and who in the past received, or in the future may receive, notices of a VPS decrease. (Id.) The Damages Class consists of all HACLA Section 8 tenants, between June 1, 2005, and September 30, 2006, whose rental contribution for a period not to exceed eleven months was greater than it would have been but for HACLA's 2004 decrease in the VPS. (Id.) All Damages Class Members are also members of the Injunctive Relief Class. (Docket No. 297, Ex. A ("Settlement Agreement") ¶ 7.) The Damages Class consists of 11,870 tenants on the Damages Class Member List, and their principal damages amount to $10,308,774. (See id. ¶¶ 9, 10; Docket No. 297, Ex. D ¶ 3.)

In February 2017, the parties filed cross-motions for partial summary judgment as to remedies. (Docket Nos. 250, 256.) Before the Court ruled on those motions, the parties filed a Stipulation for Settlement. (Docket No. 286.) On June 19, 2017, Plaintiffs filed an unopposed Motion for Preliminary Approval of Class Action Settlement. (Docket No. 296.) On July 29, 2017, the Court preliminarily approved the Settlement Agreement, as well as the appointment of JND Legal Administration ("JND") as Class Administrator, and Barrett S. Litt, Anne Richardson, and Stephanie Carroll as Class Counsel. (Docket No. 305 ("Prelim. Approval Order").)

Case 2:16-cv-00620-JGB-kk   Document 326-2   Filed 10/09/18   Page 80 of 215   Page
ID #:4775
Case 2:07-cv-00380-PA-FFM   Document 332   Filed 02/15/18   Page 3 of 12   Page ID #:3062

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|---|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

Plaintiffs now move for final approval of the Settlement Agreement. In addition, Plaintiffs seek approval of attorneys' fees, litigation costs, settlement administration costs, and incentive awards.

## II.    THE SETTLEMENT AGREEMENT

The Settlement Agreement was reached after ten years of litigation, two appeals, and two days of mediation before a retired federal judge. (See Settlement Agreement pp. 2–3.) The parties ultimately agreed that HACLA's insurers would pay a total of between $9 million and $9.4 million toward the "Class Fund" to settle all monetary claims of the Damages Class Members. (Id. at ¶ 6.) Under the Settlement Agreement, and as further explained in the motion for preliminary approval, the following expenses would be deducted from the Class Fund: attorneys' fees of less than 30% of the Class Fund; litigation costs of approximately $220,000; expenses of approximately between $48,000 and $68,000 incurred by the Class Administrator, and publication expenses of approximately $10,000 to $12,000; Pelaez's incentive award of $5,000; and Nozzi's incentive award of $1,000. (Id. at ¶¶ 4, 22, 49, 52; Mot. for Prelim. Approval at 9; Docket No. 297, Ex. E ("JND Proposal").) The residual amount of approximately $6 million (the "Residual Class Fund") would be available for Damages Class Member claims. (See Settlement Agreement ¶ 35.) The final Damages Class Member List was to be prepared by Plaintiffs' expert Kriegler based on information supplied by HACLA and HUD. (Id. at ¶¶ 9, 12.)

The Settlement Agreement required the Damages Class Members to file claims to qualify for and receive damages. (Id. at ¶ 35.) Pursuant to the Settlement Agreement, a Damages Class Member would be compensated up to the amount of additional rent that he or she paid as a result of the reduced HACLA subsidy, depending on the number of claimants. (Id. at ¶ 19.) If more claims were made than could be fully compensated by the Residual Class Fund, claimants would receive proportional reductions in their reimbursements. (Id. at ¶ 32.) If more than $2 million, but less than the Residual Class Fund, was claimed, the remainder would revert to Defendants' insurers. (Id. at ¶ 33.) If less than $2 million in claims were made, the difference between $2 million and the claims made would be donated to a cy pres organization. (Id.) In addition, if Damages Class Members made claims, but do not cash their checks, the parties agreed that the Class Administrator would make efforts to reach them and assist them to do so; the funds from checks not cashed within one year of issuance would go to agreed upon cy pres organizations. (Id.)

The Settlement Agreement further provided that HACLA would treat any payment to Damages Class Members who are current recipients of Section 8 in accordance with HUD regulation 24 C.F.R. § 5.609(c)(3), i.e., as a settlement for personal injury. (Id. at ¶ 34.) Furthermore, HACLA would designate a person whom Damages Class Members could contact with questions about the impact of receipt of settlement funds on their Section 8 benefits. (Id.)

The parties also agreed upon a three-year injunction. Pursuant to the injunction provisions, HACLA, when issuing notices related to reduction of the VPS, must "simply and plainly communicate the information provided in non-technical, [sic] language that would be reasonably understandable to Section 8 tenants, at a language level commensurate with the average educational level of Section 8

Case 5:16-cv-00620-AGR-kk Document 326-2 Filed 10/09/18 Page 81 of 215 Page
Case 2:07-cv-00380-PA-FFM Document 332 Filed 02/15/18 Page 4 of 12 Page ID
ID #:4776

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|---|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

tenants. The notice shall reasonably explain the known, likely or potential impact on the tenant of the action that is the subject of the notice." (Id. at ¶ 71(a).) Furthermore, any such notice involving reduction of the VPS "shall be provided to Class [C]ounsel before it is sent [to Section 8 tenants], and shall be subject to approval of Class Counsel before it is communicated to Section 8 tenants, which approval shall not be unreasonably withheld." (Id. at ¶ 71(b).) Finally, HACLA is required to "use language reasonably understandable to Section 8 tenants" when communicating any new notices to tenants, other than a notice of reduction of the VPS, which are addressed by ¶ 71(a) of the Settlement Agreement. (Id. at ¶ 71(c).)

In return for the injunction and damages, Class Members agree to release Defendants from "all claims . . . involving violations of law or constitutional rights, including, without limitation, their due process rights under federal and California Constitutions and law, their rights under California Civil Code § 815.6 and for negligence, any other rights under any other federal, state or local law, regulation, duty, or obligation, or any other legal theory, action or cause of action, which are based upon or could be based upon or arise from the facts alleged in the lawsuit (hereafter 'Covered Claims')." (Id. at ¶ 42.) Class Members, including the Named Plaintiffs, "waive all rights to any and all claims relating to damages or reimbursement of any kind for the Covered Claims." (Id. at ¶ 43.) They further "waive any and all rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions by the Released Persons with respect to the Covered Claims during the Class Period that fit within the definition of the Damages Class; and further, as it relates to this waiver or Release, expressly waive the provisions of California Civil Code § 1542." (Id. at ¶ 44.) Those who suffered damages but were omitted from the Damages Class Member List would not be bound by the Settlement Agreement as to claims for damages, and would be permitted to bring such claims against Defendants. (Id. at ¶ 10 n.1.) Finally, Damages Class Members could opt out or object if they were not satisfied with the settlement amount or other aspects of the Settlement Agreement. (Id. at ¶¶ 66–70.)

## III. FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### A. Fairness of the Class Settlement

Rule 23(e) requires a district court to determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003). To make this determination, courts consider a number of factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. See id. Also, the settlement may not be the product of collusion among the negotiating parties. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000). The Ninth Circuit has declared that a strong judicial policy favors settlement of class actions. Class Plaintiffs v.

Case 5:16-cv-00620-AGR-kk Document 326-2 Filed 10/09/18 Page 82 of 215 Page
Case 2:07-cv-00380-PA-FFM Document 332 Filed 02/15/18 Page 5 of 12 Page ID #:4777
ID #:4777

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | |

City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). For the following reasons, the Court finds that the Settlement Agreement is fundamentally fair, adequate, and reasonable.

1.     The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

"When evaluating the strength of a case, the Court should evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." De Santos v. Jaco Oil Co., No. 1:14-cv-0738-JLT, 2015 U.S. Dist. LEXIS 93410, at *16 (E.D. Cal. July 17, 2015). Here, prior to settlement, the parties had already litigated for more than 10 years, and endured two appeals, which ultimately resolved the issue of liability. However, whether, and to what extent, damages were available remained unresolved and cross-motions for summary judgment on that issue remained pending at the time of settlement. There remained a likelihood that the Court's ruling on those motions would have been appealed. (See Final Approval Mot. 7, 9.) In addition, failure to settle at this point would have further delayed relief for Class Members who, by definition, are (or at least were during the class period) low-income. These factors favor granting final approval of the Settlement Agreement.

2.     The Amount Offered in the Settlement Agreement

The Class Fund amount is \$9,339,256.47.[2] The Motions for Final Approval and Attorneys' Fees seek (1) an attorneys' fee award of \$2,801,776.94; (2) reimbursement of litigation expenses of \$169,699.88; (3) incentive payments to Pelaez and Nozzi of \$5,000 and \$1,000, respectively; and (4) costs for settlement administration, totaling \$60,000. Thus, the Residual Class Fund of approximately \$6.3 million was available for claims by Damages Class Members. The Residual Class Fund was sufficient for up to approximately 58% of claims of Damages Class Members to be compensated in full. In fact, approximately 19.38% of Damages Class Members filed claims that have been approved, and thus each of those claimants will be paid in full for the decrease in rent subsidy, without interest. Claimed damages total approximately \$2,160,078.45.[3] (Keough Decl. ¶ 22.)

---

[2]     The Settlement Agreement provided for a Class Fund that was between \$9 million and \$9.4 million, dependent upon defense fees. (Settlement Agreement ¶ 6.) The parties have concluded, after subtracting total defense fees, that \$9,339,256.47 is the total available Class Fund. (Final Approval Mot. 2; Litt Decl. ISO Final Approval Mot. ¶ 5.)

[3]     While the Motion for Final Approval states that the value of all valid claims was \$2,218,075.26 as of December 6, 2017, the initial declaration of the Class Administrator attests that the damages for all valid claims amounted to \$2,160,078.45 as of December 20, 2017. (Compare Final Approval Mot. 3, with Litt Decl. ISO Final Approval Mot., Ex. 7 ("Keough Decl.") ¶ 22.) However, the Class Administrator has updated the number of valid claims from 2,269 in her initial declaration to 2,300 in a

(continued...)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|---|---|

Given the increased expense and risk that would accompany continued litigation and the presence of the opt-out provision, the Court finds that the total settlement amount is reasonable and favors approval of the Settlement Agreement.

### 3. The Extent of Discovery Completed and the Stage of the Proceedings

Litigation in this action has been extensive and discovery was complete at the time of settlement. Furthermore, Plaintiffs hired an expert who performed extensive analysis of records held by HACLA and HUD to determine damages. The parties also engaged in two days of formal mediation before a third-party neutral. This extensive case history weighs in favor of approval of the Settlement Agreement.

### 4. The Experience and Views of Counsel

The Court finds that Class Counsel has sufficient experience with class action litigation to appropriately assess the legal and factual issues in this matter and determine whether the Settlement Agreement serves the interests of the Class Members. Thus, Class Counsel's belief that the Settlement Agreement is both fair and adequate weighs in favor of approval.

### 5. Collusion Between the Parties

To determine whether there has been any collusion between the parties, a court must evaluate whether "fees and relief provisions clearly suggest the possibility that class interests gave way to self interests," thereby raising the possibility that the settlement is the result of misconduct by the negotiators or improper incentives for certain class members. Staton, 327 F.3d at 961. Here, it appears that the Settlement Agreement was the product of informed, arm's-length negotiations between the parties. The reasonableness of the amount offered in settlement, the extensive litigation history, and the involvement of a third-party neutral further suggest an absence of collusion. Furthermore, the fees and incentive awards sought do not suggest collusion, particularly as any such award was conditioned upon approval of the Court. (See Settlement Agreement ¶¶ 49, 52); see also Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 968 (9th Cir. 2009) (finding conflicts of interest where incentive agreements existed between named plaintiffs and counsel). The Court finds that the Settlement Agreement is the product of non-collusive negotiations.

---

3/(...continued)
supplemental declaration, but has not updated the dollar value of approved claims. (Compare Keough Decl. ¶ 22, with Docket No. 330-1 ("Keough Suppl. Decl.") ¶ 12.a.) While this change in number of valid claims renders it likely that the $2,160,078.45 figure is low, for purposes of this Order, the Court assumes it is a reasonable approximation of the value of the valid and approved claims.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|---|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

> 6.    Presence of Governmental Participant

Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, Defendants notified the Attorney General of the United States and the CAFA Coordinators of the California Office of the Attorney General of the Settlement Agreement.  (See Docket No. 303.)  "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures."  Garner v. State Farm Mut. Auto. Ins. Co., Case No. CV 08-1365 CW (EMC), 2010 U.S. Dist. LEXIS 49477, at *14 (N.D. Cal. Apr. 22, 2010).  No government official has objected to the terms of the Settlement Agreement. Accordingly, this factor weighs in favor of final approval.  See Noll v. eBay, Inc., 309 F.R.D. 593, 608 (N.D. Cal. 2015); Holman v. Experian Info. Sols., Inc., Case No. 11-cv-0180 CW (DMR), 2014 U.S. Dist. LEXIS 173698, at *8 (N.D. Cal. Dec. 12, 2014).

> 7.    Reaction of Class Members to Settlement

Where a settlement agreement enjoys overwhelming support from the class, this lends weight to a finding that the settlement agreement is fair, adequate, and reasonable.  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."); see also Boyd v. Bechtel Corp., 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the class was persuasive that the settlement was adequate).  Class Members were provided notice of the Settlement Agreement pursuant to this Court's order granting the motion for preliminary approval.  (See infra Part III.B.)

According to the Class Administrator, there were 2,300 valid and approved claims out of 11,870 Damages Class Members, amounting to 19.38% participation of the Damages Class.  (See Keough Suppl. Decl. ¶ 12.a.)  Thirty-one additional Class Members filed claims that lacked signatures or were otherwise deficient, and were not timely cured.[4]  (Id. at ¶ 12.c.)  Twenty-seven claim forms were submitted by eligible Class Members but postmarked after the filing deadline of December 6, 2017.[5]

---

[4]    Additionally, 556 claim forms were submitted by individuals who did not appear on the Damages Class List and 65 claim forms were duplicates of earlier-submitted claims forms.  (Id. at ¶¶ 12.d, 12.e.) These claims were denied.  (Id. at ¶¶ 12.d, 12.e.)

[5]    At the final fairness hearing, counsel indicated that the parties were still deciding whether to accept these claims despite their untimeliness.  Unless otherwise agreed upon by the Parties, claim forms not received or postmarked by December 6, 2017, shall not be paid, although those claimants shall nonetheless be bound by this Order and the Judgment.

Case 5:16-cv-00620-JGB-kk   Document 326-2   Filed 10/09/18   Page 85 of 215   Page
ID #:4780
Case 2:07-cv-00380-PA-FFM   Document 332   Filed 02/15/18   Page 8 of 12   Page ID #:3967

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|----------|---------------------|------|-------------------|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|-------|--------------------------------------------------------------------------------|

(Id. at ¶ 12.b.)  No Class Member objected to the Settlement Agreement[6/] and 8 Class Members opted out.  (Keough Decl. ¶¶ 15, 18.)  The Administrator attempted to mail notices to all Class Members, and after skip-tracing, ultimately 11,056 such notices were mailed and not returned as undeliverable.  (Id. at ¶ 7.)

The settlement website created by JND tracked 13,285 unique users who registered 24,595 page views and 1,103 case document views.  (Id. at ¶ 8.)  The toll-free number established by JND received more than 1,775 calls (id. at ¶ 11), and JND associates spoke with 737 such callers (Keough Suppl. Decl. ¶ 8).  The overall positive reaction of Class Members and lack of objections is strong evidence that the Settlement Agreement is fundamentally fair and reasonable.

### B.    Adequacy of Notice to the Settlement Class

Under Federal Rule of Civil Procedure 23(e), this Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Such notice must be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Klee v. Nissan N. Am., Inc., No. CV 12-08238 AWT (PJWx), 2015 WL 4538426, at *5 (C.D. Cal. July 7, 2015).  The notice given in this case was reasonably calculated to reach the Damages Class.  The notices described the essential terms of the Settlement Agreement, defined the classes, set forth the procedure for Damages Class Members to make claims, opt out, or file objections to the Settlement Agreement, and provided information on the date, time, and location of the Final Fairness Hearing.  (Docket No. 297, Ex. C; Keough Decl. ¶ 5.)  They further provided a toll-free number for Class Members to call and a website containing essential case documents.  (Keough Decl. ¶¶ 8, 10.)  In addition, notices were posted at HACLA offices where Section 8 tenants may have occasion to visit.  (See Docket No. 325, Mendoza Decl. ¶¶ 2–3.)  Finally, a notice was published in the L.A. Times for three consecutive weeks on August 18, 2017, August 25, 2017, and September 1, 2017, and a 30-day internet advertising campaign was launched on Facebook, Instagram, and Twitter to inform Class Members about the settlement.  (Keough Decl. ¶ 12.)  The Court therefore concludes that the notice procedures satisfied the requirements of Due Process and Federal Rule of Civil Procedure 23(e).

## IV.    ATTORNEYS' FEES, LITIGATION EXPENSES, INCENTIVE AWARDS, AND ADMINISTRATION EXPENSES

### A.    Attorneys' Fees

The Court is obligated to conduct a careful review of the reasonableness of requested attorneys' fees and costs.  See In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994)

---

[6/]    One objection was received, but that Class Member later withdrew his objection, which involved matters distinct from the instant action or the Settlement Agreement.  (See Docket Nos. 318, 319, 320; see also Litt Decl. ISO Final Approval Mot., Ex. 2.)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|---|---|

("Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs."). Plaintiffs seek $2,801,776.94 in attorneys' fees. (Final Approval Mot. 19.) This constitutes 30% of the Class Fund created by the Settlement Agreement. In common fund cases, "where the settlement or award creates a large fund for distribution to the class, the district court has discretion to use either a percentage or lodestar method." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). "The percentage method means that the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." Id. The Ninth Circuit has established 25% of the common fund "as a benchmark award for attorney fees." Id.

Class Counsel cites numerous cases in district courts and other circuits that have found up to 33% to be a reasonable fee in class action settlement. (See Attorneys' Fees Mot. 13–14 & n.2.) Furthermore, the Ninth Circuit has concluded that "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048 (9th Cir. 2002) (holding that district court did not abuse its discretion in awarding 28% of common fund as attorneys' fees). Class Counsel argues that in light of the risk involved; complexity of issues; Class Counsel's experience, skill, and effort expended; and results obtained, 30% of the Class Fund is a reasonable fee in this case. (Attorneys' Fees Mot. 3–9.)

"The lodestar method can 'confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate . . . .'" In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 945 (9th Cir. 2011) (quoting In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820 (3d Cir. 1995)). Here, according to Class Counsel's professed rates and hours worked, the lodestar calculation would be approximately $3.3 million. (See Final Approval Mot. 17.) The Class was represented by two firms: Kaye, McLane, Bednarski, and Litt and Public Counsel. Between the two firms, ten attorneys have spent 3,735.7 hours working on this case since its inception more than a decade ago. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.)[7] Each of these attorneys has a rate of between $540 and $1150 per hour. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.) A litigation coordinator and three paralegals have rates of between $150 and $335 and have committed a total of 685.9 hours to this case, while three law clerks, billing at $200 per hour, spent 96.8 hours on this case. (Litt Decl. ISO Final Approval Mot. ¶ 10; Richardson Decl. ISO Final Approval Mot. ¶ 8.)

---

[7] The Court notes disparity between the hours and rates for Public Counsel provided by Mr. Litt in his Declaration in support of the Motion for Final Approval, and those provided by Ms. Richardson in her Declaration. (Compare Litt Decl. ISO Final Approval Mot. ¶ 10, with Richardson Decl. ISO Final Approval Mot. ¶ 8.) At the Final Fairness Hearing, Class Counsel acknowledged that Ms. Richardson's Declaration should be relied upon for such hours and rates where contradictions between the declarations exist.

Case 5:16-cv-00620-AGR-kk Document 226-2 Filed 10/09/18 Page 87 of 215 Page
Case 2:07-cv-00380-PA-FFM Document 334 Filed 02/15/18 Page 10 of 12 Page ID #:4969
ID #:4782

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|----------|---------------------|------|-------------------|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|-------|----------------------------------------------------------------------------------|

Considering the results achieved, the time expended, the risks faced in this litigation, the skill required, the quality of work, the contingent nature of the fee, the financial burden carried by Class Counsel, and awards made in similar cases, as well as the lack of Class Member objection to this fee award, the Court finds that the requested attorneys' fee award is reasonable. The Court therefore grants Plaintiffs' request for $2,801,776.94 in attorneys' fees to be awarded from the Class Fund.

### B.    Litigation Costs

Plaintiffs request $169,699.88 in litigation costs. "Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement." In re Media Vision Tech. Sec. Litig., 913 F. Supp. 1362, 1366 (N.D. Cal. 1996). However, expenses that should be considered part of an attorney's overhead, and therefore included within an award of attorneys' fees, should not be characterized as a litigation expense and recovered as a cost item. Id. ("An award of out-of-pocket expenses should be limited to those expenses customarily billed to a fee-paying client.") These costs are itemized in detail in the supporting declarations. (See Litt Decl. ISO Final Approval Mot. Ex. 6; Litt Decl. ISO Attorneys' Fees Mot., Ex. D.) The most expensive items include expert fees of $118,430.50, mediation costs of $18,000, and online research costs of $17,094.02. The Settlement Agreement further identifies the types of costs for which Defendants agreed to reimburse Class Counsel, and the Preliminary Approval Order noted that litigation costs of up to $220,000 could be awarded. (See Settlement Agreement ¶¶ 5, 52; Prelim. Approval Order at 3.) No Class Member objected. The Court concludes that with the exception of the online research costs of $17,094.02 which the Court determines is part of an attorney's overhead, the requested litigation costs are reasonable. Accordingly, the Court awards $152,605.86 in litigation costs.

### C.    Named Plaintiffs' Incentive Awards

Plaintiffs also seek incentive awards of $5,000 for Pelaez in addition to her damages award, and of $1,000 for Nozzi inclusive of his damages. (Final Approval Mot. 13.) Courts may consider the following criteria to determine whether to make an incentive award: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit enjoyed by the class representative as a result of the litigation. Van Vraken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995); see also Rodriguez, 563 F.3d at 959 (agreeing with district court that incentive award should be tied to work performed, risks undertaken, and time spent on litigation). Courts also consider "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." Staton, 327 F.3d at 975; see, e.g., In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 943 (9th Cir. 2015) (holding that incentive award to class representative was permissible where "[t]he amount sought and awarded was relatively small, well within the usual norms of 'modest compensation' paid to class representatives for services performed in the class action"); Friedman v. Guthy-Renker, LLC, No. 2:14-cv-06009-ODW(AGRx), 2016 WL 6407362, at *8 (C.D. Cal. Oct. 28, 2016) (balancing the above considerations and concluding that "while

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | | Date | February 15, 2018 |
|----------|---------------------|--|------|-------------------|
| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. | | | |

[two of the named plaintiffs'] awards come close to the threshold of disapproval, the Court finds that their participation in this lawsuit—including responding to substantial discovery and sitting for a deposition—justifies the award." (citation omitted)); Cox v. Clarus Mktg. Grp., LLC, 291 F.R.D. 473, 483 (S.D. Cal. 2013).

In its order preliminarily approving the Settlement Agreement, the Court explicitly warned that final approval of an incentive award would require a more significant showing. (See Prelim. Approval Order at 6.) Despite this warning, Plaintiffs have provided little additional factual basis to support the requested incentive awards. Plaintiffs assert that Nozzi initiated this action and without him there may have been no case. (Final Approval Mot. 13.) Meanwhile, Pelaez served as Class Representative and was available for a deposition if necessary, participated in interviews with Class Counsel, and provided declarations. (Id.; Litt Decl. ISO Final Approval Mot. ¶ 2.)

Such assertions do not support the awards sought by Plaintiffs. However, the Court finds an award of $2,500 to Pelaez, in addition to her damages award, and $500 to Nozzi, inclusive of his damages, to be reasonable in light of their participation, and thus, grants awards to Named Plaintiffs in those amounts.

### D.    Settlement Administration Award

Finally, Plaintiffs seek approval of settlement administration costs. The Class Administrator has billed $24,000 and anticipates billing another $24,000 for administration fees. (Keough Suppl. Decl. ¶ 13.) Furthermore, the Class Administrator seeks $12,000 in costs for publication – $6,000 for costs associated with publication in the L.A. Times, and $6,000 for the internet campaign. (Id. at ¶ 11.) Plaintiffs previously filed JND's bid, in which JND estimated a total cost of $48,000 in the event of a 25% claims rate, and noted it could reach $68,000 if more claims were filed. (See Settlement Agreement, Ex. E.) Here, including claims that have been rejected, the Class Administrator has processed 2,979 claims, representing a 25.1% claims rate. (Keough Suppl. Decl. ¶ 12.) In its bid, JND identified the services it expected to provide depending on the number of claimants. Since then, the CEO of JND has provided declarations in which she attests to the services JND has provided, and will provide in this case. (Keough Decl.; Keough Suppl. Decl.) In addition, the parties previously sought, and the Court considered, publication costs of between $10,000 and $12,000, in preliminarily approving the Settlement Agreement. (See Mot. for Prelim. Approval at 9; Prelim. Approval Order at 3.) No class member has objected to such awards of administration or publication costs. Based on the evidence provided and the lack of objections, the Court finds that up to $60,000 total to be reasonable administration and publication costs in this case, and authorizes payment of such costs to JND from the Class Fund.

Furthermore, as requested in the Proposed Order, the Class Administrator will prepare a list of all rejected claims, with the reasons for rejection, and maintain the list in its case file. The Class Administrator shall preserve all written communications from Class Members in response to the Class for at least three years. All written communications received by the Class Administrator from Class

Case 5:16-cv-00062-AGR-kk Document 226-2 Filed 10/09/18 Page 89 of 215 Page
Case 2:07-cv-00380-PA-FFM Document 334 Filed 02/15/18 Page 12 of 12 Page ID #:4871
ID #:4784

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-380 PA (FFMx) | Date | February 15, 2018 |
|---|---|---|---|

| Title | Michael Nozzi, et al. v. Housing Authority for the City of Los Angeles, et al. |
|---|---|

Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Counsel for the Parties. At the conclusion of the Class Distribution, the Class Administrator shall submit a report to the Court summarizing the payments made to the Class.

### Conclusion

For the foregoing reasons, the Court finds that the Settlement Agreement is fundamentally fair, adequate, and reasonable. The Court therefore grants Plaintiffs' Motion for Final Approval of Settlement. Injunctive Relief Class Members and Damages Class Members release those claims against Defendants as set forth in the Settlement Agreement, except as to monetary damages for those Damages Class Members who timely opted out. The Court reaffirms its approval of Barrett S. Litt, Anne Richardson, and Stephanie Carroll as Class Counsel and JND as Class Administrator.

The Court also grants in part Plaintiffs' Motion for Award of Attorneys' Fees and awards $2,801,776.94 in fees and $152,605.86 in costs to Class Counsel to be paid by Defendants. Additionally, the Court grants $2,500 to Pelaez as an incentive award and $500 to Nozzi as an incentive award. Furthermore, JND's costs of up to $60,000 are approved. Each of these awards and costs are to be paid from the Class Fund.

The Court orders Defendants to provide the Class Fund to the Class Administrator for disbursement in accordance with the terms of the Settlement Agreement. The Court further orders the Class Administrator to pay all members of the Damages Class who have filed valid claims in accordance with the terms of the Settlement Agreement. The Court will enter a Judgment consistent with this Order and the Settlement Agreement. The effective date of settlement is 30 days after the date the Judgment is entered on the Docket. (Settlement Agreement ¶ 13.)

IT IS SO ORDERED.

# Exhibit 7

Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Anne Richardson, SBN 151541
arichardson@publiccounsel.org
Stephanie Carroll SBN 263698
scarroll@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Attorneys for Plaintiffs
MICHAEL NOZZI, et al.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| MICHAEL NOZZI, et al., | Case No. 2:07-cv-00380-PA-FFM |
|---|---|
| Plaintiff, | [Honorable Percy Anderson] |
| v. | **PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS; MEMORANDUM OF LAW; DECLARATIONS AND EXHIBITS IN SUPPORT** |
| HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, et al., | |
| Defendants. | **Date:** **January 29, 2018** **Time:** **1:30 P.M.** **Place:** **Courtroom 9A** |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on January 29, at 1:30 p.m., in Courtroom 7 of the United States District Court for the Central District of California, 350 W. 1st Street, Courtroom 9A, 9th Floor, Los Angeles, California 90012, Plaintiffs will, and hereby do, move for an award of attorneys' fees and costs pursuant to the terms of the Settlement Agreement and Preliminary Approval Order in this case.

This motion is based upon this Notice of Motion and Motion, all Declarations and exhibits submitted in support of it, the papers and pleadings on file in this action, and upon such other and further evidence and argument as the Court deems necessary or convenient at the time of the hearing on this matter.

DATED: September 18, 2017      Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP
PUBLIC COUNSEL

By: /s/ Barrett S. Litt
    Barrett S. Litt
    Attorneys for Plaintiffs

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ....................................1

**I.   INTRODUCTION** ..........................................................................................1

**II.  DESCRIPTION OF PLAINTIFFS' CLAIMS** ......................................2

**III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.** ..............................3

    **A.  The Complexity Of The Issues** ................................................3
        1.  The Legal Issues Here Were Complex And Novel...................4
        2.  The Management of the Case was Challenging........................5
        3.  Reaching A Settlement Was Difficult.....................................5

    **B.  The Risks Of Non-Payment Were Substantial** ......................6

    **C.  The Effort Expended By Counsel.** ...........................................6

    **D.  The Result Obtained For The Class** ........................................7

    **E.  Counsel's Experience** ...............................................................8

    **F.  Counsel's Skill** ..........................................................................9

    **G.  The Reaction Of The Class** .....................................................9

**IV.  THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE** ..............................................................................9

    **A.  The Percentage of the Fund Method of Calculating Fees Is the Better Method to Calculate Fees And Supports The Fee Request Here.** ..............10

    **B.  The Fund Here Is The Available Funds To Be Claimed, Including Fees, Costs And Money That May Revert To Defendants If Not Claimed.** ........15

    **C.  Although A Lodestar Cross-Check Is Unnecessary, It More Than Supports The Fee Requested Here.** ................................16

i

    **D.**      **The Hours Spent On The Case Are Reasonable** ...........................................20

    **E.**      **The Hourly Rates That Plaintiffs' Counsel Will Receive Under the 30%**
                **Fee Award Are Reasonable.** ........................................................................21

    **F.**      **Failing To Award The Fees And Costs Requested Would Frustrate The**
                **Purposes Of Class Actions In The Context Of This Settlement.** ...............24

**V.**    **THE COSTS ARE REASONABLE.** .................................................................25

**VI.**  **CONCLUSION** ...................................................................................................25

Case 5:16-cv-00620-AGR-kk Document 226-2 Filed 10/09/18 Page 95 of 215 Page
Case 2:07-cv-00963-PA-FFM Document 307 Filed 09/18/07 Page 5 of 35 Page ID #:4076
ID #:4790

# TABLE OF AUTHORITIES

## Federal Cases

*In re Activision Sec. Litig.*
723 F. Supp. 1373 (N.D. Cal. 1989) ............................................................ 15

*Barjon v. Dalton*
132 F.3d 496 (9th Cir. 1997) ...................................................................... 17

*In re Bluetooth Headset Products Liab. Litig.*
654 F.3d 935 (9th Cir. 2011) ...................................................................... 13

*Blum v. Stenson*
465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984) ............................. 11

*Boeing Co. v. Van Gemert*
444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980) ............................... 15

*Camden I Condominium Ass'n v. Dunkle*
946 F.2d 768 (11th Cir.1991) .................................................................... 11

*In re Cendant Corp. PRIDES Litigation*
243 F.3d 722 (3rd Cir. 2001) ..................................................................... 16

*Charlebois v. Angels Baseball LP*
993 F. Supp. 2d 1109 (C.D. Cal. 2012) ....................................................... 17

*City of Riverside v. Rivera*
477 U.S. 561 (1986) .................................................................................. 22

*Coles v. City of Oakland*
No. C03–2961 2007 WL 39304 (N.D.Cal. Jan. 4, 2007) ............................. 17

*Cotton v. Hinton*
559 F.2d 1326 (5th Cir. 1977) ................................................................... 4

*Craft v. Cnty. of San Bernardino*
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ....................................................... 23

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab.
Litig.*
553 F. Supp. 2d 442 (E.D. Pa. 2008) .......................................................... 22

*In re Enron Corp. Securities, Derivative & ERISA Litigation*
   586 F.Supp.2d 732 (S.D.Tex. 2008) ................................................................ 10

*Fischel v. Equitable Life Assur. Soc'y of U.S.*
   307 F.3d 997 (9th Cir. 2002) ........................................................................... 23

*Franco v. Ruiz Food Prod., Inc.*
   No. 1:10-CV-02354-SKO, 2012 WL 5941801 (E.D. Cal. Nov. 27, 2012) ................ 15

*Gaskill v. Gordon*
   160 F.3d 361 (7th Cir. 1998) ........................................................................... 12

*Glass v. UBS Financial Services, Inc.*
   2007 WL 221862 (N.D.Cal. 2007) ................................................................... 16

*In re Heritage Bond Litig.*
   No. 02-ML-1475-DT, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10,
   2005) ............................................................................................................ 15

*Hicks v. Toys "R' Us-Delaware, Inc.*,
   2014 WL 4670896 (C.D. Cal. Sept. 2, 2014 ..................................................... 14

*Johnston v. Comerica Mortg. Corp.*
   83 F.3d 241 (8th Cir. 1996) ............................................................................. 16

*Landsman & Funk, P.C. v. Skinder-Strauss Associates*
   639 Fed. Appx. 880 (3d Cir. 2016) ................................................................... 15

*LaPeter v. Canada Life Ins. Co. of Am.*
   No. CV06–121–S–BLW, 2009 WL 1313336 (D.Idaho May 11, 2009) ................... 17

*Lopez v. Youngblood*
   No. CV-F-07-0474 DLB, 2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ................ 24

*Mashburn v. National Healthcare, Inc.*
   684 F.Supp. 679 (M.D.Ala.1988) ..................................................................... 11

*Masters v. Wilhelmina Model Agency, Inc.*
   473 F.3d 423 (2nd Cir. 2007) .......................................................................... 15

*Missouri v. Jenkins*
   491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) .................................... 17

*Moore v. James H. Matthews & Co.*
   682 F.2d 830 (9th Cir. 1982) ................................................................ 20

*Moreno v. City of Sacramento*
   534 F.3d 1106 (9th Cir. 2008) .............................................................. 21

*Nozzi v. HACLA*
   806 F.3d 1178 (9th Cir. 2015) ................................................................ 3

*Paul, Johnson, Alston & Hunt v. Graulty*
   886 F.2d 268 (9th Cir. 1989) ................................................................. 9

*Perdue v. Kenny A. ex rel. Winn*
   559 U.S. 542, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) ................ 22

*In re Quintus Sec. Litig.*
   148 F.Supp.2d 967 (N.D.Cal.2001) ....................................................... 3

*In re Remeron Direct Purchaser Antitrust Litigation*
   2005 WL 3008808 (D.N.J. 2005) ........................................................ 12

*In re Rite Aid Corp. Securities Litigation*
   396 F.3d 294 (3rd Cir. 2005) ......................................................... 13, 22

*Rosenfeld v. U.S. Dep't of Justice*
   904 F. Supp. 2d 988 (N.D. Cal. 2012) ............................................... 18

*Stanger v. China Elec. Motor, Inc.*
   812 F.3d 734 (9th Cir. 2016) .............................................................. 23

*Staton v. Boeing Co.*
   327 F.3d 938 (9th Cir. 2003) .............................................................. 16

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*
   2005 WL 1213926 (E.D. Pa. May 19, 2005) ..................................... 24

*Swedish Hosp. Corp. v. Shalala*
   1 F.3d 1261 (D.C.Cir.1993) ................................................................ 11

*In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act
(FACTA) Litig.*
   295 F.R.D. 438 (C.D. Cal. 2014) .......................................................... 9

*United States v. $12,248 U.S. Currency*
    957 F.2d 1513 (9th Cir.1991) ....................................................... 18

*Vizcaino v. Microsoft Corp.*
    290 F.3d 1043 (9th Cir. 2002) ..................................... 9, 10, 11, 23

*In re Washington Public Power Supply System Securities Litigation*
    19 F.3d 1291 (9th Cir. 1994) ................................................... 9, 22

*Waters v. Int'l Precious Metals Corp.*
    190 F.3d 1291 (11th Cir.1999) .................................................. 15

*Williams v. MGM-Pathe Commun. Co.*
    129 F.3d 1026 (9th Cir.1997) .................................................... 15

*Yang v. Focus Media Holding Ltd.*
    2014 WL 4401280 (S.D.N.Y. 2014) ........................................... 25

**State Cases**

*Peak-Las Positas Partners v. Bollag*
    171 Cal. App. 4th 101 (2009) ................................................... 20

*Ramon v. County of Santa Clara*
    173 Cal. App. 4th 915 (Cal. Ct. App. 2009) .............................. 20

**Federal Statutes**

42 U.S.C. §1983 ............................................................................ 3
42 U.S.C. §1988 ...................................................................... 4, 17

**State Statutes**

Govt. Code §815.6 ........................................................................ 3

**Rules**

Rule 23(h) .................................................................................. 25
Rule 26 ......................................................................................... 6

**Other Authorities**

Citing, Richard A. Posner, *Economic Analysis of Law* 626–27 (5th ed.1998) ................. 25

"Empirical Study of Class Actions in Four Federal District Courts: Final
    Report to the Advisory Committee on Civil Rules" ("FJC Report") ........................... 10

*In re Heritage Bond Litigation*,
 2005 WL 1594403 ............................................................................................ 3

John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on
 Deterrence and Its Implementation* (Columbia Law. Sch. Ctr. for Law &
 Econ. Studies, Working Paper No. 293, 2006) (available at
 http://ssrn.com/abstract_id=893833) ........................................................... 25

*Myriam Gilles, Exploding The Class Action Agency Costs Myth: The Social
 Utility Of Entrepreneurial Lawyers, University of Pennsylvania Law
 Review,* 155 U ............................................................................................... 25

*Newberg on Class Actions* §16:10 (5th ed.) ...................................................... 25

Pa. L. Rev. 103 (November 2006) ...................................................................... 25

*Parker v. Vulcan Materials Co. Long Term Disability Plan*
 No. EDCV 07–1512 ........................................................................................ 17

Rubinstein, *Newberg on Class Actions* §15:87 (5th ed.) ................................... 23

Silber and Goodrich, *Common Funds and Common Problems: Fee
 Objections and Class Counsel's Response* ............................................. 11, 12

vii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Class Counsel seek an award of 30 % of the Class Fund (somewhere between $2,700,000 and $2,820.000 depending on the size of the available fund) plus an award of litigation and expert costs in the amount of $167,350.61 (exclusive of class administration costs), out of a total class fund of between $9 Million and $9.4 Million. Said fees would be paid separately from payments made to class members pursuant to the provisions of the settlement agreement. The settlement agreement provides as follows regarding money distributions to class members and Class Representatives from available funds after payment of attorney's fees and costs, and class administration costs, subject to the final approval of the Court:

    a. Payment of $5,000 to Nidia Pelaez, the designated Class Representative, in addition to her rent reimbursement. Ms. Pelaez will receive this additional amount under the Settlement Agreement because of the role that she played in the litigation. There will also be a payment to Named Plaintiff Michael Nozzi of $1,000 (inclusive of his rent reimbursement) as compensation for his individual damages claim and for his more limited role in initiating the class action (but not ultimately acting as a class representative).

    b. Payment to the members of the class who filed claims for payment of the amount of additional rent that each Damages Class Member paid as a result of the reduced HACLA subsidy (to be proportionately reduced if the total claims filed by Damages Class Members exceed the funds available for payment to them).

    c. To the extent that the filed claims do not total the amount available for distribution to Damages Class Members, the excess funds will not be paid out and will be retained by HACLA's insurers. However, in no event will the total funds paid out to Damages Class Members, or organizations that assist Section 8 tenants, be less than $2,000,000. (This is so that, if not enough Class

1

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 101 of 215
Case 2:07-cv-03809-AFFMB-Document 307 Filed 07/18/17 Page 11 of 39 Page ID #:4782
Page ID #:4796

Members file claims to total $2,000,000, the difference between the amount claimed and $2,000,000 will be paid to organizations to be agreed upon that help Section 8 tenants.)

In addition, the parties have agreed to the entry of an injunction as follows, which provides (and has effectively provided) a substantial non-monetary benefit to the injunctive relief class members:

a. In any future notices to Section 8 tenants, related to the Voucher Payment Standard, Defendant HACLA shall simply and plainly communicate the information provided in non-technical, language that would be reasonably understandable to Section 8 tenants, at a language level commensurate with the average educational level of Section 8 tenants, and without assuming prior knowledge. The notice shall reasonably explain the known, likely or potential impact on the tenant of the action that is the subject of the notice.

b. Any notice within the next three years regarding reduction of the Voucher Payment Standard shall be provided to Class Counsel before it is sent, and shall be subject to the approval of Class Counsel before it is communicated to Section 8 tenants, which approval shall not be unreasonably withheld.

c. When communicating any new notices to tenants (other than a notice of reduction of VPS to which sub-paragraph (a) above applies), HACLA will use language reasonably understandable to Section 8 tenants. For purposes of the Settlement Agreement, the Parties agree that existing notices that have been historically sent regularly to tenants without challenge, such as the RE 38 notice, notices sent to tenants when HACLA approves a rent increase requested by the landlord, when there is a bedroom downsizing, meet this standard.

## II. DESCRIPTION OF PLAINTIFFS' CLAIMS

The Court is very familiar with Plaintiffs' claims since they have been addressed twice by the Ninth Circuit and by this Court's ruling on the Motion for Class Certification. In light of these extensive court rulings, the claim is described only briefly.

2

Plaintiffs are Section 8 Housing Choice Voucher Participants whose rental contributions were increased as a result of HACLA's reduction in the rental subsidy it provided to them in the period June 1, 2005, through April 30, 2007. Plaintiffs challenged the legal sufficiency of the notice they were provided for this reduction on the ground that they were entitled to a legally sufficient and understandable notice, and they contended that the notice sent indicating that HACLA was reducing the Voucher Payment Standard did not meet that standard. The Ninth Circuit ultimately granted Plaintiffs summary judgment on liability on due process and mandatory duty grounds (under 42 U.S.C. §1983 and Govt. Code §815.6) in *Nozzi v. HACLA*, 806 F.3d 1178 (9th Cir. 2015) ("*Nozzi II*"), and remanded the matter for further proceedings regarding class certification and remedy. The Court certified injunctive relief and damages classes, Dkt. 245. While cross summary judgment motions were pending on the appropriate remedy, the parties reached a settlement, subject to the final approval of this Court, and these proceedings followed.

## III. ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). Because this provides a useful framework for analyzing the appropriate fee award here, counsel will employ that framework in analyzing the requested fee here, although we will reverse the order of discussion.

### A. THE COMPLEXITY OF THE ISSUES

This was unquestionably a complex case. First, class actions are generally considered one of the most complex types of litigation. "It is common knowledge that class action suits have a well-deserved reputation as being most complex. The

requirement that counsel for the class be experienced attests to the complexity of the class action." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Second, civil rights cases, even if not class actions, are generally considered complex litigation. Indeed, Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

### 1.      The Legal Issues Here Were Complex And Novel.

The issues in this case involve complex issues of constitutional law in a novel context where there was little direct authority on the question of whether the HUD regulation mandating one year's advance notice constituted a property interest for purposes of the due process clause. Similarly, there were disputes over what kind of showing Plaintiffs had to make to establish that the notice was not understandable and violated due process. (In the first appeal, the Court found disputed facts regarding the adequacy of notice and remanded for consideration under *Mathews v. Eldridge*.) The novelty and complexity are established by the fact that the case was twice dismissed by the District Court pursuant to Defendants' summary judgment motion on liability, only to prevail both times on appeal (the first time resulting in a remand for further proceedings and the second time resulting in a grant of summary judgment to Plaintiffs). Even after winning summary judgment on liability, there were uncertainty and pending cross summary-judgment motions on whether the violation here resulted in the right to monetary compensation for the increased rent. The case, by the time the Final Approval Motion is heard, will have gone on for nearly twelve years (including the pre-filing work and unsuccessful efforts to resolve the case before filing). Extensive paper discovery and depositions occurred; obtaining class data was heavily litigated (prior to the Ninth Circuit's grant of summary judgment on the second appeal.)

### 2.     The Management of the Case was Challenging.

While the liability case did not present a particular management challenge, the remedy analysis did. The HACLA data was not well suited to answer the questions that needed to be answered to identify class members, for whom there were numerous reasons for exclusion. Many hours were required of both Plaintiffs' counsel and their expert, Brian Kriegler (reflected in the tens of thousands in expert fees advanced to Dr. Kriegler's firm, Econ One). Mr. Litt, who has extensive experience in the use of data in class actions, considers the challenges of identifying class members and their loss among the most challenging he has experienced. See Declaration of Barrett S. Litt, ¶¶ 38-39 (hereafter "Litt Dec.")..

Similarly, the briefing regarding remedy presented novel and complex issues on which there was little directly applicable law. Whether Plaintiffs were entitled to the rent differential between what their rental contribution would have been absent the violation and what they actually paid was vigorously contested. Plaintiffs claimed that the defective notice was the equivalent of no notice, was void *ab initio* and rendered the increased rental requirement unlawful while Defendants contended to the contrary. Because there was a paucity of directly applicable case law, it was difficult to reliably determine the likely outcome of that dispute.

### 3.     Reaching A Settlement Was Difficult.

Another example of complexity, and counsel's skill, arose during settlement discussions. The Defendants' position was that any money could only come from the insurance companies. At the first mediation, there was little movement from the insurance companies, and HACLA's position was that it would not (and could not) make any contribution. Only after that mediation, when Plaintiffs' counsel made a policy limits demand, did movement occur that ultimately resulted in a settlement, and then several knotty issues had to be resolved before settlement could be reached. Litt Dec., ¶31.

**B.    THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL**

There was substantial risk of non-payment facing plaintiffs' counsel. While Plaintiffs were not concerned about their ability to collect if they were successful (although, as noted, Defendants contended that they could not, and even were not allowed to, use funds other than insurance funds to pay judgment), the risk lay in establishing that the underlying conduct was illegal and, if so, what the appropriate remedy was. This was discussed at some length in the previous section, and will not be repeated here. Additionally, seeking seven figure amounts of money from government entities carries inherent risks because factors other than economic risk-benefit analysis (i.e., politics) are involved. See Litt Dec. ¶30

Further, class actions are inherently risky for a variety of reasons. Most cases filed as a class action are not certified and many that are can still result in a loss, or in only a partial success. Thus, there is an added level of risk in any class action. See Litt Dec. ¶¶68 to 70. This case was taken with full recognition that, because there were not cases previously finding a property interest in the kind of advance notice here, the case was on the high end of the risk spectrum, and with the expectation that, if successful, it would result in a significant fee enhancement. Litt Dec. ¶30.

**C.    THE EFFORT EXPENDED BY COUNSEL.**

Including the investigation time, and pre-litigation settlement efforts, counsel litigated this case for nearly twelve years. A partial list of the work performed (or to be performed) includes: 1) extensive investigation of the underlying circumstances, including communicating directly with class members; 2) extensive (albeit unsuccessful) attempts to settle the case pre-filing; 3) preparation of the complaint and amended complaint and extensive legal research related to framing the issues; 4) the Rule 26 conference and report; 5) propounding discovery related to liability, which included extensive analysis of the relevant documents and several depositions; 6) litigating the first round of summary judgment motions, which included several hearings in the District Court;  7) successfully appealing the grant of summary judgment to Defendants, which

required opening and reply briefs and all the other work attendant on an appeal in the Ninth Circuit; 8) returning to the District Court and continuing to litigate the case, which involved further discovery, heavily contested efforts contested to obtain class data from HACLA's data bases, and again opposing (unsuccessfully) Defendants' renewed summary judgment motion; 9) again successfully appealing the grant of summary judgment to Defendants, which this time resulted in a grant of summary judgment to Plaintiffs; 10) successfully opposing Defendants' petition for a writ of certiorari, which Opposition the Court requested after Plaintiffs decided not to file one unless requested; 11) filing and winning a successful motion to certify both an injunctive relief and a damages class; 12) obtaining the class databases and retaining experts to analyze the data in a way that would allow identification of class members and their damages, which was an extremely complex endeavor (for which Plaintiffs' counsel have advanced over $100,000; 13) filing and defending against cross-motions for summary judgment on the appropriate damages remedy; 14) preparation of an extensive mediation brief and two full day mediation sessions; 15) negotiation and preparation of lengthy settlement documents, including settlement agreement, preliminary approval order, class notice and claim forms; 16) obtaining bids from qualified settlement administrators and ongoing work with the selected Class Administrator, JND; 17) yet to be done responses if objections are filed, Motion For Final Approval and proposed Final Approval Order; 18) Final Approval Hearing; and 19) continuing contact with class members offering information and assistance as requested..

### D. THE RESULT OBTAINED FOR THE CLASS

This case was hard fought, as we have already described. The class members are by definition low income individuals of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after plaintiffs won summary judgment on liability and contested class certification. Even then it required extensive settlement efforts.

The financial terms of the settlement are very favorable to class members. It is likely that every class member who files a claim will receive the full amount of his or her rental differential (the difference between the tenant's rental contribution absent the reduction in subsidy and the rental contribution the tenant actually made). Only if the claims rate reaches well over 50% would there begin to be a slight downward adjustment of class damages (depending on how many claims are filed). In addition, the settlement includes an injunctive relief order that ensures that HACLA provides understandable notice in the future.

This is a very favorable result for the class members and was the result of counsel's extensive and uncompensated effort over many years.

### E. COUNSEL'S EXPERIENCE

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The first set of counsel is Mr. Litt and attorneys in his office. Mr. Litt is a well-known civil rights lawyer in the Los Angeles area, and has extensive class action and civil rights experience, as his Declaration and CV attached to it attest. He likely has more civil rights class action experience than any attorney practicing in the Central District. The attorneys associated with him who worked on the case (primarily Paul Estuar when he was with Mr. Litt) are also experienced in these areas. Mr. Litt's CV contains a variety of attestations to his skill, experience and reputation, several from judges in this District.

The other set of counsel are attorneys with Public Counsel, the largest pro bono law firm in the country. The Declaration of Anne Richardson, who has 28 years of civil rights and class action experience and is the current Director of Public Counsel's Consumer Law Project, addressees the Public Counsel attorneys' work on this case.

All of the appointed class counsel (Mr. Litt, Ms. Richardson and Ms. Carroll) are well-known and highly regarded civil rights and public interest lawyers, and all have extensive experience dealing both with civil rights and class action litigation, as do the other primary attorneys (Paul Estuar, Lisa Jaskol and Patrick Dunlevy) who worked on the case. See Litt and Richardson Declarations.

Case 5:16-cv-00620-JGB-KK   Document 226-2   Filed 10/09/18   Page 108 of 215
Case 2:07-cv-00380-AFM-DVC   Document 307   Filed 09/18/17   Page 18 of 39   Page ID #:4789
Page ID #:4803

### F.   COUNSEL'S SKILL

As addressed above, Plaintiffs' counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions. Their performance in this case, and its successful outcome, attest to their skill level.

### G.   THE REACTION OF THE CLASS

As of the time of this writing, Plaintiffs' counsel has not yet received a final report of the number of claims, opt-outs, or objections filed. That information will be provided in connection with the final approval hearing. However, as of September 15, 2017, the Claims Administrator reports receiving 1493 claims (approximately 12.5% of the 11,870 class members), with a value of  $1,338,753.60  (approximately 22% of the approximately $9.2 Million class fund after fees), four opt-outs, and no objections. Litt Decl., ¶32. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received).

## IV.   THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE

In this case, plaintiffs' counsel seek an award of $2,700,000-$2,820,000 (30% of the available fund of $9 Million-$9,4 Million), plus costs. Costs are significant, primarily due to the large cost of expert work to analyze the class data to determine class membership and damages, totaling approximately $167,350.61, and mediation costs.

It is well established in the Ninth Circuit that, while the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), the percentage of the fund is the typical method of calculating class fund fees. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary

basis of the fee award remains the percentage method"). While most circuits leave the method used to the discretion of the trial court, "[m]ost federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes" *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008). Thus, we discuss the requested fee based upon that method. We provide lodestar information as a cross-check, and can provide greater detail if the Court wishes.

### A. THE PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES IS THE BETTER METHOD TO CALCULATE FEES AND SUPPORTS THE FEE REQUEST HERE.

Class action litigation is risky by its very nature. In a Federal Judicial Center 1996 report, titled "Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report"), the Report authors studied the outcomes of four federal districts and concluded that 31.7% or less of the filed class cases resulted in successful class outcomes for plaintiffs. This does not account for the degree of success (i.e., some cases could have resulted in minimal or partial success, and they would still be in the successful claim category). Thus, an outcome such as that obtained in this case is the exception, not the rule. The FJC Report also examined the awarded fees and concluded that "attorneys' fees were generally in the traditional range of approximately one-third of the total settlement."

Courts and commentators recognize that the percentage of the fund approach is preferred because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working efficiently. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a

reasonable fee, since the lodestar method does not reward early settlement.")  [1];  Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class."). The Supreme Court has recognized that "the calculation of [reasonable] attorney's fees under the "common fund doctrine" … is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900, 104 S. Ct. 1541, 1550, 79 L. Ed. 2d 891 (1984).

Among the drawbacks to the lodestar method listed by Silber & Goodrich are that the lodestar method increases the amount of fee litigation; lacks objectivity; can result in churning, padding of hours, and inefficient use of resources. When the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours. Finally, the lodestar method inadequately responds to the problem of risk. *Id*. at pp.529-532. *See also Vizcaino*., 290 F.3d at 1050 ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp.

---

[1] *See also Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency" by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice"; "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991) (holding in a reversionary common fund case "that the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.");

679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee calculation); *Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in practice, the lodestar method is difficult to apply, time consuming to administer, inconsistent in result, …capable of manipulation, …[and] creates inherent incentive to prolong the litigation").

Silber and Goodrich advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become misaligned. They also reviewed two studies of fee awards in common fund cases. One study was the FJC Report discussed above. The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and Goodrich, *supra,* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id.* at 546-549.

Alignment of the class' and Class Counsel's interests is best accomplished by awarding a percentage of the fund in the normal contingent fee range. In this way, class counsel are incentivized to maximize the recovery. In defining a 'reasonable fee' in representative actions, the law should 'mimic the market.' *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases), making the requested fee her highly reasonable in relation to the market for contingent fees.

Case 5:16-cv-00620-JGB-K... Document 226-2 Filed 10/09/18 Page 112 of 215
Case 2:07-cv-00386-AFM-...-... Document 307 Filed 09/18/17 Page 22 of 35 Page ID #:4793
Page ID #:4807

The 30% figure sought here compares favorably with the general percentage of recovery awarded in cases around the country. *See* Silber and Goodrich, *supra* (summarizing available data and recommending that a 33% of the fund fee award is both reasonable, and in line with the general market for contingent fee work); *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

Further supporting the requested award is that none of the warning signs for a settlement that may be influenced by improper favorable treatment of class counsel exists here. The class was certified through a contested motion, not by agreement, and the merits of the case were heavily litigated, including a contested petition for a writ of certiorari. Class counsel are not receiving a disproportionate distribution of the settlement, the payment of fees is not separated from the class funds and therefore counsel cannot receive excessive fees in exchange for an unfair class settlement, and the fund established, whether fully claimed or not, is a substantial one sufficient to substantially compensate class members for their losses (and to refund the full principle if the claims rate is in the 50-60% range. *See, e.g., In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-947 (9th Cir. 2011).

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund, (*see Six Mexican Workers v. Arizona* Citrus *Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award)), this is an across the board benchmark, which is often adjusted upward or downward depending upon the assessment of the results, and the size of the fund. For cases under $10 Million, the percentage is usually adjusted upward,

13

Case 5:16-cv-00620-JGB-KK    Document 226-2    Filed 10/09/18    Page 113 of 215
Case 2:07-cv-03605-RT-FMO   Document 367   Filed 01/10/17   Page 23 of 35   Page ID #:4794
Page ID #:4808

generally to 30% or more. *See, e.g., Hicks v. Toys "R' Us-Delaware, Inc.*, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014) (awarding 30% of the fund in a $4 Million settlement where the Court found little risk "in any even arguably meritorious California wage and hour class action," such as the case before the court there, and citing *In re Omnivision Technologies, Inc.,* 559 F.Supp.2d 1036, 1047–48 (N.D.Cal.2007) ("nearly all common fund awards range around 30% ... [and] absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%"); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 297 (N.D.Cal.1995) ("the cases ... in which high percentages such as 30–50 percent of the fund were awarded involved relatively smaller funds of less than $10 million" and concluding that, "30 % is a common percentage award" in such cases); *Cicero v. DirecTV, Inc.*, 2010 WL 2991486, at *6 (C.D. Cal. Jul. 27, 2010) ("a review of California cases in other districts reveals that courts usually award attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a common fund under $10 million"); I*n re: Cathode Ray Tube (Crt) Antitrust Litigation.*, 2016 WL 721680 (N.D. Cal. 2016) (awarding $173,025,000 fee, 30 % of over $575,000,000 megafund, in light of the eight year length of the case, the uncertain state of the applicable class action and antitrust law and the outstanding result). [2]

---

[2] Numerous other cases support a 30% or higher fee. *See, g.g., Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932 (C.D. Cal. May 14, 2015) (awarding 30% of the gross settlement fund of $17.5 Million reached before class certification motion was filed, considering *inter alia* the monetary benefit to the class "in light of the complex factual and legal issues involved in the case," the intangible benefit of the injunctive relief obtained, the contingent nature of the representation and the risk of loss, the high level of skill and quality of class counsel's work in a complex case); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) (awarding 33% of gross settlement fund where class counsel created a roughly proportional gross settlement fund in wage-and-hour case); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *1 (N.D. Cal. Apr. 1, 2011) (awarding over 40% of settlement fund in wage-and-hour case, observing that throughout "the course of the litigation Class Counsel successfully defended against [Defendant's] attempts to dismiss Plaintiffs' claims and to decertify the classes and pursed Plaintiffs' claims until the point of settlement"); *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding district court did not abuse its discretion when awarding

Case 5:16-cv-00620-JGB-kk    Document 226-2    Filed 10/09/18    Page 114 of 215
Case 2:07-cv-00620-AFM-DM    Document 307    Filed 10/18/17    Page 24 of 35    Page ID #:4795
Page ID #:4809

**B.** **THE FUND HERE IS THE AVAILABLE FUNDS TO BE CLAIMED, INCLUDING FEES, COSTS AND MONEY THAT MAY REVERT TO DEFENDANTS IF NOT CLAIMED.**

The Ninth and other Circuits have explained that all funds recovered should be aggregated into a common fund in a class action settlement, even where the defendant pays attorneys' fees directly to class counsel as opposed to paying all sums directly into a fund, and even where funds revert to the defendant to the extent they are not claimed. Thus, in claims made or class reversion cases in this Circuit where there is a maximum fund, and unclaimed funds revert to the defendant, attorney's fees are awarded based on the gross settlement fund. See *Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed). Other circuits are in accord.[3]

---

33% fee award in light of "the complexity of the issues and the risks").); *Franco v. Ruiz Food Prod., Inc.*, No. 1:10-CV-02354-SKO, 2012 WL 5941801, (E.D. Cal. Nov. 27, 2012) (approving 33% of the Maximum Settlement Fund "in two year old wage-and-hour action, in part, because the "case was actively litigated and significant time was spent on discovery," and, "[o]verall, the specialized skill of Class Counsel in this area of the law was generally an asset to the Class Members and the quality of work performed was good"); *In re Heritage Bond Litig.*, No. 02-ML-1475-DT, 2005 U.S. Dist. LEXIS 13555, at *65 (C.D. Cal. June 10, 2005) ("[t]he experience of Class Counsel also justifies the [33%] fee award requested"); "); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) ("nearly all common fund awards range around 30%").

[3] *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir.1999) (distribution of attorneys' fees are to be based upon the funds available to eligible claimants, whether claimed or not; affirming a fee award nearly twice the amount actually claimed by the class from the fund); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2nd Cir. 2007) (the "entire Fund… is created through the efforts of counsel at the instigation of the entire class"; an "allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not"); *Landsman & Funk, P.C. v. Skinder-Strauss Associates*, 639 Fed. Appx. 880, 884 (3d Cir. 2016) (holding that the lower court "properly relied on the entire fund as the appropriate benchmark for assessing the size of the fund created" for the purpose of calculating a fee award, as opposed to calculating fees based on the amount claimed by class members); *cf Boeing Co. v. Van Gemert*, 444 U.S. 472, 480, 100 S. Ct. 745, 750, 62 L. Ed. 2d 676 (1980) (observing that absent class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel").

Case 5:16-cv-00620-JGB-kk Document 226-2 09/Filed 10/09/18 Page 115 of 215 Page ID #:4796
Case 2:07-cv-00380-RT-PWB Document 307 Filed 13/17 10/09/18 Page 25 of 35 Page ID #:4796
Page ID #:4810

Fees, litigation costs and class administration costs are included in determining the size of the fund. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ("constructing a hypothetical 'fund' by adding together the amount of money Boeing would pay in damages to members of the class …, the amount of fees provided to various counsel, the cost of the class action notices paid for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement"; court accepted the concept but not its application there); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 -246 (8th Cir. 1996)(although "technically" defendant would pay fees directly rather than their being paid "out of the class' recovery… in essence the entire settlement amount comes from the same source"; even if "the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery", and, "[a]ccordingly, the direct payment of attorney fees by defendants should not be a barrier to the use of the percentage of the benefit analysis"), citing *In re General Motors,* 55 F.3d 768, 821 (3rd Cir. 1995) (the "rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source"); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 734 (3rd Cir. 2001) ("[t]hough this is not a traditional common-fund case, because the unclaimed portion of the settlement fund is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award (depending on the number of plaintiffs who recover rights from the fund), use of the percentage-of-recovery method is appropriate in this case").

### C. ALTHOUGH A LODESTAR CROSS-CHECK IS UNNECESSARY, IT MORE THAN SUPPORTS THE FEE REQUESTED HERE.

A lodestar cross-check is not required in this circuit, and, in a case such as this, is likely not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D.Cal. 2007). In *Glass*, no lodestar cross-check was required by the Court where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive. The *Glass* Court awarded fees of $11,250,000 where, as here, the

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 116 of 215
Case 2:07-cv-00380-AFM-WB Document 367 Filed 09/18/17 Page 26 of 85 Page ID #:4797
Page ID #:4811

$45 Million fund was subject to a reversion for unclaimed funds so that the actual fund could end up being substantially less than the theoretical fund. Here, the case was heavily litigated, and, as of this motion, there have been no objections. Litt Decl., ¶32.

In discussing the lodestar, we use current rates to adjust for delay in payment. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute [42 U.S.C. § 1988]"); *Barjon v. Dalton*, 132 F.3d 496, 502–03 (9th Cir. 1997) ("the district court may choose to apply either the attorney's current rates to all hours billed or the attorney's historic rates plus interest"). Generally, for a "fee award to be reasonable, it must be based on current, rather than historic, hourly rates." *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 (C.D. Cal. 2012) (lodestar award in settled class action, citing *Missouri v. Jenkins*). The *Charlebois* Court went on to note that the increase to current rates

"is justified by comparable increases in the market. *See Coles v. City of Oakland,* No. C03–2961 THE, 2007 WL 39304, *7 (N.D.Cal. Jan. 4, 2007) (rejecting defendants' argument that rate increases should not surpass the rate of inflation and stating 'the focus of the rate analysis is to ensure that fees are awarded at 'prevailing market rates in the relevant community,' and such rates may be affected by factors other than inflation, such as attorneys' additional years of experience or changes in the legal market') (quoting *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *Parker v. Vulcan Materials Co. Long Term Disability Plan,* No. EDCV 07–1512 ABC (OPx), 2012 WL 843623, *7 (C.D.Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent increase between 2011 rates and 2012 rates and because '[i]t is common practice for attorneys to periodically increase their rates for various reasons, such as to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice'); *LaPeter v. Canada Life Ins. Co. of Am.,* No. CV06–121–

17

Case 2:07-cv-03608-CAS-PWB Document 307 Filed 10/09/18 Page 27 of 35 Page ID #:4812
Case 5:16-cv-00620-JGB-k Document 226-2 09/Filed 10/09/18 Page 117 of 215 #:4798
Page ID #:4812

S–BLW, 2009 WL 1313336 *3 (D.Idaho May 11, 2009) ('It is typical for rates to increase on a yearly basis and, also, for associates' and paralegals' rates to increase as they gain more experience.').''

Because the requested fee is not based on the lodestar, "a less exhaustive cataloging and review of counsel's hours" is involved than where the fee is based on a lodestar directly. *See, e.g., Victoria Secret Stores, LLC*, 2008 WL 8150856, at *9 (C.D. Cal. July 21, 2008) and cases cited therein. Nonetheless, we provide detailed timesheets in the event the Court wishes to review them. All the time records submitted were contemporaneously maintained with two exceptions.[4]

For purposes of the lodestar cross-check, the tables below show each person for whom time has been billed, that person's position and years of practice, the hours worked (through August 31, 2017) and the hourly rate used to bill for that person's time (using current rates) for the firms in which Mr. Litt worked during the pendency of the case (which changed over the course of the twelve years of work) and for Public Counsel. Some qualifications and explanations are in order. The Litt firms had eleven billers who billed under 15 hours on the case; all of those were eliminated. Paul Hughes is listed

---

[4] As is explained in the Anne Richardson Declaration, the time records of two Public Counsel attorneys could not be located. Hernán Vera's records are no longer available. Mr. Vera left his position as Executive Director of Public Counsel in 2014 and has submitted a Declaration attesting that his reconstructed time is correct. Lisa Jaskol left Public Counsel in 2016 to become a Superior Court judge, and her contemporaneous time records cannot be found; she has similarly submitted a Declaration that the reconstructed time is correct. While contemporaneous time records are preferred, reconstructed records are acceptable when adequately supported. *See, e.g., United States v. $12,248 U.S. Currency,* 957 F.2d 1513, 1521 (9th Cir.1991) (accepting "reconstructed records developed by reference to litigation files and other records"); *Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 1005 (N.D. Cal. 2012) ("'[b]asing the attorneys' fee award in part on reconstructed records developed by reference to litigation files and other records' is an established practice in this circuit" ) (quoting *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir.1983). Here, the reconstructed time constitutes a small percentage (approximately 6%) of the lodestar (otherwise based on contemporaneous time records). The file in this case establishes that massive time was spent by both sides litigating it.

under the Litt firms but is actually a partner in the appellate section at Mayer Brown (and co-director of the Yale Law School Supreme Court Clinic); Mr. Litt associated him in specifically to work on the (successful) opposition to the Petition for Certiorari given his experience and expertise in opposing such petitions. His hours are based on the bill he sent to Mr Litt after the Supreme Court activity ended. The $730 rate charged for Mr. Hughes, who regularly does retained work, is his current standard rate for retained work at Mayer Brown. The Litt firm also has billed for Patrick Dunlevy, who had worked on the case when he was at Public Counsel and was brought in by Mr. Litt to assist after Mr. Dunlevy left Public Counsel. Each of the billers for the Litt firms, and an explanation of the role they played, is discussed in Mr. Litt's Declaration. All Litt firm time was contemporaneously recorded. See Litt Dec., ¶¶28, 31.

| LITT FIRM BILLERS | | | | | |
|---|---|---|---|---|---|
| **Biller** | **Position** | **Years Practice (Grad Yr)** | **Rate** | **Hours** | **Total** |
| Barrett S. Litt | Attorney | 48 years (1969) | $1150 | 1189 | $1,367,350 |
| Paul Estuar | Attorney | 24 years (1993) | $765 | 516.1 | $394,816.50 |
| Pat Dunlevy | Attorney | 25 years (1992) | $750 | 324 | $243,000 |
| Paul Hughes | Attorney | 9 years (2008) | $730 | 60 | $43,800 |
| Stacey Brown | Attorney | 11 years (2006) | $600 | 22.1 | $13,260 |
| Julia White | Sr. Paralegal | | $335 | 504.1 | $168,873.50 |
| Miguel Villafuerte | Jr. Paralegal | | $150 | 42.3 | $6,345 |
| Charla Gray | Law Clerk | | $200 | 39.8 | $7,960 |
| James Debergh | Law Clerk | | $200 | 27.1 | $5,420 |
| Jonathan Dale | Law Clerk | | $200 | 29.5 | $5,900 |
| **TOTAL** | | | | | **$2,256,725** |

| PUBLIC COUNSEL BILLERS | | | | | |
|---|---|---|---|---|---|
| **Biller** | **Position** | **Years Practice (Grad Yr)** | **Rate** | **Hours** | **Total** |
| Hernán Vera | Attorney | 23 Years (1994) | $750 | 160.6 | $120,450 |
| Lisa Jaskol | Attorney | 29 Years (1988) | $850 | 75.6 | $64,260 |
| Anne Richardson | Attorney | 28 Years (1989) | $850 | 146.7 | $124,695 |
| Stephanie Carroll | Attorney | 13 Years (2004) | $640 | 945.8 | $605,312 |
| Pat Dunlevy | Attorney | 25 years (1992) | $750 | 195 | $146,250 |
| Adelaide Anderson | Attorney | 2010 (7 years) | $540 | 19.9 | $10,746 |
| **TOTAL** | | | | | **1,071,713** |

Based on these hourly rates (which are the rates these attorneys would seek in an awarded statutory fee motion), the lodestar through August 31, 2017 is $3,328,438. This does not account for the remaining work, which includes work done after August 31 on this motion, the yet to be drafted motion for Final Approval and Order, responses to objections to the extent necessary, and ongoing work with the Class Administrator and class members as needed (which time will be provided for the Final Approval Hearing).

### D. THE HOURS SPENT ON THE CASE ARE REASONABLE

The hours spent by Plaintiffs' counsel to assess the lodestar cross-check are reasonable. Hours are reasonable if "at the time rendered, [they] would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest in the pursuit of a successful recovery . . . ." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (internal quotations omitted); *see also Ramon v. County of Santa Clara*, 173 Cal. App. 4th 915, 925 (Cal. Ct. App. 2009). In making that determination, courts must look at "the entire course of the litigation, including pretrial matters, settlement negotiations, discovery, litigation tactics, and the trial itself . . . ." *Vov. Las Virgenes Municipal Utility Dist.*, 79 Cal.App.4th 440, 447 (2000); *see also Peak-Las Positas Partners v. Bollag*, 171 Cal. App. 4th 101, 114 (2009) (fees reasonable because of complexity of issues, results obtained, and defendants' aggressive litigation).

As the Ninth Circuit has recognized, civil rights lawyers working without payment from their clients have little to gain from "churning" a case. "[L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Accordingly, they should be fully compensated for taking the steps that they reasonably believe are necessary to *win* the case: "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; ***after all, he won, and might not have, had he been more of a slacker.***" *Id.* (emphasis added).

Counsel have presented detailed evidence of the time spent litigating this case for the past twelve years. *See* Exhibit C to Litt Declaration. The substantial time spent was justified in the context of this litigation. In any event, since this is a percentage of the fund fee claim, any unnecessary hours do not increase Plaintiffs' fee.

### E. *THE HOURLY RATES THAT PLAINTIFFS' COUNSEL WILL RECEIVE UNDER THE 30% FEE AWARD ARE REASONABLE.*

The listed rates in the foregoing table are amply supported. The evidence submitted attests to the skill, experience and reputations of the lead attorneys in this case. Lead counsel Mr. Litt has been recognized as a Super Lawyer every year between 2005 and the present, is named in Best Lawyers In America, and was described in 2014 by one court in this District as "one of the leading civil rights attorneys in the country." See Litt Declaration, ¶¶ 5, 12. His CV identifies numerous certified class actions in which he has been the, or one of the, lead counsel as well as pending class actions. Ms. Richardson has provided evidence of her skill, experience and reputation. She has been a Super Lawyer every year since 2004. The experience and qualifications and reputation of the lawyers is addressed in the accompanying Litt and Richardson Declarations.

The Declaration and supporting exhibits of Mr. Litt and Carol Sobel have provided ample citations from a variety of sources to support the rates used for the lodestar comparison. (As their Declarations explain, both Mr. Litt and Ms. Sobel have been identified by courts as experts on attorney fee rates in Southern California.)

21

The submitted evidence includes numerous attorney fee awards in civil rights cases (either direct fee awards or lodestar cross-checks in class actions) and consumer class actions using or awarding rates comparable to those requested here (or in which rates are comparable to those requested after accounting for the general increase in rates in Los Angeles in intervening years). In addition, Plaintiffs identified numerous commercial rate awards or commercial fees charged to clients at similar or higher rates. Congress expressly recognized that fees in federal civil rights cases should be comparable to those in complex federal civil litigation. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-76 (1986) ("Congress made clear that it 'intended that the amount of fees awarded under [§1988] be governed by the same standards which prevail in other types of equally complex Federal litigation.'" (citing S. Rep. No. 94-1011, at 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913)).

In this lodestar cross-check, whose purpose is to "alert[]the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award"( *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 306, 60 Fed. R. Serv. 3d 851 (3d Cir. 2005), as amended, (Feb. 25, 2005), the Court need not make an independent determination that each rate is reasonable. The Court is essentially ensuring that Plaintiffs' counsel do not receive a "windfall." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d 442, 467 (E.D. Pa. 2008), *as corrected* (Apr. 9, 2008).

Whether the Court would award these rates in this case in a pure statutory fee motion is not the issue in this motion because, while multipliers are generally not available (see *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553–57, 130 S. Ct. 1662, 1673–75, 176 L. Ed. 2d 494 (2010)) in statutory fee cases, they are expected, indeed required, in successful class action litigation where the fund is sufficient. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299–300 (9th Cir. 1994) (reversing denial of risk multiplier in class action; noting that, "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class

client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing" and that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases," and distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ("It is an abuse of discretion to fail to apply a risk multiplier… when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky."); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) ("the district court must apply a risk multiplier to the lodestar" where the foregoing conditions exist).  This case was taken with the expectation that of a risk enhancement; discounted hourly rates would not reflect that risk; and the case was indisputably risky.

While the foregoing cases do not identify a benchmark multiplier, "[e]mpirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1–2 range," which "counsels in favor of a presumptive ceiling of 4, or slightly above twice the mean." Rubinstein, *Newberg on Class Actions* § 15:87 (5th ed.).[5]

Class Counsel seek a fee award of $2,700,000 to $2,820,000 depending on the size of the fund available after defense litigation attorneys' fees and costs, plus an additional

---

[5] In practice, many cases have awarded multiplier above four where the Court found it appropriate. *See Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (multiplier of 5.2 in $25.5 Million settlement based on award of 25% of fund, collecting cases with high multipliers). Multipliers above two are common where the fund supports it. *See, e.g.,Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (risk multiplier appropriate on percentage of fund award in megafund settlement resulting in 28.5% of the fund and a multiplier of 3.65). *Vizcaino* contains an Appendix listing percentage and multipliers in several megafund cases, and is enlightening on the norm even in megafund cases. It lists 46 cases, the smallest of which is a $53 Million fund, and the largest of which is a $193 Million fund. Of those 46 cases, 30 received a multiplier (eight with a multiplier between 1.2-1.8, twelve with a multiplier between 2.0-2.5, six with a multiplier between 3.0-3.6, three with a multiplier between 4.0-6.2, and one with a multiplier of 19.6). Despite the fact these were mega-fund cases, where percentages of the fund are generally smaller, ten awarded percentages of the fund between 30-40%.

$167,350.61 through August 31, 2017 (to be supplemented with a final accounting) for litigation costs. The total hours in the case through August 31, 2017 are 4297.60. The lodestar through August 31, 2017, using Plaintiffs' counsel claimed rates, is $3,328,438. Plaintiffs estimate an additional 200 plus hours for the work performed after August 31 on the fee motion, the final approval motion and order and related work.

Thus, if the rates submitted are used to calculate the lodestar, the award Plaintiffs' counsel will receive is in the range of 80% of the lodestar. Even using substantially lower rates, the multiplier would likely be under 1.5. Plaintiffs' counsel have addressed the risk in class actions generally, the risks in this case given the absence of clear authority on the property interest in advance notice under the HUD regulation, and the expectation of a substantial multiplier if the case were successful.

Where Plaintiffs' counsel obtain an expeditious and "excellent result" in a "complex and risky case", they are entitled to a fully compensatory award. *See Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May 19, 2005). This was a risky, exceptionally protracted and complex case, where there was a substantial risk that Plaintiffs would not prevail, and, even if they prevailed on liability as they ultimately did, there remained a risk that that a court would not award monetary damages based on the claim of entitlement to the difference between the rental contribution the tenant actually and the lowered rental contribution they should have been paying during the one year notice period , regardless of individual circumstances (an issue unresolved at the time of settlement). The "skill and experience brought to bear by counsel throughout the year[s] they spent actively litigating this case" justifies a substantial fee award, a conclusion reinforced "by the high caliber of Plaintiffs' counsels' work in this case." *Id.*

### F. *FAILING TO AWARD THE FEES AND COSTS REQUESTED WOULD FRUSTRATE THE PURPOSES OF CLASS ACTIONS IN THE CONTEXT OF THIS SETTLEMENT.*

As *Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011 WL 10483569, at *14 (E.D. Cal. Sept. 2, 2011) explained, "[w]here… class members are receiving a substantial monetary recovery, and the interests of the class members and counsel are aligned, i.e.,

Case 5:16-cv-00620-JGB-k    Document 226-2 09/Filed 10/09/18   Page 124 of 215
Case 2:07-cv-00380-RAJ-RWB  Document 307  Filed 10/17/17  Page 34 of 35  PageID#:4805
Page ID #:4819

1  class counsel is not receiving an unreasonable proportion of the total recovery," the court

2  should consider that "one important purpose of the class action device is that defendants

3  should not benefit from their wrongdoing, and should be deterred from doing so by being

4  vulnerable to class actions to remedy their wrongful conduct." (Citing, Richard A.

5  Posner, *Economic Analysis of Law* 626–27 (5th ed.1998) ("the most important point from

6  an economic standpoint is that the violator be confronted with the costs of his violation-

7  this achieves the allocative purpose of the suit not that he pays them to his victims");

8  John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and

9  Its Implementation,* 2–3 (Columbia Law. Sch. Ctr. for Law & Econ. Studies, Working

10  Paper No. 293, 2006) (available at http://ssrn.com/abstract_id=893833). *See also Myriam

11  Gilles, Exploding The Class Action Agency Costs Myth: The Social Utility Of

12  Entrepreneurial Lawyers, University of Pennsylvania Law Review,* 155 U. Pa. L. Rev.

13  103 (November 2006).

14  ## V.    THE COSTS ARE REASONABLE.

15      Plaintiffs seek $167,350.61 in costs, which are primarily for expert and mediation

16  costs (plus other chargeable costs). See Litt Dec. ¶ 68; Exhibit D. These costs, primarily

17  reimbursement for out of pocket costs for experts, mediation and litigation costs, are

18  reasonable, and the Court should award costs (exclusive of class administration) in that

19  amount (as supplemented by costs to be supplemented for the Final Approval hearing).

20  Nontaxable cost reimbursement is authorized by Rule 23(h), and "include[s] counsel's

21  out-of-pocket expenses that would normally be charged to a fee paying client." *Newberg

22  on Class Actions* §16:10 (5th ed.). In class actions, expenses that "are of the type that law

23  firms typically bill to their clients … include such things as: mediator fees, expert fees,

24  computer research, photocopying, postage, meals, and court filing fees"). *Yang v. Focus

25  Media Holding Ltd*., 2014 WL 4401280, *19 (S.D.N.Y. 2014).

26  ## VI.    CONCLUSION

27      For the foregoing reasons, Plaintiffs respectfully request that the Court award 30%

28

Case 2:07-cv-003800-AFFWB-Document 307 Filed 09/18/17 Page 35 of 35 Page ID #:4806
Case 5:16-cv-00620-JGB-K Document 226-2 Filed 10/09/18 Page 125 of 215
Page ID #:4820

of the class fund as attorneys' fees plus litigation, consulting and expert costs in the amount of $167,350.61.

Dated: September 18, 2017      Respectfully Submitted,

     KAYE, MCLANE, BEDNARSKI & LITT
     PUBLIC COUNSEL


     By:__/s/ Barrett S. Litt_____
       Barrett S. Litt
       Attorneys for Plaintiff

Exhibit 8

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 127 of 215
Case 2:13-cv-01531-WHW-CLW Document 86-6 Filed 09/09/16 Page 1 of 7 PageID: 1579
Page ID #:4822

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA SKEEN and LAURIE FREEMAN, on behalf of themselves and all others similarly situated, | Case No. 2:13-cv-01531-WHW-CLW |
| Plaintiffs, | |
| v. | |
| BMW OF NORTH AMERICA, LLC, a Delaware limited liability company; BMW (U.S.) HOLDING CORP., a Delaware corporation; and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a foreign corporation, | |
| Defendants. | |

## DECLARATION OF RAYMOND P. BOUCHER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR
## ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 128 of 215
Case 2:13-cv-01830-WHW-CLW Document 86-26 Filed 10/16/19 Page 2 of 74 PageID: 1580
Page ID #:4823

# DECLARATION OF RAYMOND P. BOUCHER

I, Raymond P. Boucher, declare as follows:

1.      I am an attorney admitted to practice law in California and admitted *pro hac vice* to practice before this Court. I am a partner with Boucher LLP and a shareholder of the Law Office of Raymond Boucher, A.P.C. I was preliminarily appointed by this Court as Interim Co-Lead Class Counsel and subsequently appointed by this Court as Co-Class Counsel on behalf of Plaintiffs and the Class in this action.

2.      Additionally, I was a non-equity partner of the law firms of Khorrami Boucher Sumner Sanguinetti, LLP, and Khorrami Boucher, LLP ("Khorrami"). During that time, members of the Khorrami firm worked on this case. Previously, I was also a former partner of Kiesel Boucher Larson, LLP ("KBL"). The Khorrami firm and KBL were former counsel of record for Plaintiffs in this case.

3.      I submit this declaration in support of Plaintiffs' Motion For Attorneys' Fees, Costs and Incentive Awards. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

4.      I believe that the Settlement in this case is a fair remedy for the claims of Class Members arising from the marketing and sale by Defendants BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft (collectively, "Defendants" or "BMW") of the Class Vehicles, defined as the following turbocharge-equipped MINI Cooper automobiles equipped with "N14" engines and manufactured at any time from start of production in November 2006 through July 2010 (the "Class Vehicles"): model-year 2007 through 2009 MINI Cooper 'S' Hardtop (R56); model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55); and model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57), and the settlement is

fair, reasonable, and adequate. The Settlement would not have been possible without the substantial efforts of Plaintiffs and Class Counsel, who are identified below, and therefore justifies the payment of reasonable attorneys' fees, litigation costs, and incentive awards.

5.      Plaintiffs alleged the Class Vehicles contain a defect in a component part known as the "Timing Chain Tensioner," which causes the engine to malfunction and eventually, if left unrepaired, to fail. Recognizing the challenging issues and contingent risks involved in this litigation, the law firms of Kiesel Boucher & Larson, LLP, Law Office of Raymond P. Boucher, Markun Zusman Freniere & Compton LLP, all of which have significant complex litigation and class action experience, associated as co-counsel for Plaintiffs, together with Pinilis Halpern LLP as local counsel familiar with the rules of the District Court of New Jersey.

6.      Subsequently, multiple other putative class actions, all of which sought relief, similar to this action, under various state and federal laws for the timing chain tensioner issue, were eventually filed in the United States District Court for the Districts of New Jersey, California, New York, and Ohio.

7.      On April 29, 2014, the Court appointed Khorrami Boucher Sumner Sanguinetti, LLP, Cafferty Clobes Meriwether & Sprengel LLP, and Markun Zusman Freniere Compton LLP as Interim Co-Lead Class Counsel, with Pinilis Halpern, LLP as Interim Liaison Counsel. (ECF No. 48). These firms worked together with Kiesel Law, LLP. Subsequently, Interim Co-Lead Class Counsel worked with plaintiffs' counsel who had filed later similar class actions, Ahdoot & Wolfson, PC, and Morgan & Morgan Complex Litigation Group.

8.      On January 6, 2016, the Court appointed as Lead Class Counsel the law firms of Boucher, LLP, Kiesel Law, Markun Zusman Freniere & Compton LLP, Cafferty Clobes Meriwether & Sprengel LLP, Pinilis Halpern LLP, Ahdoot & Wolfson, PC, and Morgan &

Case 2:18-cv-01830-WFW-CBW   Document 36-2   Filed 09/20/19   Page 4 of 63   Page ID #:1582
Case 5:16-cv-00620-JGB-vk   Document 266-2   Filed 10/09/18   Page 130 of 215
Page ID #:4825

Morgan, LLP. (ECF No. 72.)

9.     The law firms comprising Interim Co-Lead Class Counsel, and later those firms
preliminarily appointed as Class Counsel, have essentially functioned as an executive committee
that managed the litigation and assigned specific tasks to the appropriate responsible attorneys.
Class Counsel took steps to avoid the duplication of labor, including limiting attorney
assignments, appearances, and other tasks to only those necessary. A partner from each Class
Counsel firm was responsible for managing the attorney work in this case to ensure there was no
duplicative work and that maximum efficiency was achieved. This meant that, where
appropriate, only one attorney among the firms had primary responsibilities relating to specific
projects. Based on these protocols, which were implemented by Class Counsel throughout the
litigation, I believe that the hours and work performed by all Class Counsel, including the work
performed by attorneys and staff of Boucher, LLP, Law Office of Raymond Boucher, A.P.C.,
and the Khorrami firm were reasonable and necessary.

## I.     FACTUAL BACKGROUND

### a.     Class Counsel's Exhaustive Investigative Efforts

10.     In the summer of 2012, my co-counsel David Markun at Markun Zusman
Freniere & Compton LLP ("MZFC") was contacted by the owner of a BMW MINI Cooper who
had experienced problems with the vehicle's timing chain that resulted in engine failure. MZFC
then contacted a consultant who owned and managed a MINI Cooper repair shop who suggested
that the cause of the problem emanated from a loosening of the timing chain that was possibly
due to a faulty timing chain tensioner.

11.     It is my understanding that a timing chain has to be properly tensioned and
synchronized or it will cause serious damage that ultimately results in catastrophic engine failure.
Most automobile engines are designed with a rubber-composite timing belt located outside the

engine block (the cast metal block containing the cylinders) but Class Vehicles do not have timing belts, rather, they utilize timing chains. When the timing chain tensioner begins to fail, as it did for each of the named Plaintiffs, the timing chain will stretch out of place which can result in serious damage to the engine. When the timing chain tensioner fails completely, the engine components suffer so much damage that the engine can seize up and all power to the vehicle is lost. This failure of the timing chain tensioner does not occur suddenly, rather, it slowly develops over time due to Class Members' ordinary and intended use of the Class Vehicles, i.e., driving.

12.     After meeting with the consultant, MZFC conducted on-line research which confirmed what it had been told by the consultant and learned that dozens, if not hundreds, of other MINI Cooper owners were experiencing the same set of problems. MZFC then reached out to me (at the time I was a partner with the law firm of Kiesel, Boucher & Larson LLP, now Kiesel Law, LLP) because of my and the firm's experience handling automotive-related product defect class actions. Without recalling the impacted cars, BMW issued a new timing chain tensioner. Thereafter, both law firms conducted an exhaustive investigation of the cause of the engine failures that MINI Cooper owners were experiencing. The investigation included creating a web site and responding to dozens of calls from MINI Cooper owners who had experienced problems with their timing chain and engine and visiting dozens of MINI repair shops in several states.

13.     Moreover, we took various tensioners, old and new, to a consulting metallurgical expert who confirmed that while the new and old timing chain tensioners were made from the same materials, the internal spring in the revised tensioner was more robust. The redesigned timing chain tensioner spring included significant revisions to the spring diameter, coil diameter,

total length, and pitch. Thus after a thorough and lengthy investigation, we confirmed that an integral component of the engines in the Class Vehicles was prone to failure and if not replaced early enough, would result in the complete failure of the engine necessitating the replacement of the engine at a significant cost. Critically, the failure to replace created a significant safety hazard. Early intervention still cost the consumer out of pocket anywhere from a few hundred to almost one thousand dollars depending on the severity of the damage.

### a.    The Initial Complaint

14.    On March 12, 2013, Plaintiffs Joshua Skeen and Laurie Freeman filed a Complaint against Defendants for (1) Breach of Express Warranty; (2) Breach of Implied Warranty; (3) Violation of N.J.S.A. 56:8-1, et seq.; (4) Violation of 15 U.S.C. § 2301, et seq. (5) Violation of Ga. Code Ann. §§ 10-1-390, et seq.; and (6) Violation of 815 Ill. Comp. Stat. 505/1, et seq.  (ECF 1)  The Complaint set forth in great detail the nature and extent of the timing chain tensioner defect. Among other allegations, the Complaint set forth the differences in the measurements of the spring and coil diameter and total length and pitch between the original and redesigned timing chain tensioners. Plaintiffs alleged that Defendants knew or should have known of the issues with the timing chain and its components at the time the Class Vehicles were put into the stream of commerce in this jurisdiction and throughout the United States. Compounding the defect, the Class Vehicles were marketed as having sophisticated on-board computers that were constantly monitoring the vehicles to alert the owner when service was required; however, this system failed to alert consumers to the issues with the timing chain. Plaintiffs further alleged that Defendants exacerbated their improper sale of the Class Vehicles to Class Members by refusing to honor their obligation to repair the timing chain and its components after the expiration of the warranty period despite the defect being present in the

Case 5:16-cv-00620-JGB-kk  Document 26-2  Filed 10/09/18  Page 133 of 215
Page ID #:4828
Case 2:13-cv-01393-WHW-CLW  Document 86-2  Filed 09/09/16  Page 7 of 63 PageID: 1585

Class Vehicles on delivery and within the original vehicle warranty period.

15.     Multiple other similar putative class actions were eventually filed in the United States District Court for the: District of New Jersey (*Curran v. BMW of North America, LLC*, Civil Action No. 2:13-cv-4625-WHW-CLW); Southern District of California (*Brown v. BMW of North America, LLC*, Civil Action No. 3:14-cv-00950-JLS-BLM); Eastern District of New York (*Kahn v. BMW of North America, LLC*, Civil Action No. 2:14-cv-02463-ADS-ARL); and, Southern District of Ohio (*Quinlan v. BMW of North America, LLC*, Civil Action No. 1:14-cv-00485-MRB) (collectively, the "Federal Actions"). The Federal Actions asserted a number of claims, all of which sought relief, like this action, under various state and federal laws. The class actions noted above had been represented by the following law firms: Cafferty Clobes Meriwether & Sprengel LLP represented the putative class in *Curran v. BMW of North America, LLC*; Ahdoot and Wolfson APC and Morgan and Morgan Complex Litigation Group represented the putative class *in Brown v. BMW of North America, LLC* and *Quinlan v. BMW of North America, LLC*; Ahdoot & Wolfson, P.C. and the Law Offices of Paul C. Whalen, P.C. represented the putative class *in Kahn v. BMW of North America*.

    a.     **Defendants' Motion to Dismiss, Discovery, and Ongoing Investigation**.

16.     On April 23, 2013, Defendants filed a Motion to Dismiss the first-filed complaint on various grounds. (ECF 5). In response, the parties agreed to the filing of the First Amended Complaint, which named five Plaintiffs from three states.  (ECF 12, 13). On July 23, 2013, Defendants moved to dismiss the FAC.  (ECF 15). Plaintiffs opposed the motion (ECF 28) and, by Order and Opinion dated January 24, 2014 (ECF 37, 38), this Court denied in part and granted in part Defendants' motion.

17.     On May 2, 2014, a Second Amended Complaint ("SAC") was filed on behalf of

Case 5:16-cv-00620-WGB-vk Document 66-2 Filed 10/09/18 Page 134 of 215 Page ID #:1586
Case 2:13-cv-01830-WRW-CEW Document 86-2 Filed 10/09/18 Page 634 of 215
Page ID #:4829

21 plaintiffs from 12 states pleading the following counts: (1) Breach of Express Warranty; (2) Breach of Implied Warranty; (3) Violation of N.J.S.A. 56:81, et seq.; (4) Violation of 15 U.S.C.§ 2301, et seq.; (5) Violation of Ga. Code Ann. §§ 10-1-390, et seq.; (6) Violation of 815 Ill. Comp. Stat. 505/1, et seq.; (7) Violation of Cal. Bus. & Prof. Code § 17200, et seq.; (8) Violation of Cal. Civil Code § 1750, et seq.; (9) Violation of Minnesota Unlawful Trade Practices Act (Minn. Stat. § 325D.13); (10) Violation of Minnesota False Statements in Advertising Act (Minn. Stat. § 325F.67); (11) Violation of Minnesota Consumer Protection Act (Minn. Stat. § 325F.69); (12) Violation of Arizona Consumer Fraud Act (Ariz. Rev. Stat. § 44-1521, et seq.); (13) Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA)(Fla. Stat. §§ 501.201, et seq.); (14) Violation of the Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code §§ 17.41, et. seq.); (15) Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); (16) Violation of Tennessee Consumer Protection Act (Tenn. Code § 47-18-101, et seq.); Violation of Arkansas Deceptive Trade Practices Act (Ark. Code Ann. § 4-88-101, et seq.): and (18) Violation of New York Consumer Protection Act (NYCPA)(N.Y. Gen. Bus. Law § 349). (ECF 52). Defendants ultimately filed an Answer to the SAC. (ECF 58).

18.     The parties exchanged initial disclosures, engaged in extensive written discovery including exchanging interrogatories and requests for production. Plaintiffs' counsel continued to investigate the timing chain failures being reported to them from consumers across the country. This included not only conversations with many dozens of consumers but also, in many instances, obtaining and examining their service, and other, records relating to their vehicles.

### a.     The Repair Letter and Service Bulletin

19.     In October 2013, approximately seven months after the initial complaint was

Case 5:16-cv-00620-JGB-KK   Document 86-2   Filed 10/09/18   Page 135 of 215
Page ID #:4830
Case 2:18-cv-01830-WHW-CLW   Document 26-2   Filed 09/19/18   Page 9 of 63   PageID: 51587

filed, Defendants wrote a letter regarding the faulty timing chain tensioner which was sent by Defendants to owners of the subject vehicles known to them. The letter stated, in pertinent part, as follows:

> As part of ongoing quality analysis at MINI USA, it was determined that your vehicle may have been fitted with a faulty chain tensioner which may lead to an insufficiently tightened timing chain. To ensure that your vehicle is operating as designed, the chain tensioner and timing chain must be checked for wear and replaced, if necessary.

> To have this service performed, please contact your authorized MINI dealer at your earliest convenience to arrange an appointment. The repair will be done at no cost to you…

20.     Attached as Exhibit 1 is a true and correct copy of this letter.

21.     Thereafter, in January 2014, Defendants issued a technical service bulletin (the "Bulletin") to MINI dealers addressing the N14 engine timing chain tensioner and timing chain and recognizing a defect in the spring force of the tensioner. Specifically, the Bulletin states, in pertinent part, as follows:

**Situation**

The timing chain tensioner applies pre-tension to the timing chain guide rail mechanism. In some cases, the tensioner spring force may be too low. Depending upon the severity of the wear, it may lead to a rattling noise when starting the engine cold or when the engine is idling.

**Cause**

The timing chain tensioner internal tolerances are not consistent.

22.     Attached as Exhibit 2 is a true and correct copy of this Bulletin. The Bulletin described the affected vehicles as "certain MINI models equipped with the N14 engine, produced from 11/2006-5/2009." The Bulletin set forth a required procedure to be followed by dealers to inspect and possibly replace the timing chain tensioner and/or other related parts before customer delivery or the next time the covered vehicle was brought in for maintenance or repairs. Stated

differently, every time a customer with a covered vehicle brought in his or her vehicle for any kind of service or repair, the dealer was directed to follow certain procedures, including possible repair of the tensioner or repair and/or replacement of other components or parts, as outlined in the Bulletin. Importantly, the repair covered in the Bulletin is covered under warranty regardless of time or mileage.

### a. The Settlement Negotiations

23. The Settlement was the culmination of lengthy negotiations among the parties, which involved a full-day mediation with the Honorable Theodore Katz (Ret.) on February 14, 2014, in New York, New York, followed by a settlement conference with the Honorable Cathy L. Waldor on February 20, 2015, as well as multiple in-person, telephonic, and written communications between the parties. Such negotiations, which occurred over the span of more than one year, did not take place until after the above-referenced dispositive motion was filed and ruled upon. Over one year after the first mediation, a Settlement was finally reached and settlement documents were fully executed in November 2015. Preliminary approval of the Settlement was granted on January 6, 2016. (ECF Nos. 71, 72).

24. The settlement terms are detailed in the Settlement Agreement submitted to the Court in the preliminary approval motion and are also described and cited in Plaintiffs' Motion for Attorneys' Fees, Costs, and Incentive Awards.

25. Only after the parties came to agreement regarding the relief to the Class did they begin to negotiate attorneys' fees. Unable to agree, the parties retained Judge Joel A. Pisano (Ret.) and mediated the issue in person in Newark, New Jersey, after written submissions. Class Counsel and Defendants have agreed that Class Counsel may apply to the Court for an award of Class Counsel fees and expenses and that Defendants may object to or oppose that application,

although Defendants will not object to Class Counsel's application for an award of fees and expenses up to $1,820,000.00 and Class Counsel may apply for an award of fees and expenses not to exceed $2,320,000.00. The payment of Class Counsel fees and expenses will be paid by Defendants in addition to, and will not reduce in any way, the Settlement benefit to Class Members. See Settlement Agreement ¶ VIII.A-B.

## II.  PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS

26.     Class Counsel seek the Court's award of $2,320,000 in attorneys' fees and expenses incurred in the prosecution of this litigation.

27.     The fees and costs requested by Class Counsel are, in my view, reasonable in light of the risks and costs undertaken to advance this litigation. The fees were wholly contingent in nature and the case presented far more risk that the usual contingent fee case. The work performed in this litigation precluded our work on other cases. There was the prospect of the enormous cost inherent in class action litigation, as well as a long battle with corporate Defendants. Class Counsel risked not only a great deal of time, but also a great deal of expense to ensure the successful litigation of this action on behalf of all Class Members. The reasonableness of the fees and costs request are also supported by the settlement obtained, which provides substantial monetary benefit to Plaintiffs and other Class members.

28.     Additionally, at my direction, the time reports provided by Class Counsel were reviewed by lawyers at Boucher, LLP for accuracy and removal of any time entries that, although incurred for work performed, it was determined in their discretion should not be included in this fee application.

29.     The lodestar of attorneys' fees incurred by Class Counsel, collectively, is $3,387,328.75 for 5,100.25 hours of time expended. Without deduction for costs incurred, the amount requested represents a discount of the lodestar in the amount of $1,067,328.75 (or

Case 2:13-cv-01531-WHW-CLW Document 86-6 Filed 06/19/15 Page 138 of 215 PageID: 1590

approximately 31.5%).

### III.   THE WORK PERFORMED BY LAW OFFICE OF RAYMOND BOUCHER, APC, BOUCHER, LLP, AND THE KHORRAMI FIRM IN THIS LITIGATION

30.     As set forth above, I have been involved in the above-entitled putative class action from its inception and have spent significant time investigating the alleged defect, meeting with potential plaintiffs, meeting with consultants and experts, developing and co-prosecuting this case, and negotiating a settlement on behalf of the Plaintiffs and Class members.

31.     During the course of this litigation, I and other attorneys and staff actively participated in all aspects of this case, including: (1) attorney meetings and discussions regarding strategy and case management; (2) analysis of case-related developments and strategy; (3) case management; (4) appearances before this Court for certain hearings and conferences (including teleconferences); (5) drafting and reviewing initial disclosures and other written discovery; (6) consulting with experts; (7) communicating with Plaintiffs and class members; (8) conducting research related to theories of the case, alleged defenses, and the proposed settlement; (9) conducting factual investigations into the plaintiffs' claims; (10) drafting, reviewing, and revising the pleadings and amended pleadings, as well as motions practice, as well as the preparation of other court-related filings; (11) preparing for and participating in mediations and settlement-related discussions, reviewing and revising the settlement documents and motions for preliminary approval, and overseeing claims administration by the third party claims administrator.

32.     I also anticipate spending additional time after the date of this declaration relating to settlement administration and final approval. I believe this work performed contributed to the beneficial result reached for the class members in this case.

### IV.   THE ATTORNEYS' FEES AND COSTS INCURRED BY LAW OFFICE OF RAYMOND BOUCHER, APC, BOUCHER, LLP, AND THE KHORRAMI FIRM

Case 2:18-cv-01534-WWW-CEWk Document 86-6 Filed 05/14/26 Page 130 of 215 PageID 1591
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 01/09/18 Page 139 of 215
Page ID #:4834

## IN THIS LITIGATION

33.    The Law Office of Raymond Boucher, APC, Boucher, LLP, and the Khorrami firm were retained to work on this matter on a contingency fee basis, and have not received any compensation for the services rendered in this case or any reimbursement for the litigation costs advanced to co-prosecute this case on behalf of Plaintiffs and other Class members. Information specific to the time, lodestar and costs for these firms follows below.

34.    **Law Office of Raymond Boucher, APC:** The summary schedules below and attached as an exhibit are a true and correct reflection of the time spent by me as shareholder of Law Office of Raymond Boucher, APC working on this case. The summary schedules were prepared based on the contemporaneous time records of all work performed following review of the records for errors and redundancies. All of the tasks performed, and the time expended, were reasonable and necessary for the prosecution and ultimate settlement of the claims of Plaintiffs and Class members. The schedules indicate a total of 952.9 hours of work and a total lodestar of $1,039,947.50, which was calculated based on the hourly rate in effect at the time the work was performed.

35.    A summary of Law Office of Raymond Boucher, APC's lodestar calculation sorted by categories of work performed is set forth in a table attached as Exhibit 3.

36.    A summary of Law Office of Raymond Boucher, APC's lodestar calculation sorted by professional rate is set forth as follows:

| Professional | Status | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Raymond P. Boucher (Rate 1) | Name Partner of Boucher, LLP and Shareholder of Law Office of | 47.1 | $925.00 | $43,567.50 |

| | Raymond Boucher, APC | | | |
|---|---|---|---|---|
| Raymond P. Boucher (Rate 2) | Name Partner of Boucher, LLP and Shareholder of Law Office of Raymond Boucher, APC | 905.8 | $1,100 | $996,380.00 |
| **TOTALS:** | | **952.9** | | **$1,039,947.50** |

37.　　Attached as Exhibit 4 is a true and correct summary of expenses incurred by Law Offices of Raymond Boucher, APC during the course of this litigation. The expenses pertaining to this case are reflected in the books and records of my firm. This expense summary was prepared based on expense vouchers, check records and other documents and is an accurate record of the expenses. Exhibit 4 indicates a total of $7,100.12 in expenses incurred by Law Office of Raymond Boucher, APC in connection with the prosecution of this litigation. I believe the litigation expenses incurred were reasonable and necessary given the complex nature and scope of the case.

38.　　**Boucher, LLP:** The summary schedules below and attached as an exhibit are a true and correct reflection of the time spent by attorneys and staff of Boucher, LLP working on this case. The summary schedules were prepared based on the contemporaneous time records of all work performed following review of the records for errors and redundancies. All of the tasks performed, and the time expended, were reasonable and necessary for the prosecution and ultimate settlement of the claims of Plaintiffs and Class members. The schedules indicate a total of 147.8 hours of work and a total lodestar of $92,792.50, which was calculated based on the hourly rate in effect at the time the work was performed.

39.     A summary of the attorneys and staff at Boucher, LLP's lodestar calculation sorted by categories of work performed is set forth in a table attached hereto as Exhibit 5.

40.     A summary of Boucher, LLP's lodestar calculation sorted by professionals is set forth as follows:

| Professional | Status | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Shehnaz Bhujwala | Partner | 34.4 | $750.00 | $25,800.00 |
| Maria Weitz | Partner | 71.5 | $750.00 | $53,625.00 |
| Priscilla Szeto | Associate | 14.2 | $395.00 | $5,609.00 |
| Lauren Burton | Associate | 13.6 | $395.00 | $5,372.00 |
| Alexander Gamez | Law Clerk | 1.2 | $185.00 | $222.00[1] |
| Sandra Haro | Paralegal | 12.9 | $185.00 | $2,386.50 |
| **TOTALS:** | | **147.8** | | **$92,792.50** |

41.     Attached as Exhibit 6 is a true and correct summary of expenses incurred by Boucher, LLP during the course of this litigation. The expenses pertaining to this case are reflected in the books and records of Boucher, LLP. This expense summary was prepared based on expense vouchers, check records and other documents and is an accurate record of the expenses. Exhibit 6 indicates a total of $16,601.82 in expenses incurred by Boucher, LLP to date in connection with the prosecution of this litigation. I believe the litigation expenses incurred were reasonable and necessary given the complex nature and scope of the case.

42.     **Khorrami, LLP:** The summary schedules below are a true and correct reflection of the time spent by attorneys and staff at the Khorrami firm. The summary schedules were

---

[1] The minimal amount billed by Mr. Gamez was discounted from the total lodestar for Boucher, LLP ($93,014.50), resulting in a total lodestar for Boucher, LLP of $92,792.50. The discounted lodestar amount ($92,792.50) was used to calculate total lodestar across all firms.

prepared based on the contemporaneous time records of all work performed following review of the records for errors and redundancies. All of the tasks performed, and the time expended, were reasonable and necessary for the prosecution and ultimate settlement of the claims of Plaintiffs and Class members. The schedules below and time and lodestar records lodged with the Court indicate a total of 269.2 hours of work performed and a lodestar of $139,078.25, which was calculated based on the hourly rate in effect at the time the work was performed.

43.    A summary of the Khorrami firm's lodestar calculation sorted by categories of work performed is set forth in a table attached hereto as Exhibit 7.

44.    A summary of the Khorrami firm's lodestar calculation sorted by professionals is set forth as follows:

| Professional | Status | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Shehnaz Bhujwala | Associate | 125.9 | $625.00 | $78,687.50 |
| Robert Drexler | Associate | 5.9 | $625.00 | $3,687.50 |
| Santo Riccobono | Associate | 27.4 | $495.00 | $13,563.00 |
| Maria Weitz | Associate | 18.1 | $495.00 | $8,959.50 |
| Brian Bush | Associate | 32.35 | $395.00 | $12,778.25 |
| Paymon Khatibi | Associate | 25.4 | $395.00 | $10,033.00 |
| Steven Soliman | Associate | 5.8 | $395.00 | $2,291.00 |
| Scott Tillett | Associate | 18.3 | $395.00 | $7,228.50 |
| Jaspreet Tiwana | Law Clerk | 10.0 | $185.00 | $1,850.00 |
| **TOTALS:** | | **269.2** | | **$139,078.25** |

45.    Attached as Exhibit 8 is a true and correct summary of expenses incurred by the Khorrami firm relating to this case. This expense summary was prepared based on check records

Case 2:18-cv-01531-WFW-GJSk  Document 86-3  Filed 05/14/16  Page 176 of 215  Page ID #:1595
Case 5:16-cv-00620-JGBk  Document 226-2  Filed 04/09/18  Page 143 of 215
Page ID #:4838

and other documents and I believe it is an accurate record of the Khorrami firm's payment of expenses related to this case. Exhibit 8 indicates a total of <u>$17,003.15</u> in expenses incurred by the Khorrami firm in connection with the prosecution of this litigation. I believe the litigation expenses incurred were reasonable and necessary given the complex nature and scope of the case.

46.     Based on a review of the State Bar website, Shawn Khorrami, the sole shareholder of the Khorrami firm, was ordered inactive by the California State Bar on November 23, 2015, and is thus ineligible to practice law. Over the past several months, creditors of Mr. Khorrami and his firm have communicated to me an intent to secure payments from Khorrami, LLP's *quantum meruit* interest in certain cases, including this case. Upon request, I have also provided information regarding this case to a court-appointed receiver in *Hamilton Capital VII, LLC v. Khorrami, LLP et al*., New York State Supreme Court Case No. 650791/2015, in which a bank that provided financing to the Khorrami firm obtained an $8.5 million default judgment against the firm on November 4, 2015. Accordingly, I request that the Court approve an award of attorneys' fees for work performed by the Khorrami firm on this case based on 68% of the lodestar calculation provided, or a *pro rata* award based upon the total fees claimed and the ultimate total award, as well as for costs incurred by that firm, which funds will be placed into a segregated account maintained by my firm for the benefit of the Khorrami firm's creditors.

47.     **Reasonableness of Hourly Rates:** The hourly rates charged by Law Office of Raymond Boucher, APC and Boucher, LLP in this case are the standard, hourly rates charged by me and Boucher, LLP attorneys, paralegals, and law clerks. These hourly rates have been approved by courts presiding over class actions, including cases reflected in the firm resume and my curriculum vitae (see Section IV, below). For example, these rates were approved in two

recent decisions in state and federal court, *Lopez, et al. v. Citrus Valley Health Partners, Inc.,* Los Angeles Superior Court Case Nos. BC544139 and BC545110 (Superior Court of California, Los Angeles County) and *Del Campo v. Hometown Buffet, Inc. et al.*, Central District of California Case No. 2:14-cv-04378-RGK-SH.

48.     Indeed, the hourly rates for all attorneys and staff identified herein at the time the work was performed are commensurate with the prevailing market rates for attorneys of comparable experience and skill handling complex litigation. Additionally, all reasonable attempts were made to assign tasks to time-keepers at the appropriate billing rates.

## V.     PLAINTIFFS' SERVICE AWARDS

49.     Pursuant to the terms of the preliminarily approved settlement, Plaintiffs are making an application to the Court for a service award of $4,000 each, which is some compensation sought for their efforts in instituting, prosecuting and bearing the laboring oar and risk of this litigation as Class Representatives. This amount would be paid by Defendants in addition to any benefits to be paid under the Settlement to the Class. *See* Settlement Agreement ¶ VIII.C. Given the significant efforts of the Plaintiffs to advance this case on behalf of Class members who will benefit from such efforts, and the risks and burdens they undertook, I believe the requested service awards are imminently reasonable.

## VI.     EXPERIENCE, QUALIFICATIONS AND VIEWS ON THE SETTLEMENT

50.     I, together with attorneys at Boucher, LLP who worked on this case, have significant experience prosecuting complex class action litigation on behalf of plaintiffs. Attached as Exhibits 9 and 10, respectively, are true and correct copies of the Boucher, LLP firm resume and my curriculum vitae.

51.     As set forth in the attached resume and CV, my firm and I have wide-ranging experience leading and managing a variety of complex litigation matters in state and federal

courts, including Judicial Council Coordinated Proceedings ("JCCPs") in California state court, multi-district litigation ("MDLs") involving mass tort matters and class actions in federal courts, and state and nationwide class action lawsuits. A representative sampling of the cases in which attorneys from my firm and I have held lead, liaison, or co-lead positions in several mass torts, class actions, and complex coordinated actions follows:

a.     *Abrica v. Tosco et al.*, Case No. BC239882 (Superior Court of California, County of Los Angeles): Mass tort relating to toxic refinery fire, which resolved successfully.

b.     *Bartley v. Camarillo Miramonte Homeowners Association*, Case No. SC020953 (Superior Court of California, Ventura County). Class action against real estate developers on behalf of individual unit owners of a condominium project for faulty construction and repairs. The units were constructed over a high water table and on poor soils which expanded and contracted, causing the units to sink, and causing floor slabs, foundations, and walls to crack. The defendants knew about the defects but did not disclose them. After receiving complaints, developers failed to repair as promised. Homeowners complained the repairs were not performed, or were not performed improperly. Resolved on eve of trial.

c.     *Black v. Blue Cross*, Case No. BC250339 (Superior Court of California, County of Los Angeles): Certified class action against a health insurer for improper mid-year contract modifications which led to a $22.5 million settlement.

d.     *Bustamante v. Southern California Gas Company, et al.*, Case No. BC285598 (Superior Court of California, County of Los Angeles): Class action against energy companies on behalf of California citizens for manipulation of the market for natural gas by reporting false price and volume information to the price indices and industry publications that were used to establish the cost of natural gas to end users, and the value of natural gas in the

commodities markets.

      **e.**    *Chavez v. Nestle USA, Inc.*, Case No.: CV09-9192 GW (CWx) (C.D. Cal.): Class action to recover for false advertising in the marketing of a beverage for infants.

      **f.**    *Clergy Cases I & II*, California Judicial Council Coordinated Proceedings ("JCCPs") 4286, 4297, and 4359: Litigated childhood sexual abuse cases against the Archdioceses of Los Angeles, San Diego, and Orange and other Catholic entities with the total settlement exceeding $1.2 billion.

      **g.**    *Colin Higgins Productions, LTD. v. Universal City Studios, LLC*, Case No. BC499180 (Superior Court of California, County of Los Angeles). Class action against movie studio arising from studio's calculation of profit participation from home video distribution of films. Final approval of class action settlement granted.

      **h.**    *County of Santa Clara v. Smithkline Beecham Corporation*, C.A. NO. 2:10-cv-01637-CMR (E.D. Pa.). This is an action on behalf of the People of the State of California for false advertising and deceptive business practices in the marketing, sales and distribution of the Type 2 Diabetes drug Avandia.

      **i.**    *Del Campo v. Hometown Buffet, Inc. et al.*, C.D. Cal. 2:14-cv-04378-RGK-SH. Court-appointed as Class Counsel in wage and hour case against restaurant chain. Final approval of settlement granted.

      **j.**    *In Re Crestor Products Liability Cases*, California JCCP No. 4713. Appointed Plaintiffs' Co-Liaison Counsel in coordinated proceeding involving alleged personal injuries from ingestion and use of prescription drug Crestor.

      **k.**    *In re Transient Occupancy Tax Cases*, California JCCP 4472: Represented the City of Los Angeles in a class action on behalf of all cities in the state of California to

Case 2:18-cv-01581-WWW-CEW-kk Document 86-6 Filed 05/14/16 Page 21 of 74 Page ID 1599
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 06/09/18 Page 147 of 215
Page ID #:4842

recover unremitted occupancy taxes from certain online travel companies.

l.      *In re Galvanized Steel Pipe Litigation*, Case No. BC174649 (Superior Court of California, County of Los Angeles): Class action involving construction defects that resolved successfully for $41 million.

m.      *In re Wholesale Electricity Antitrust Cases I & II*, California JCCP 4204-00005 and 4204-00006: Actions in which the plaintiffs sought to recover damages from energy traders for unfair business practices.

n.      *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig*., MDL No. 09-2074 (C.D. Cal.): Served in a leadership role in a consolidated action to recover for anticompetitive price fixing and for artificial deflation of medical payments and reimbursements, leading to underpayments to doctors for medical care that they provided, and to artificially high charges for out-of-pocket costs to insured individuals for medical care that they received.

o.      *In Re: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation*, MDL No. 2329 and Wright California JCCP. Co-Lead Counsel and Plaintiffs' Steering Committees in complex national and state complex litigations involving defective hip system product. Co-tried first bellwether case for Plaintiff Christiansen resulting in $11M jury verdict.

p.      *In re Yaz, Yasmin, Ocella Contraception Cases*, California JCCP No. 4608 (Superior Court of California, County of Los Angeles): Serves as liaison counsel to the court. This coordinated proceeding involves personal injury actions resulting from ingestion of the oral contraceptives Yaz, Yasmin and Ocella.

q.      *Lopez, et al. v. Citrus Valley Health Partners, Inc.* Case Nos. BC544139 and BC545110 (Superior Court of California, Los Angeles County). Court-appointed as Class

Counsel in wage and hour class actions against large California hospital entity. Final approval of settlement granted.

      **r.**     *Silver v. Del Webb*, Nevada Case No. A437325: A certified class construction defect suit involving the installation of faulty plumbing systems in new homes. The litigation resulted in a $21 million settlement.

      **s.**     *Zoloft Birth Defects Cases*, JCCP No. 4771. Appointed Plaintiffs' Co-Lead Counsel in coordinated proceeding involving alleged birth defect claims arising from mother plaintiffs' use and ingesting of prescription anti-depressant drug.

      **t.**     As more fully set forth in my curriculum vitae, throughout my career I have also held numerous leadership positions in various legal organizations. I was the 2007 President of Consumer Attorneys of California ("CAOC"), and the 2005 President of Consumer Attorneys Association of Los Angeles ("CAALA"). I have served as a member of the Board of Directors of Public Justice; the California State Delegate to the American Association of Justice; a member of the Pepperdine School of Law Board of Visitors; a member of the Diversity in Law Foundation; and the California State Delegate to the Association of Trial Lawyers of America. I also previously served on the Los Angeles County Bar Association Board of Directors.

      52.     I have been honored with numerous awards and distinctions for my work. Notably, I was the recipient of the Los Angeles Daily Journal Trial Lawyer of the Decade, 2001-2010, in particular for my work in California JCCPs entitled *Clergy Cases I & II,* JCCPs 4286, 4297, and 4359. In 2007, I received both the CAALA and CAOC Trial Lawyer of the Year Awards. I have also received the Trial Lawyer of the Year Award from the Orange County Trial Lawyers Association. I have also received the CLAY award from California Lawyer Magazine, which recognizes attorneys from across the state whose achievements have made a profound

impact on the law. Additionally, the Honorable Chief Justice Ronald George and the California State Bar honored me with an award for my efforts on behalf of court funding and on behalf of the State Courts of California. In 2006, I was presented with the David S. Casey, Jr. Consumer Advocate Award by the Consumer Attorneys of San Diego; and the Justice Armand Arabian Award by the Project Sister organization. The California League of Conservation Voters awarded me with the 2005 Environmental Leadership Award for my longstanding dedication to the environment and public health rights of individuals, and I was the recipient of the Ted Horn Memorial Award, a CAALA honor for the selfless gift of one's talent. Additionally, I have been the recipient of numerous Presidential Awards, Awards of Merit and Commendation from Trial Bars around the country.

53.     I personally have extensive trial experience and have briefed and argued many appeals before the Ninth Circuit Court of Appeals and California Courts of Appeal.

54.     I am a frequent speaker at CAOC, CAALA, AAJ, law schools, and National College of Advocacy seminars and various educational conventions throughout the country.

55.     I spend a considerable amount of time performing pro bono work and community service. I began my career doing pro bono work with Cesar Chavez and the United Farm Workers. More recently, I took a humanitarian trip to Uganda to assist improving the Juvenile Justice system. I have spearheaded fundraisers for various local, state and national organizations.

56.     I frequently advise U.S. Senators and Representatives, as well as California State Senate, Assembly and Constitutional Officers about legal and political issues. In the fall of 2004, I helped lead the fight to defeat Proposition 64, which sought to limit the ability to bring environmental polluters to justice. I have received commendations from U.S. Senators Barbara Boxer and Diane Feinstein, from numerous Congressmen and women, including U.S. Flags

flown over the U.S. Capitol for my humanitarian efforts. Likewise, I have received commendations from the Governor, Lt. Governor, State Senate, State Assembly, Mayor of Los Angeles, and the Board of the Los Angeles City Council.

57.     I have been involved in the above-entitled putative class action from its inception and have spent significant time investigating the alleged claims. I have allocated a significant amount of time and money to develop the case. My firm, Boucher, LLP, has the resources, both financially and personnel-wise, to pursue this type of litigation. Boucher, LLP employs seven lawyers, works with one attorney who is of counsel to the firm, in addition to employing several litigation assistants, paralegals, and other support staff. It has committed to technology and has invested in complex litigation software tools that allow it to litigate a case of any size and scope. The firm's lawyers are also widely acknowledged by their peers as possessing the skills and resources to litigate class actions effectively and efficiently.

58.     The Settlement Agreement and Release between Plaintiffs and Defendants was reached after hard-fought litigation, including discovery, law and motion, arms-length negotiations between the parties as well as formal mediation and other settlement discussions and meetings.

59.     In my judgment, based on my professional experience, the settlement is not only fair, adequate, and reasonable, but it also represents an excellent resolution of the Plaintiffs' and proposed Class members' claims against Defendants.

60.     Based upon my experience in similar class action litigation and this case, I believe that the proposed settlement is fair, reasonable and adequate, and is in the best interests of the Class members. Also based upon my experience in similar cases and this case, the requested fees, costs and service awards are reasonable and appropriate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of May, 2015, at Woodland Hills, California.

/s/ Raymond P. Boucher
Raymond P. Boucher

Exhibit "1"

# MINI



Dear Mary E Morford,

Re: WMWMF73599TT95840    4220

Our records indicate that you are the owner of the above-referenced MINI.

As part of ongoing quality analysis at MINI USA, it was determined that your vehicle may have been fitted with a faulty chain tensioner which may lead to an insufficiently tightened timing chain. To ensure that your vehicle is operating as designed, the chain tensioner and timing chain must be checked for wear and replaced, if necessary.

To have this service performed, please contact your authorized MINI dealer at your earliest convenience to arrange an appointment. The repair will be done at no cost to you and will take approximately one day to complete; however, additional time may be required depending upon the MINI dealer's schedule.

If you are no longer the owner of the above-referenced vehicle, we kindly ask you to pass this letter on to the new owner as soon as possible.

Should you have any questions, the MINI Customer Relations and Services Department is available Monday through Friday from 9:00 A.M. to 9:00 P.M., ET. You can reach us at 1.866.ASK.MINI (275-6464).

We apologize for any inconvenience should your MINI be affected.

Sincerely,

**Company**
MINI USA
A division of
BMW Group Company

**MINI USA**
**Customer Relations and Services**

**Mailing Address**
PO Box 1227
Westwood, NJ
07675-1227

**Telephone**
(866)ask-mini
275-6464

**Fax**
(201) 930-8484

**E-mail**
MINI.Assistance@askminiusa.com

**Website**
www.miniusa.com


Printed on Recycled Paper

Exhibit "2"



## SI M11 04 13
Engine

January 2014
Technical Service

This Service Information bulletin supersedes SI B11 04 13 **dated November 2013**

## PERFORM THE PROCEDURE OUTLINED IN THIS SERVICE INFORMATION ON ALL AFFECTED VEHICLES BEFORE CUSTOMER DELIVERY OR THE NEXT TIME THEY ARE IN THE SHOP FOR MAINTENANCE OR REPAIRS.

[NEW] designates changes to this revision

SUBJECT
**Service Action: N14 Engine Check Timing Chain Tensioner and Timing Chain**

MODEL
R55

R56

R57

With the N14 engine

SITUATION
The timing chain tensioner applies pre-tension to the timing chain guide rail mechanism. In some cases, the tensioner spring force may be too low. Depending on the severity of the wear, it may lead to a rattling noise when starting the engine cold or when the engine is idling.

CAUSE
The timing chain tensioner internal tolerances are not consistent.

AFFECTED VEHICLES
This Service Action affects certain MINI models equipped with the N14 engine, produced from 11/2006 to 5/2009.

[NEW] First check the B-pillar Service Action label for code number **61**.

[NEW] If code number **61** has been punched out, the campaign has already been performed and no further action is necessary.

[NEW] Vehicles which require this Service Action to be completed will show it as "Open" when checked either in the "Service Menu" of DCSnet (Dealer Communication System) or with the Key Reader.

PROCEDURE
**Inspecting the Chain Tensioner:**

1. The timing chain tensioner will need to be inspected before removal. The timing chain tensioner is visible from above, inside the engine compartment, between the intake tube and

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 156 of 215 Page 2 of 9
Case 2:15-cv-01583-WFN-JCW Document 86-6 Filed 05/13/16 Page 30 of 76 Page ID #:1608
Page ID #:4851

air filter housing. One of the following timing chain tensioners may be installed. **Do not remove the timing chain tensioner for the inspection.**



GRUSB1113-61

| Item 1: Protruding boss -- Not OK | Item 3: Drilled head -- OK |
| Item 2: Flat head, no markings, no holes, no machined edge -- Not OK | Item 4: Machined edge in head -- OK |

2. ■■■■ If the engine is fitted with a timing chain tensioner that has a drilled head (item 3) or has a machined head (item 4), do not replace the timing chain tensioner. No further repairs are needed. If the chain tensioner has a protruding boss (item 1) or a flat head (item 2), proceed to step 3.

3. Remove the right-hand wheel arch trim to access the crankshaft central bolt.

4. Disconnect the battery and remove the ignition coils and spark plugs. Turn the engine in clockwise direction by hand to move the flywheel approximately 90° before TDC. Rotating the engine counterclockwise may cause an incorrect measurement.

5. Install the locating pin (Special



Tool 11 9 590) to lock the position of the engine.

Note:

Do not remove the cylinder head cover! Do not install camshaft locking tool during this procedure. To achieve an accurate measurement, the camshafts need to rotate.

Remove the chain tensioner and collect the residual oil with a shop towel.



6. Fit the chain tensioner (Special Tool 11 9 340) without the seal ring and with the lock nut loose. Pretension the chain tensioner with Special Tool 00 9 250 to 0.6 Nm. Finger-tighten the M10 lock nut on Special Tool 11 9 340.

Note:
Gently turn Special Tool 00 9 250 while applying the torque. Quickly rotating the tool will provide an inaccurate measurement result.



7. Remove chain tensioner Special Tool 11 9 340 from the engine, with the lock nut still tight. Measure the distance (A), as described in the illustration.

8. If distance A is less than 68 mm, replace the chain tensioner with sealing ring P/N 11 31 4 609 482 (refer to parts list A).

9. If distance A is 68 mm or greater, replace the components below, found in the Timing Chain Repair Kit P/N 11 31 8 623 601 (refer to parts list B):

   o Timing chain tensioner

   o Sealing ring

   o Timing chain

   o Guide rail

   o Tensioner rail

   o Sliding rail

   o Sprocket on the crankshaft

   o Bearing bolts for the tensioner and guide rails

Refer to Repair Instruction 11 31 051, "Replacing timing chain N14."

During the replacement of the timing chain module (guide rails), inspect for missing or broken parts. If portions of or the entire guide rail(s) are missing, it is very likely these component fragments have migrated into the engine oil pan.

In this case, remove the engine oil pan to retrieve the component fragments and replace the engine oil and filter.

Note: If the engine oil service is showing "Recommended" or "Due," reset the CBS data.

Refer to Repair Instruction 11 13 000, "Removing and installing, sealing or replacing oil pan (N14)." (Refer to parts list B and C.)

**Do not replace the front crankshaft hub seal unless it is found to be leaking or damaged.**

**Refer to the EPC for additional onetime-use parts as required, e.g., gaskets, seals, bolts, etc.**

**Do not replace the hydraulic valve lifters (HVA), intake camshaft VANOS adjustment unit, or the exhaust camshaft sprocket for this repair. Refer to the Warranty section of this bulletin for more details.**

PARTS INFORMATION

| Parts List A | | |
|---|---|---|
| | | |
| **Part Number** | **Description** | **Quantity** |
| 11 31 4 609 482 | Chain tensioner with seal ring | 1 |
| | | |

| Parts List B | | |
| --- | --- | --- |
| | | |
| **Part Number** | **Description** | **Quantity** |
| 11 31 8 623 601 | Timing chain repair kit (includes timing chain tensioner and seal ring) | 1 |
| | | |
| **Parts List C** | **Removing and Installing Engine Oil Pan** | |
| | | |
| **Part Number** | **Description** | **Quantity** |
| 11 42 7 622 446 | Set oil-filter element | 1 |
| | | |
| and, claim in sublet | | |
| | | |
| **Part Number** | **Description** | **Quantity** |
| 83 19 0 404 517 | Loctite 5970 liquid sealer - 50ml | 1 |
| 07 51 0 143 829 | SAE 5W-30 Longlife motor oil | 5 |

**LABEL INSTRUCTIONS**



This Service Action has been assigned code number **61**. After the vehicle has been checked and/or corrected, obtain a label (MD20–064) and:

A. Emboss your MINI dealer warranty number in the middle of the label (1);

B. Punch out code number **61** (2), printed on the label; and

C. Affix the label to the B-pillar as shown.

If the vehicle already has a label from a previous Campaign, affix the new label next to the old one. Do not affix one label on top of another one, because a number from an underlying label could appear in the punched-out hole of the new label.

**WARRANTY INFORMATION**
The repair described in this bulletin is covered under warranty regardless of time or mileage.

Reimbursement for this Service Action will be via normal claim entry utilizing the following information.

| Defect Code: | 00 11 08 03 00 | |
|---|---|---|
| | | |
| **Main Work** | | |
| **Labor Operation:** | **Labor Allowance:** | **Description:** |
| 00 61 055 | Refer to KSD2 | Checking chain tensioner |
| or | | |
| 00 61 056 | Refer to KSD2 | Checking chain tensioner, replacing chain tensioner and checking timing chain |
| or | | |
| 00 61 057 | Refer to KSD2 | Checking and replacing timing chain tensioner and timing chain |
| or | | |
| 00 61 120 | 🆕 Refer to KSD2 | Checking and replacing timing chain tensioner, timing chain and removing and installing/sealing engine oil pan to remove fragments when necessary |

The labor operation codes above are Main labor operations. If you are using a **Main** labor code for another repair, use the appropriate Plus code labor operation below.

**Plus Work (Vehicle already in the workshop)**

| **Labor Operation:** | **Labor Allowance:** | **Description:** |
|---|---|---|
| 00 61 689 | Refer to KSD2 | Checking chain tensioner |
| or | | |
| 00 61 690 | Refer to KSD2 | Checking chain tensioner, replacing chain tensioner, and checking timing chain |
| or | | |
| 00 61 691 | Refer to KSD2 | Checking and replacing timing chain tensioner and timing chain |
| or | | |
| 00 61 855 | 🆕 Refer to KSD2 | Checking and replacing timing chain tensioner, timing chain and removing and installing/sealing engine oil pan to remove fragments when necessary |

Case 2:16-cv-00620-JCB-kk Document 226-2 Filed 05/13/20 Page 33 of 76 Page ID 1613
Case 5:16-cv-00620-JGB-kk Document 86-6 Filed 04/06/18 Page 161 of 215
Page ID #:4856

Sublet

| Sublet Code 4 | See sublet reimbursement calculation below | Reimbursement for repair-related materials (Part numbers not eligible for claim submission) |

Sublet reimbursement calculation for claiming used quantities of repair-related materials:

- MINI part numbers (including the engine oil and Loctite 5970) at dealer net plus handling; or
- Other materials not available through MINI and obtained locally at cost plus 20 percent.

Enter the material cost in sublet and itemize the amount in the claim comment section.

**Other Repair**

Please review the vehicle's DCSnet Warranty Vehicle Inquiry and the Key Reader/ISPA Light application's information to determine if the Service Action outlined in SI M11 05 13 (Defect Code 00 11 17 03 00) also applies.

**MINI Maintenance Program**

For vehicles with an active maintenance program:

When the engine oil and filter are replaced in conjunction with removing and installing the engine oil pan, and the engine oil service is showing "Recommended" or "Due," reset the CBS data and claim as follows:

| Defect Code: | 85 99 05 01 MP | |
| --- | --- | --- |
| | | |
| Main Work | | |
| Labor Operation: | Labor Allowance: | Description: |
| 00 00 105 | Refer to KSD2 | Service – standard scope |

**Claim comment**

Engine oil and filter replaced with removal and installation of the oil pan as part of the N14 Engine Check Timing Chain Tensioner and Timing Chain Service Action.

**Plus Work**

NEW Claim the Plus code labor operation: 00 61 855 for:

Checking and replacing the timing chain tensioner, timing chain and removing and installing/sealing the engine oil pan to remove fragments when necessary, when this work is performed.

Case 2:15-cv-01531-WHW-CLW Document 86-6 Filed 05/19/16 Page 38 of 76 PageID: 1614
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 162 of 215 Page 8 of 8
Page ID #:4857

{ Copyright ☆2014 BMW of North America, Inc. }

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 163 of 215
Case 2:13-cv-01531-WHW-CLW Document 86-6 Filed 05/19/16 Page 37 of 76 PageID: 1615
Page ID #:4858

Exhibit "3"

Case 2:16-cv-06020-JGB-kk Document 226-2 Filed 05/09/18 Page 164 of 215
Case 2:16-cv-01531-WWW-JEWk Document 86-6 Filed 05/14/20 Page 38 of 76 Page ID 1616
Page ID #:4859

## BMW MINI
## TIME REPORT

FIRM NAME: Law Office of Raymond Boucher
REPORTING PERIOD: Inception- Present

**Categories:**
(1) Analysis/Strategy/Attorney Meetings
(2) Case Management
(3) Court Appearance
(4) Discovery
(5) Document Review
(6) Experts - Work or Consult
(7) Client Meeting

(8) Research
(9) Fact Investigation/Development
(10) Pleadings / Motions
(11) Settlement

**Status:**
(P) Partner
(A) Associate
(LC) Law Clerk
(PL) Paralegal

| NAME | STATUS | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | Total Hours | Hourly Rate | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raymond Boucher (Rate 1) | P | 15.4 | 0.0 | 0.0 | 0.0 | 0.0 | 8.3 | 1.20 | 0.0 | 12.0 | 10.2 | 0.0 | 47.1 | $ 925.00 | $ 43,567.50 |
| Raymond Boucher (Rate 2) | P | 486.9 | 76.1 | 48.9 | 0.5 | 0.0 | 0.7 | 3.1 | 29.9 | 8.1 | 30.3 | 221.3 | 905.8 | $ 1,100.00 | $ 996,380.00 |
| TOTALS | | 502.3 | 76.1 | 48.9 | 0.5 | 0.0 | 9.0 | 4.3 | 29.9 | 20.1 | 40.5 | 221.3 | 952.9 | | 1,039,947.5 |

Exhibit "4"

Case 5:16-cv-00620-JGB-kk   Document 226-2   Filed 06/09/18   Page 166 of 215
Case 2:15-cv-01538-WFWv-CEkk   Document 864   Filed 05/14/20   Page 466 of 76   PageID 1618
Page ID #:4861

| **Law Office of Raymond Boucher, APC -- Expense Report for 2/26/14 - 12/14/14** | |
|---|---|
| | |
| **Description** | **Expense** |
| Meals | $790.11 |
| Parking | $4.00 |
| Travel (Flights, Hotel, Transport) | $6,306.01 |
| **TOTALS:** | **$7,100.12** |

Case 2:13-cv-01531-WHW-GEW   Document 86-6   Filed 05/19/16   Page 41 of 76   PageID: 1619

Exhibit "5"

Case 2:16-cv-00620-JCB-vk Document 226-2 Filed 10/09/18 Page 168 of 215
Case 2:18-cv-01531-WAW-CEW Document 86-6 Filed 05/19/16 Page 42 of 76 Page ID 1620
Page ID #:4863

# BMW MINI
## TIME REPORT

FIRM NAME: Boucher LLP
REPORTING PERIOD: Inception- May, 2016

**Categories:**
(1) Analysis/Strategy/Attorney Meetings
(2) Case Management
(3) Court Appearance
(4) Discovery
(5) Document Review
(6) Experts - Work or Consult
(7) Client Meeting
(8) Research
(9) Fact Investigation/Development
(10) Pleadings / Motions
(11) Settlement

**Status:**
(P) Partner
(A) Associate
(LC) Law Clerk
(PL) Paralegal

| NAME | STATUS | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | Total Hours | Hourly Rate | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alexander Gamez | LC | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | 0.0 | 0.0 | 0.0 | 1.2 | $ 185.00 | $ 222.00 |
| Lauren Burton | A | 0.0 | 13.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 13.6 | $ 395.00 | $ 5,372.00 |
| Maria Weitz | P | 6.8 | 4.2 | 0.1 | 0.0 | 0.0 | 0.0 | 2.2 | 4.1 | 0.0 | 21.0 | 33.1 | 71.5 | $ 750.00 | $ 53,625.00 |
| Priscilla Szeto | A | 0.0 | 3.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 4.0 | 14.2 | $ 395.00 | $ 5,609.00 |
| Sandra Haro | PL | 0.0 | 12.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.9 | $ 185.00 | $ 2,386.50 |
| Shehnaz Bhujwala | P | 3.4 | 6.4 | 0.0 | 0.0 | 0.8 | 0.0 | 0.8 | 0.6 | 0.0 | 0.2 | 22.2 | 34.4 | $ 750.00 | $ 25,800.00 |
| TOTALS | | 10.2 | 40.3 | 0.1 | 0.0 | 0.8 | 0.0 | 3.0 | 12.9 | 0.0 | 21.2 | 59.3 | 147.8 | | 93,014.5 |

Exhibit "6"

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 170 of 215
Case 2:18-cv-01531-WHW-CLW Document 86-3 Filed 05/14/20 Page 4 of 76 PageID: 1622
Page ID #:4865

| Boucher, LLP -- Expense Report from December 15, 2014 to May 2, 2016 | | | | |
|---|---|---|---|---|
| **Description** | **Expense** | | | |
| Filing Fees | $424.00 | | | |
| Legal Research | $500.82 | | | |
| Meals | $693.78 | | | |
| Parking | $152.00 | | | |
| Prof'l Fees - Connell Foley, LLP | $3,647.08 | | | |
| Travel (Flights, Hotel, Transport) | $10,251.95 | | | |
| *Subtotal for Case Costs:* | *$15,669.63* | | | |
| | | | | |
| Copies (Print Jobs) | $428.00 | | | |
| Office Copies (Canon):  5 copies / 3 color @ $0.75 and 2 black @ $0.10 | $2.45 | | | |
| Faxes:  14 pages @ $0.50 each | $7.00 | | | |
| Pacer Access | $33.00 | | | |
| Postage | $0.47 | | | |
| Westlaw | $39.72 | | | |
| NJ Fund: TBP 5/31/2016 | $424.00 | | | |
| **TOTALS:** | **$16,601.82** | | | |

Exhibit "7"

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 172 of 215
Case 2:15-cv-01531-MWW-CEW Document 86-6 Filed 05/19/16 Page 48 of 76 Page ID: 1624
Page ID #:4867

**BMW MINI**
**TIME REPORT**

FIRM NAME: Khorrami LLP
REPORTING PERIOD: July 18, 2013 - November 20, 2014

**Categories:**
(1) Analysis/Strategy/Attorney Meetings
(2) Case Management
(3) Court Appearance
(4) Discovery
(5) Document Review
(6) Experts - Work or Consult
(7) Client Meeting

(8) Research
(9) Fact Investigation/Development
(10) Pleadings / Motions
(11) Settlement

**Status:**
(P) Partner
(A) Associate
(LC) Law Clerk
(PL) Paralegal

| NAME | STATUS | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | Total Hours | Hourly Rate | Amount |
|------|--------|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|------|-------------|-------------|--------|
| Brian Bush | A | 1.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.3 | 0.4 | 17.9 | 0.0 | 32.4 | $ 395.00 | $ 12,778.25 |
| Jaspreet Tiwanna | LC | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.0 | 0.0 | 0.0 | 0.0 | 10.0 | $ 185.00 | $ 1,850.00 |
| Maria Weitz | A | 1.9 | 1.9 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 2.4 | 9.8 | 0.7 | 18.1 | $ 495.00 | $ 8,959.50 |
| Paymon Khatibi | A | 2.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 3.0 | 0.0 | 20.0 | 25.4 | $ 395.00 | $ 10,033.00 |
| Robert Drexler | A | 5.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.9 | $ 625.00 | $ 3,687.50 |
| Santo Riccobono | A | 2.8 | 1.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.7 | 0.0 | 12.0 | 0.0 | 27.4 | $ 495.00 | $ 13,563.00 |
| Scott Tillett | A | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 18.3 | 0.0 | 0.0 | 0.0 | 18.3 | $ 395.00 | $ 7,228.50 |
| Shehnaz Bhujwala | A | 11.1 | 14.0 | 0.0 | 7.7 | 0.0 | 0.0 | 0.2 | 5.9 | 2.3 | 64.5 | 20.2 | 125.9 | $ 625.00 | $ 78,687.50 |
| Steven Soliman | A | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.8 | 0.0 | 5.8 | $ 395.00 | $ 2,291.00 |
| **TOTALS** | | **25.7** | **18.0** | **1.2** | **7.7** | **0.0** | **0.0** | **0.2** | **57.4** | **8.1** | **110.0** | **40.9** | **269.2** | | **$ 139,078.25** |

Exhibit "8"

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 174 of 215
Case 2:18-cv-01581-WLH-JEM Document 86-6 Filed 05/14/26 Page 488 of 767 Page ID #:1626
Page ID #:4869

**Khorrami, LLP Costs**

| Date | Case Name | Code | Quantity | Cost | Total Cost | Description |
|------|-----------|------|----------|------|------------|-------------|
| 10/31/2013 | 44060 / BMW Mini Cooper / SE | O | 1 | $84.41 | $84.41 | Info/Online Search -LexisNexis, Inv.1309047414 |
| 1/31/2014 | 44060 / BMW Mini Cooper / SE | O | 1 | $1.03 | $1.03 | Info/Online Search -LexisNexis, Inv. 1401046779 |
| 2/6/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $2,040.00 | | Travel - $2,040.00 02/6/14 |
| 2/8/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $2,045.00 | $2,045.42 | Travel - $2,045.00 3/14/14 |
| 2/13/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $2,045.42 | | |
| 2/28/2014 | 44060 / BMW Mini Cooper / SE | O | 1 | $90.87 | $90.87 | Info/Online Search -LexisNexis, Inv. 1402046714 |
| 2/28/2014 | 44060 / BMW Mini Cooper / SE | O | 1 | $81.91 | $81.91 | Info/Online Search -LexisNexis, Inv. 1402046714 |
| 3/31/2014 | 44060 / BMW Mini Cooper / SE | O | 1 | $58.83 | $58.83 | Info/Online Search -LexisNexis -Inv. 1403046592 |
| 4/10/2014 | 44060 / BMW Mini Cooper / SE | AR | 1 | $29.42 | $29.42 | Arbitrations & Mediations -CD Labels for Mediation PPT - ADP Payroll 5/1/14 |
| 4/18/2014 | 44060 / BMW Mini Cooper / SE | PS | 1 | $42.56 | $42.56 | Postage & Delivery - -FedEx, Inv. 2-627-21985 dtd 4/18/14 -Paid chk#3686 5/23/14 |
| 4/21/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $1,808.24 | $1,808.24 | Travel -$4,308.00 Travel |
| 4/21/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $4,308.00 | | |
| 4/24/2014 | 44060 / BMW Mini Cooper / SE | OC | 1 | $212.00 | $212.00 | Other Costs -NJ Lawyers' Fund For Client Protection -Renewal of Pro-Hac Vice - Ray Boucher |
| 4/24/2014 | 44060 / BMW Mini Cooper / SE | OC | 1 | $212.00 | $212.00 | Other Costs =NJ Lawyers' Fund For Client Protection -ProHac Vice for Maria Weitz |
| 4/30/2014 | 44060 / BMW Mini Cooper / SE | O | 1 | $5.32 | $5.32 | Info/Online Search -LexisNexis, Inv. 1404046516 dtd 4/30/14 |
| 6/24/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $1,384.94 | $1,384.94 | Travel - 7/1/14 |
| 10/3/2014 | 44060 / BMW Mini Cooper / SE | TR | 1 | $2,553.20 | $2,553.20 | Travel - Payroll 10/16/14 |
| | | | | **TOTAL:** | **$17,003.15** | |

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 175 of 215
Page ID #:4870
Case 2:13-cv-01531-WHW-CLW Document 86-6 Filed 05/19/16 Page 496 of 76 PageID: 1627

Exhibit "9"

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 06/09/18 Page 176 of 215
Case 2:13-cv-01531-WHW-CLW Document 86-6 Filed 05/19/16 Page 5 of 7 PageID: 1628
Page ID #:4871

# BOUCHER LLP

Boucher LLP focuses on the prosecution of high-impact, complex litigation, including class actions, mass actions, and representative actions on behalf of consumers and employees harmed by major corporations and insurance companies; civil rights and police misconduct cases; cases involving the sexual abuse of minors and disabled; and significant personal injury and wrongful death cases. Boucher and his colleagues are frequently appointed class counsel in major class actions and often serve among plaintiffs' leadership in state and federal coordinated proceedings.

Boucher's successes include a groundbreaking settlements on behalf of the victims of childhood sexual abuse. In addition to several other honors, he was named Los Angeles Daily Journal's Trial Lawyer of the Decade (2001-2010).

## EXPERTISE AND RESOURCES

### Consumer Class Actions

The firm has extensive experience with consumer class action litigation and the relevant issues in evaluating and settling class action claims. Boucher LLP's attorneys have litigated and certified consumer class actions in a range of areas—from automotive and other product defects, to privacy and data breach, to antitrust, breach of contract, and other business disputes.

Boucher LLP's attorneys have served as lead class counsel and/or on the plaintiffs' steering committee in numerous consumer class action cases including, *In Re Aetna UCR Litigation*, Dist. N.J., MDL No. 2020 (Class Counsel), *American Medical Association et al. v. Wellpoint, Inc*., C.D. Cal, MDL No. 2074 (Interim Co-Lead Class Counsel), *Black v. Blue Cross of California*, Super. Ct. Los Angeles County, No. BC250339 (Class Counsel), *Chavez v. Nestlé USA, Inc*. C.D. Cal., No. CV09-9192 GW (CWx) (Lead Counsel), *In Re: Facebook, Inc. Internet Tracking Litig*., N.D. Cal., MDL No. 2314 (Interim Liaison Counsel), *In Re Galvanized Steel Pipe Litigation*, Super. Ct. Los Angeles County, No. BC174649 (Lead Class Counsel), *In re: Pellicano Cases*, Super. Ct. Los Angeles County No. BC316318 (Co-Lead Class Counsel), *Sister Sledge et al. v. Warner Music Group Corp*., N.D. Cal., No. 12-CV-0559-RS (Interim Co-Lead Class Counsel), and *Skeen, et al. v. BMW of North America LLC, et al.*, Dist. N.J., No. 2:13-cv-1531-WHW-CLW (Interim Co-Lead Class Counsel).

### Employment Class and Representative Actions

Boucher LLP is currently prosecuting numerous class and representative cases against corporations on behalf of thousands of workers alleging wage-and-hour violations, including claims for violations of meal and rest break laws, illegal rounding of time, and failure to pay all wages. The firm is committed to ensuring employees are properly compensated under state and federal laws, and to holding corporations accountable for failing to abide by the law.

Case 2:18-cv-01531-WvAw-GEwk Document 86-6 Filed 05/14/19 Page 52 of 76 Page ID #:1629
Case 5:16-cv-00620-JGBwk Document 226-2 Filed 01/09/18 Page 177 of 215
Page ID #:4872

## Mass Tort Litigation

Boucher LLP's attorneys have obtained favorable recoveries for thousands of clients harmed by major pharmaceutical companies. Boucher presently serves in leadership for numerous coordinated proceedings in state and federal court, including *In Re Crestor Products Liability Cases*, Super. Ct. Los Angeles County, JCCP No. 4713 (Plaintiffs' Co-Liaison Counsel), *In Re Diet Drug Litigation*, Super. Ct. Los Angeles County, JCCP 4032 (Plaintiffs' Co-Liaison Counsel), *In re Wright Medical* Technology, *Inc., Conserve Hip Implant Products Liability Litigation,* MDL No. 2329 (Co-Lead Counsel for Plaintiffs and state Liaison Counsel), and *Zoloft Birth Defects Cases*, JCCP No. 4771 (Plaintiffs' Co-Lead Counsel).

Boucher LLP's attorneys have also successfully resolved mass tort cases involving toxic exposure, including, among others, *Bunker Hill Twrs Condo Ass'n, et al. v. W.R. Grace & Co*., Super. Ct. Los Angeles County, No. B072642, and *Zachary et al. v. ARCO et al.*, Super. Ct. Los Angeles County, No. BC209944.

## Complex, High-Impact Litigation

Boucher LLP is committed to advancing the rights of the people and to holding corporations accountable. Throughout his career, Mr. Boucher has brought worthy cases in furtherance of these goals. For example, in the *California Gubernatorial Recall Election Litigation*, Boucher represented former Governor Gray Davis in a challenge to the qualification of the 2003 California gubernatorial recall election. In *Madrid v. Perot Systems Corporation et al*., Super. Ct. Sacramento County, No. 03AS04763, Boucher resolved an antitrust and unfair competition action to recover from Perot Systems Corporation for aiding and abetting the manipulation, distortion, and corruption of California's electricity market. More recently, in *Centinela Freeman Emergency Medical Associates, et al. v. Maxwell-Jolly, et al.*, Super. Ct. Los Angeles County, Pending, No. BC406372, Boucher and his partners obtained an order compelling California's Department of Health Care Services to comply—for the first time ever—with their obligation to annually review of Medi-Cal physician reimbursement rates to ensure access to quality healthcare in California. These are but a few of the many "impact" cases Boucher and his colleagues have pursued in the interest of positive social change.

## Civil Rights and Police Misconduct Cases

Boucher LLP prosecutes individual, mass, and class actions against public entities for civil rights violations and police misconduct. The firm is committed to helping people obtain justice and to motivating significant policy changes.

Boucher is particularly proud of the published result in *Wallace v. City of Los Angeles* (1993) 12 Cal. App. 4th 1385, a case of first impression he brought against the City on behalf of Demetria Wallace, a teenaged honors student who was shot and killed while waiting for a bus, just five days before she was to testify against a man accused of fatally shooting a taxi driver. After non-suit was granted at trial, the appeals court held the police had a duty to warn the victim. The case affirmed the government's responsibility to protect citizens who place their lives in jeopardy by stepping forward as witnesses to crimes, and prompted changes in police procedures that have saved countless other witnesses' lives since.

Case 2:18-cv-01531-WQW-GEW Document 86-6 Filed 05/14/20 Page 52 of 76 Page ID 1630
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 01/09/18 Page 179 of 215
Page ID #:4873

### Sexual Abuse Cases

Boucher LLP prosecutes individual and mass action cases against public and private entities that fail to protect minors and the disabled from sexual abuse. The firm's attorneys have extensive experience representing survivors of sexual abuse in such cases.

For example, in *The Clergy Cases,* Super. Ct. California*,* JCCP Nos. 4286, 4297, 4359, Boucher served as Plaintiffs' Liaison Counsel on behalf of almost 1,000 individuals and their families in significant personal injury claims involving molestation at the hands of Catholic priests. In *Jane Doe v. Garden Grove Unified School District,* Boucher prosecuted claims on behalf of a child victim of sexual abuse at school against a public school district. *Elena A. et al. v. Casa de Angeles Cal. Corp., d/b/a Healthy Start, et al*., Super. Ct. Los Angeles County, No. BC457840, was brought on behalf of developmentally disabled adults who were subjected to serious verbal, physical, and sexual abuse and neglect while attending an adult day care center. And Boucher was a leader in *Los Angeles Unified School District Sexual Molestation Cases*, which were brought on behalf of the many children who were molested by a teacher at Miramonte Elementary School.

Case 2:18-cv-01531-WvAw-JCEwk Document 866-2 Filed 05/19/26 Page 530 of 715 PageID #: 1631
Case 5:16-cv-00620-JGB-wk Document 226-2 Filed 04/09/18 Page 179 of 215
Page ID #:4874

# RAYMOND P. BOUCHER

Raymond P. Boucher, a veteran trial lawyer specializing in complex consumer litigation, class actions, product liability, toxic tort litigation, employment discrimination and bad faith, he is the Founder and Senior Partner of Boucher LLP.

During his professional career, which spans three decades, Boucher has tried more than 60 Cases, and has helped obtain verdicts and settlements on behalf of clients in excess of $3 billion. In two of his more notable cases, he served as lead attorney in the landmark $660 million sexual abuse settlement with the Catholic Archdiocese of Los Angeles in which he represented over 250 abuse victims in the July 2007 settlement as well as obtaining nearly $200 million for 144 survivors in a lawsuit against the Roman Catholic Diocese of San Diego. Boucher has briefed and argued more than 20 appeals before the Ninth Circuit Court of Appeals and California Courts of Appeal.

For his professional achievements, Boucher has received a diverse array of honors and awards, to include recognition as: "Top 100 Attorneys in California" (2002) by the Daily Journal; "Trial Lawyers of the Decade, " (2001-2010) by the Daily Journal; "California Lawyer Attorney of the Year" (2008) by California Lawyer; "Consumer Attorney of the Year" (2007) by the Consumer Attorneys of California; and "Trial Lawyer of the Year" by the Consumer Attorneys Association of Los Angeles (additional awards listed below).

A noted author and lecturer, Boucher has lectured at numerous law schools (e.g. Stanford, Pepperdine, Loyola) and has delivered hundreds of presentations to bar associations and other legal organizations as well as legal media sponsored events and educational and government forums.

Prior to founding Boucher, LLP, Boucher served several other Los Angeles area law firms, including: Kiesel, Boucher & Larson LLP (Partner), Law Offices of Raymond P. Boucher (Founder/Senior Partner), Nordstrom, Steele, Nicolette & Jefferson (Of Counsel), Sayre, Moreno, Purcell & Boucher (Managing Partner), and Gould & Sayre.

A native of Massachusetts, Boucher received his undergraduate education at Fort Lewis College in Durango, CO where he received his Bachelor of Arts degree with a double major in Business Administration and Political Science. And was later honored as its "Alumnus of the Year" (2007). He matriculated to Colorado State University where he received a Master of Science degree in Management. Boucher obtained his Juris Doctor degree from Pepperdine University School of Law and was later honored in 2002 with its Distinguished Alumnus Award. He also received an Honorary Doctor of Law by Whittier College School of Law in 2005.

Boucher is admitted to the State Bar of California as well as the United States District Court for the Central, Northern, Southern, and Eastern Districts of California. He is a member of, and has held leadership positions in, numerous legal professional entities, including:

- American Association for Justice, Member

- American Bar Association, Admitted as a Fellow of the American Bar

- Association of Trial Lawyers of America, State of California Delegate Member

- Beverly Hills Bar Association, Member
- California Courts, Administrative Office of the Courts (2002 to 2007), Committees: Court Funding, Complex Courts System, Court Integration
- California State Bar Association, Member
- Civil Justice Foundation, Member
- Consumer Attorneys Association of Los Angeles (Formerly the Los Angeles Trial Lawyers Association) President (2005), Board of Governors, Emeritus Member (2005 to present), Board of Governors, Member (1996 to 2006)
- Consumer Attorneys of California (Formerly the California Trial Lawyers Association, President (2007), Board of Governors (1997 to present)
- Consumer Attorneys of San Diego (2001 to present), Consumer Advocate of the Year (2007)
- Diversity in Law Foundation, Board of Directors
- Los Angeles County Bar Association, Board of Trustees (2000 to 2002)
- Los Angeles Superior Court Bench and Bar Committee (2001 to 2008)
- National College of Advocacy, Fellow
- Orange County Trial Lawyers Association, Member
- Pepperdine School of Law, Board of Visitors (1997 to present)
- Public Citizen, Member
- Public Justice (Formerly Trial Lawyers for Public Justice), Board of Directors (1996 to present), Member (1984 to present)
- The Roscoe Pound Foundation, Member

Among the other honors, awards and other forms of recognition Boucher has received for his professional achievements and accomplishments from legal, community, educational, nonprofit and media entities, include:

- American Association for Justice Steven J. Sharp Public Service Award (2008)
- Consumer Attorneys Association of Los Angeles Ted Horn Memorial Award in recognition of service to the California State Bar (2002), Finalist, Trial Lawyer of the Year (1996) , Several Presidential Awards for Outstanding Contribution to the Trial Bar
- Consumer Attorneys of California Legislative Champion Award (2002), Several Presidential Awards of Merit
- Consumer Attorneys of San Diego David S. Casey, Jr. Consumer Advocate Award (2006)
- California League of Conservation Voters Environmental Leadership Award (2005) for dedication to the environment and for fostering the public health rights of individuals
- Fort Lewis College, Durango, Colorado Alumnus of the Year (2007)

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 05/09/18 Page 181 of 215
Case 2:15-cv-01534-WHW-CLW Document 86-6 Filed 05/19/16 Page 53 of 78 PageID: 1633
Page ID #:4876

- Lawdragon Named one of 500 Leading Lawyers in America (2009-2014)

- Los Angeles Daily Journal Law Business Named one of the 100 Most Influential Attorneys in California several times

- Los Angeles Magazine Super Lawyer (2001 to present); named one of the Top 100 Super Lawyers in Southern California (2010 to present)

- Loyola Law School Champion of Justice Award (2008)

- Martindale-Hubbell, Peer Reviewed AV (highest rating)

- Orange County Trial Lawyers Association Top Gun Award (2008)

- Pepperdine University School of Law Distinguished Alumnus Award (2002)

- Project Sister Family Services Justice Armand Arabian Award (2006) for outstanding efforts to secure justice for victims of clergy abuse

- Trial Lawyers for Public Justice Trial Lawyer of the Year (1994)

Additionally, Boucher has been the recipient of presidential awards, awards of merit, recognition and commendation from federal, state and local government entities as well as a variety of bar associations.

Boucher, who resides in Tarzana, CA, is active in numerous business, civic, community and charitable organizations (e.g. Ambassador, Make a Wish Foundation). He is also active in fund raising for various local, state and national organizations for whom he has raised millions of dollars. He spends significant time doing pro bono work and frequently advises California Senate, Assembly and constitutional offices about legal and political issues.

# BOUCHER LLP

## SHEHNAZ M. BHUJWALA

Shehnaz M. Bhujwala, a strong advocate of consumer rights in civil courts and the California Legislature, is a partner of Boucher LLP.

Bhujwala helps consumers harmed by defective products or business practices of corporations and insurance companies obtain justice through the courts. She exclusively prosecutes class actions, mass torts, and other complex civil cases on behalf of consumers in federal and California state courts. In recent years, she has developed expertise with class actions involving data breaches and corporate privacy violations.

Bhujwala, who has been recognized for her work as a consumer attorney as a "Southern California Rising Star" by both Los Angeles Magazine and Southern California Rising Stars Magazine (2009-2011), and was bestowed with a Martindale-Hubbell "AV Preeminent" rating for her professionalism and ethics in 2015, has helped bring resolution to numerous cases through settlement and trials over the course of her legal career, including:

- A $58 million jury verdict for a construction worker who suffered severe burn injuries from a defective O-ring part on his construction vehicle

- A historic settlement on behalf of hundreds of survivors of childhood sexual abuse against the Los Angeles and San Diego Catholic Archdioceses

- A favorable settlement on behalf of a news reporter who suffered severe electrical burns and related injuries when her transmission truck hit overhead power lines

- A class action settlement with the Writers Guild of America on behalf of writers to ensure the Guild's payment of collected, foreign levy funds to them.

Prior to joining Boucher LLP, Bhujwala worked for top plaintiffs' firms in the Los Angeles area, including Khorrami Boucher, LLP, Kiesel Boucher & Larson, LLP, and Greene, Broillet, Panish & Wheeler, LLP.

An active author and speaker on consumer law subjects, Bhujwala is a member of, and has held leadership positions in, numerous professional organizations, including:

- Consumer Attorneys of California - (Board of Governors – 2011-2015; Chair-Elect, Women's Caucus – 2014, Chair, Woman's Caucus – 2015)

- Consumer Attorneys Association of Los Angeles - (Board of Governors, 2013-2014)

- Los Angeles County Bar Association - (Litigation Section, Legislative Chair – 2014, member of Judicial Appointments Committee)

- American Association for Justice

- Public Justice

Through her work with the Consumer Attorneys of California, Bhujwala also regularly speaks with California legislators regarding the need for sufficient court funding and other issues affecting consumers.

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 183 of 215
Case 2:13-cv-01531-WHW-CLW Document 864-6 Filed 05/19/16 Page 5 of 76 PageID: 1635
Page ID #:4878

# BOUCHER LLP

### BRIAN BUSH

Brian Bush, a trial lawyer who concentrates his legal practice in the areas of civil rights, personal injury and mass tort litigation, is an Associate of Boucher LLP.

Bush is admitted to the State Bar of California as well as the United States District Courts for the Central, Eastern and Northern Districts of California. Among his professional affiliations, he is a member of the American Association for Justice, Los Angeles County Bar Association and the Consumer Attorneys Association of Los Angeles (CAALA).

Bush received his Juris Doctor degree from Loyola Law School in Los Angeles. Throughout law school, Bush volunteered at the Los Angeles County District Attorney's Office. In his capacity as a certified law student, he presided over numerous felony preliminary hearings, evidence suppression hearings and also served as second chair for the prosecution in a child molestation trial.

While in law school, Bush competed in trial advocacy tournaments in California and New York as a member of Loyola's nationally-ranked Byrne Trial Advocacy Team and served as speaker, co-chair and vice president of Loyola's student chapter of CAALA. Additionally, at Loyola, he earned First Honors awards in White Collar Crimes, Cross Examination and Advanced Trial Advocacy.

A native of Seattle, WA, Bush attended Washington State University where he obtained a Bachelor of Arts degree in Communications with an Advertising Emphasis. At the university, he was on the Dean's Honor Roll (2001-2004), was a graduate of the WSU Honors College, served as President and Vice President of the Ad Club and was a member of the student chapter of the American Advertising Federation.

Case 2:13-cv-01531-WFN-CEW Document 866 Filed 05/19/16 Page 53 of 78 Page ID: 1636
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 184 of 215
Page ID #:4879

# BOUCHER LLP

## MILIN CHUN

Milin Chun, an attorney with experience in both criminal and civil law, is a Senior Associate of Boucher LLP. Throughout her career, Chun has focused her practice on federal white-collar criminal defense and appellate matters. She has represented clients in criminal investigations, including cases arising out of the Hobbs Act, Contraband Cigarette Trafficking Act, False Claims Act, securities fraud, money laundering, wire fraud, and tax evasion. Chun has previously represented a CEO of a major defense firm and executive director of a large non-profit organization in Washington, D.C.

Chun has been named to the Maryland Rising Stars list by Maryland Super Lawyers for three consecutive years (2013-2015), and in 2015 was named "Top 40 Under 40" by the National Trial Lawyers.

Chun currently serves on the Diversity Task Force for the National Association of Criminal Defense Lawyers, the nation's leading organization devoted to ensuring a just legal process for all criminal cases, and previously served on the Editorial Advisory Board of the Daily Record, a legal and business newspaper in Maryland.

Chun is admitted to practice in California, Maryland, and the District of Columbia. She is also admitted to practice in the United States District Courts for the Central District of California, District of Maryland, and the District of Nebraska, and the United States Court of Appeals for the Fourth Circuit.

Raised in Southern California, Chun attended the University of California, San Diego, where she received a Bachelor of Arts degree in Political Science. She then obtained her Juris Doctor degree from the University of Maryland, Baltimore, where she served as the Managing Editor of the University of Maryland Law Journal of Race, Religion, Gender, and Class. Following law school, Chun clerked for the Honorable Gale E. Rasin in the Circuit Court for Baltimore City.

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 185 of 215
Case 2:18-cv-01581-WHW-CLW Document 86-6 Filed 05/19/16 Page 53 of 78 PageID: 1637
Page ID #:4880

# BOUCHER LLP

## CATHY KIM

Cathy Kim is an Associate of Boucher LLP. During her legal career, Cathy has focused her practice on representing individuals in mass tort litigation (e.g. products liability) against major pharmaceutical companies and medical device manufacturers in state and federal proceedings.

Cathy is admitted to the State Bar of California and the United States District Court, Central District of California. Among her professional affiliations, she is a member of Consumer Attorneys of California and the Korean American Bar Association.

Raised in Torrance, CA, Cathy attended the University of California, Los Angeles where she received a Bachelor of Arts degree in Business Economics with a minor in East Asian Languages and Cultures. Cathy graduated magna cum laude, was a member of Phi Beta Kappa Honor Society and the Golden Key International Honour Society, as well as being on the Provost's Honors List for six quarters.

Cathy matriculated to Loyola Law School in Los Angeles where she obtained her Juris Doctor degree while receiving numerous academic honors and recognition, including the First Honors Award in Advanced Legal Research. During law school, she served as a judicial extern to the Honorable Samuel L. Bufford in the United States Bankruptcy Court. Cathy also served as the Internal and External Vice President of the Asian Pacific American Law Students Association.

An accomplished musician (e.g. piano, violin) who has won many awards in competitions and performed in various orchestras, Cathy is active in community and cultural organizations. Among her involvements, she has served as a Korean-English translator for the Asian Pacific American Legal Center's Citizenship Workshops and Volunteer Income Tax Assistance.

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 06/09/18 Page 186 of 215
Case 2:13-cv-01531-WWW-CEW Document 864-4 Filed 05/19/16 Page 60 of 76 Page ID 1638
Page ID #:4881

# BOUCHER LLP

## HERMEZ MORENO

Hermez Moreno, a veteran trial lawyer who specializes in complex police misconduct litigation and catastrophic person injury and trial work, serves as Of Counsel to Boucher LLP.

During his professional career, which spans nearly four decades, Moreno has a diverse array of litigation experience and has attained verdicts and settlements for his clients up to eight figures. Some of the legal areas he has litigated include:

- Civil Rights
- Medical/Legal Malpractice
- Mass Torts
- Insurance Bad Faith
- Police Misconduct
- Excessive Use of Force
- False Arrest/Imprisonment
- Asbestos Personal Injury
- Mishandling of Human Remains
- Traumatic Brain Injury
- Asbestos Commercial Property Damage
- Asbestos Personal Injury
- Jail Abuse

Moreno also has extensive experience in transactional work and has been involved in the negotiating and drafting of contracts and other documents for entertainers in the fields of film, music recordings and film and recording financing. He has also negotiated and drafted contracts for the sale and purchase of businesses and landmark real estate in the Los Angeles area.

Moreno, who began his career handling civil rights cases throughout California, served as Special Counsel to Cesar Chavez (1984-1993) and as Trial Counsel for the United Farm Workers Union (1984-1990) in areas involving labor disputes and cases brought by growers' efforts to break the union. He also represented indigent clients in pro bono cases and continues to do so.

In addition to his legal practice, Moreno is actively serving as a professor of trial advocacy. He has served as a Clinical Professor at the UCLA School of Law in its Trial Advocacy Program and has been both a Visiting Associate Professor of Law, Clinical Instructor in the Trial Advocacy Program of Southwestern Law School and currently serves as an Adjunct Professor of Law in the school's Trial Advocacy and Civil Rights Program.

Moreno is admitted to the State Bar of California as well as the United States Supreme Court, United States Court of Appeal Ninth Circuit, United States Court of Appeal, Federal Circuit and the United States District Court for the Central, Northern, and Eastern

Districts of California. Among his professional affiliations, he is or has been a member of:

- Consumer Attorneys of California
- Consumer Attorneys Association of Los Angeles
- Trial Lawyers for Public Justice
- Mexican American Bar Association (Board of Trustees)
- Mexican American Bar Foundation (Board of Directors)
- Santa Monica Third Street Development Corporation (Board of Directors)

A native of Mexico, Moreno attended the University of California, Santa Barbara where he received a Bachelor of Arts degree in Political Science. He obtained his Juris Doctor degree from the UCLA School of Law. While in law school, he co-founded Centro Legal de Santa Monica, Inc., a non-profit legal aid office operated by UCLA Chicano law students. The organization, which subsequently merged with Westside Legal Services, provided legal services to underprivileged residents in Santa Monica and Moreno served as a Board of Trustees member and supervising attorney.

Moreno lives with his wife in Moorpark, CA on a 15-acre horse ranch. Among his personal interests, he is an art collector, an artist, and has written his first novel.

Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 189 of 215
Page ID #:4883
Case 2:15-cv-01581-WFN-CWk Document 86-6 Filed 05/19/16 Page 62 of 76 Page ID: 1640

# BOUCHER LLP

## MARIA L. WEITZ

Maria L. Weitz, an attorney with broad experience in numerous areas of consumer law, is a partner of Boucher LLP.

Throughout her legal career, Weitz has focused her practice on unfair, deceptive, and fraudulent business practices, and seeking legal accountability on behalf of injured plaintiffs. As a result, her diverse range of litigation experience spans a wide array of legal issues, including complex class actions, product liability and other personal injury cases, employment litigation, and appellate practice.

Weitz's interest in civil justice developed while attending the University of California, Davis School of Law, where she earned her Juris Doctor degree. She received a Public Service Law Certificate recognizing her legal work in public interest organizations and government agencies. This work included serving as co-counsel in a federal jury trial on behalf of an inmate alleging civil rights violations, and working within the California Attorney General's Office to prosecute civil cases for violations of California's Air Pollution Control Laws. She also received a Witkin Award for Academic Excellence in Legal Writing and the Sacramento County Bar Association Diversity Fellowship.

Weitz is admitted to the State Bar of California and the United States District Courts in the Northern, Southern, Central, and Eastern Districts of California. Among her professional affiliations, she is a member of the Consumer Attorneys Association of Los Angeles.

In recognition of her career accomplishments, Weitz has twice been selected as a Southern California Rising Star by Super Lawyers Magazine and was listed among Top Women Attorneys by Los Angeles Magazine.

Weitz received her undergraduate education at the University of California, Los Angeles, where she earned a Bachelor of Arts degree in Sociology and Communications.

Exhibit "10"

Case 2:18-cv-01531-WWW-GLWk Document 86-4 Filed 05/19/16 Page 6 of 76 Page ID 1642
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 190 of 215
Page ID #:4885

# CURRICULUM VITAE

## RAYMOND PAUL BOUCHER, ESQ.
### BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
Tel. (818) 340-5400 | Fax (818) 340-5401
ray@boucher.la | www.boucher.la

## EDUCATION

**Pepperdine University School of Law, Malibu, California**
> Distinguished Alumnus Award (2002). Juris Doctorate (1984).
> Ranked in top fifteen percent of class. Moot Court (first place petitioner brief).
> Phi Delta Phi honor society.

**Whittier College School of Law, Costa Mesa, California**
> Honorary Doctor of Law (2005).

**Colorado State University, Fort Collins, Colorado**
> Master of Science in Management (1981). Graduate assistant.
> Sigma Iota Epsilon honor society.

**Fort Lewis College, Durango, Colorado**
> Alumnus of the Year (2007). Bachelor of Arts (1979). Double Major, Business
> Administration and Political Science. Student Body President. Dean's List.

## ADMISSIONS

State Courts of California; United States District Courts for the Central, Northern,
Southern, and Eastern Districts of California

## PROFESSIONAL EXPERIENCE

**Boucher LLP**, Woodland Hills, California
> Partner (2014 to Present)

**Khorrami Boucher LLP**, Los Angeles, California
> Member (2013 to 2014)

**Kiesel, Boucher & Larson LLP**, Beverly Hills, California
> Partner (1999 to 2013)

**Law Offices of Raymond P. Boucher**, Tarzana, California
> Partner (1990 to present)

**Nordstrom, Steele, Nicolette & Jefferson**, Los Angeles, California
> Attorney of Counsel (1993 to 1996)

**Sayre, Moreno, Purcell & Boucher**, Los Angeles, California
> Managing Partner (1985 to 1990)

**Gould & Sayre,** Santa Monica, California
> Attorney at Law (1984 to 1985)

Raymond Paul Boucher
Curriculum Vitae
Page 2

## AFFILIATIONS AND SELECTED LEGAL INVOLVEMENT

**American Association for Justice**, Member

**American Bar Association**, Admitted as a Fellow of the American Bar

**Association of Trial Lawyers of America**
State of California Delegate
Member

**Beverly Hills Bar Association**, Member

**California Courts, Administrative Office of the Courts** (2002 to 2007)
Committees: Court Funding, Complex Courts System, Court Integration

**California State Bar Association**, Member

**Civil Justice Foundation**, Member

**Consumer Attorneys Association of Los Angeles**
*Formerly the Los Angeles Trial Lawyers Association*
President (2005)
Board of Governors, Emeritus Member (2005 to present)
Board of Governors, Member (1996 to 2006)

**Consumer Attorneys of California**
*Formerly the California Trial Lawyers Association*
President (2007)
Board of Governors (1997 to present)

**Consumer Attorneys of San Diego** (2001 to present)
Consumer Advocate of the Year (2007)

**Diversity in Law Foundation**, Board of Directors

**Los Angeles County Bar Association**
Board of Trustees (2000 to 2002)

**Los Angeles Superior Court Bench and Bar Committee** (2001 to 2008)

**Make a Wish Foundation**, Ambassador

**National College of Advocacy**, Fellow

**Orange County Bar Association**, Member

**Orange County Trial Lawyers Association**, Member

**Pepperdine School of Law**
Board of Visitors (1997 to present)

**Public Citizen**, Member

**Public Justice**, Board of Directors
*Formerly Trial Lawyers for Public Justice*
Board of Directors (1996 to present)
Member (1984 to present)

**The Roscoe Pound Foundation**, Member

Case 2:18-cv-01531-WBV-GEW Document 86-6 Filed 05/19/20 Page 6 of 76 PageID: 1644
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 192 of 215
Page ID #:4887

## SELECTED AWARDS AND HONORS

**Trial Lawyer of the Decade (2001-2010)**
  Los Angeles Daily Journal

**American Association for Justice**
  Steven J. Sharp Public Service Award (2008)

**California Lawyer Magazine**
  California Lawyer Attorney of the Year (CLAY) Award (2008)

**Consumer Attorneys of Los Angeles**
  Trial Lawyer of the Year (2007)
  Ted Horn Memorial Award in recognition of service to the
    California State Bar (2002)
  Finalist, Trial Lawyer of the Year (1996)
  Several Presidential Awards for Outstanding Contribution
    to the Trial Bar

**Consumer Attorneys of California**
  Consumer Attorney of the Year (2007)
  Legislative Champion Award (2002)
  Several Presidential Awards of Merit

**Consumer Attorneys of San Diego**
  David S. Casey, Jr. Consumer Advocate Award (2006)

**California League of Conservation Voters**
  Environmental Leadership Award (2005) for dedication to the environment and
  for fostering the public health rights of individuals

**Fort Lewis College, Durango, Colorado**
  Alumnus of the Year (2007)

**Lawdragon**
  Named one of 500 Leading Lawyers in America (2009-2011)

**Los Angeles Daily Journal Law Business**
  Named one of the 100 Most Influential Attorneys in California several times

**Los Angeles Magazine**
  Super Lawyer (2001 to present); named one of the Top 100 Super Lawyers in
  Southern California (2010 to present)

**Loyola Law School**
  Champion of Justice Award (2008)

**Martindale-Hubbell**, Peer Reviewed AV (highest rating)

**Orange County Trial Lawyers Association**
  Top Gun Award (2008)

**Pepperdine University School of Law**
  Distinguished Alumnus Award (2002)

Case 2:18-cv-01531-WRW-GEWk Document 866-4 Filed 05/13/20 Page 6 of 76 Page ID 1645
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 193 of 215
Page ID #:4888

**Project Sister Family Services**
> Justice Armand Arabian Award (2006) for outstanding efforts to secure justice for victims of clergy abuse

**Trial Lawyers for Public Justice**
> Finalist, Trial Lawyer of the Year (2000, 2008)
> Trial Lawyer of the Year (1994)

Recipient of presidential awards, awards of merit, recognition, and commendations from federal, state, and local governmental entities and a variety of bar organizations.

## LITIGATION

Tried more than sixty cases to verdict, recovering in excess of three billion dollars in verdicts and settlements for clients. Briefed and argued more than twenty appeals before the Ninth Circuit Court of Appeals and California Courts of Appeal.

<u>Selected class actions and complex litigation generated</u>:

***Adderton v. Nextel Commc'n, Inc., et al. ("Boost Mobile")***
Super. Ct. Los Angeles County, 2006, No. BC344300.
> Owners of Pipeline asserted Nextel unlawfully used its power as majority interest holder to force Pipeline's owners to sell their shares in Boost Mobile for below market value. Nextel withheld financial and marketing support from Boost Mobile until the Pipeline owners sold their interests, and provided false valuations and withheld financial information so that Pipeline could not know Boost Mobile's true value. Resolved.

***In Re Aetna UCR Litigation***
Dist. N.J., Pending, MDL No. 2020, No.: 2:07-cv-3541 (FSH)(PS)
> Appointed Class Counsel for class of subscribers to Aetna's healthcare insurance plan in class action alleging Aetna knowingly used inherently flawed databases licensed from Ingenix to set usual, customary, and reasonable ("UCR") rates for out-of-network services, resulting in artificially reduced reimbursements to plaintiffs. Plaintiffs allege the existence of a secret and illegal agreement by Aetna, UnitedHealth Group, Ingenix, and most of the country's largest health insurers to systemically under-reimburse consumers for out-of-network services in violation of ERISA, RICO, and the Sherman Act, as well as state law. Pending.

***American Medical Association et al. v. Wellpoint, Inc.***
C.D. Cal, Pending, MDL No. 09-2074 PSG (FFMx)
> Appointed Co-Lead Counsel in action on behalf of physicians and physician groups to recover payment from insurers who violated federal antitrust laws by fixing artificially low reimbursement rates for treatment provided to out-of-network patients. Pending.

Case 2:16-cv-00620-JCB-kk Document 226-2 Filed 05/19/16 Page 6 of 76 Page ID 1646
Case 2:13-cv-01531-WPAV-CEW Document 86-6 Filed 05/19/16 Page 6 of 76 Page ID
Page ID #:4889

**Balasubramaniam v. Cty of Los Angeles, et al.**
Super. Ct. Los Angeles County, 2004, Case No. BC158506.
 Represented plaintiff medical doctor in case of employment discrimination based upon color. Resolved after trial, on appeal.

**Bartley v. Camarillo Miramonte Homeowners Ass'n**
Super. Ct. Ventura County, 2002, No. SC020953.
 Class action against real estate developers on behalf of individual condominium owners for faulty construction and repairs. The units were constructed over a high water table and on poor soils which expanded and contracted, causing the units to sink, and causing floor slabs, foundations, and walls to crack. The defendants knew about the defects but did not disclose them. After receiving complaints, developers failed to repair as promised. Resolved on eve of trial.

**Bianchi v. Schneiderman, et al.**
Super. Ct. Los Angeles County, 2003, No. EC033688.
 Represented plaintiff in suit for breach of an agreement and for fraud after Schneiderman fraudulently obtained control of L.A. Digital Post and then transferred it to his wife in order to hide assets from creditors. Resolved.

**Black v. Blue Cross of California**
Super. Ct. Los Angeles County, 2007, No. BC250339.
 A certified class action against a health insurer for improper mid-year contract modifications. Settled for an eight-figure amount after a liability trial.

**Berger v. The Berger Foundation, et al.**
Super. Ct. Riverside County, 2011, Case No. INC 10010664.
 H. N. and Frances Berger founded a charitable organization to promote and support education and alleviate human suffering. Defendants diverted millions from this foundation to engage in self-dealing transactions and to pay themselves excessive compensation, and to fund ventures to employ their relatives. Represented the Berger Foundation to remedy these wrongs and safeguard a family legacy. Resolved.

**Bunker Hill Twrs Condo Ass'n, et al. v. W.R. Grace & Co.**
Super. Ct. Los Angeles County, No. B072642.
 Represented 250 resident unit owners in a 32-story, luxury downtown high-rise in an action against the nation's leading asbestos products manufacturer. The building's steel girders were coated with asbestos, which contaminated the building with hazardous amounts of emitted asbestos fibers in breathable dust. A jury awarded over $6 million to compensate for the cost of the abatement.

**California Gubernatorial Recall Election Litigation**
 Represented former Governor Gray Davis in a challenge to the qualification of the 2003 California gubernatorial recall election.

Case 2:18-cv-01531-WFN-CELL Document 86-36 Filed 05/19/20 Page 6 of 76 Page ID 1647
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 10/09/18 Page 195 of 215
Page ID #:4890

Raymond Paul Boucher
Curriculum Vitae
Page 6

### Castaneda, et al. v. State of California et al.
Super. Ct. Los Angeles County, 2004, No. BC299062.
> The California Legislature passed a bill to allow victims of wrongful deportation or coerced emigration between 1929 and 1944 to bring civil actions. *Castaneda* was a class action on behalf of approximately 400,000 U.S. citizens and resident aliens who were wrongfully expelled from California because of their Mexican heritage. Complaint withdrawn after governor's veto of the bill.

### Catalina Toys v. Forward Winsome
Super. Ct. Orange County, No. 68-59-34.
> Defended Forward Winsome, one of the largest toy manufacturers in the world, and represented it on a cross complaint. Plaintiffs alleged that Forward Winsome intentionally delayed shipments of goods and breached an agreement in order to place the plaintiffs in financial duress and to foreclose upon their assets. After a fifteen-day trial, the jury entered a unanimous verdict awarding Forward Winsome more than $6 million; settled before punitive damages phase.

### Centinela Freeman Emergency Medical Associates, et al. v. Maxwell-Jolly et al.
Super. Ct. Los Angeles County, Pending, No. BC406372.
> Action on behalf of emergency room doctors who received medical reimbursements in amounts that were significantly below the costs that they incurred to treat their patients. Writ of mandate issued; case pending.

### Chavez v. Nestlé USA, Inc.
C.D. Cal., 2013, No. CV09-9192 GW (CWx).
> Appointed lead counsel in class action for false advertising in the marketing of a beverage for infants. Resolved following successful appeal to Ninth Circuit.

### CIGNA Litigation
> Class action against medical insurers who under-reimbursed hundreds of thousands of medical patients for out-of-network care they received. The plaintiffs allege the health insurers manipulated data to artificially depress reimbursements for medical care. Pending.

### The Clergy Cases
Super. Ct. California, JCCP Nos. 4286, 4297, 4359
> Served as Plaintiffs' Liaison Counsel representing almost 1,000 individuals and their families in significant personal injury claims involving molestation at the hands of Catholic priests. Settlements totaled in excess of $1.5 billion.

> ### The Clergy Cases I, California JCCP 4286 (Diocese of Orange).
> > Ninety survivors of Clergy sexual abuse filed lawsuits against the Roman Catholic Diocese of Orange. In December 2004, after nearly two years of intense negotiations, lead negotiations to successfully settle all claims against the Diocese for $100 million on the condition that the secret files of the Diocese of Orange would be made public.

Case 2:18-cv-01531-WWW-GEWk Document 866-3 Filed 05/19/16 Page 76 of 215 Page ID 1648
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 196 of 215
Page ID #:4891

Raymond Paul Boucher
Curriculum Vitae
Page 7

**The Clergy Cases I**, California JCCP 4286 (Archdiocese of Los Angeles).
Five-hundred and eight survivors of clergy sexual abuse filed lawsuits against the Roman Catholic Archbishop of Los Angeles. On the eve of the first of more than a dozen scheduled trials, successfully negotiated an agreement with the Archbishop to resolve all cases against it for $660 million, the largest resolution with any diocese in the United States. The case is still pending as the parties litigate the public release of abusing priest and Church files.

**The Clergy Cases II**, California JCCP 4297 (Archdiocese of San Diego).
One-hundred and forty-four survivors were sexually abused by Clergy members in the Roman Catholic Diocese of San Diego. In the second-largest settlement by a Roman Catholic diocese nationwide since claims of sexual abuse by clergy members came to light in 2002, the Diocese agreed to pay nearly $200 million to these 144 survivors. The case is pending as the parties litigate over the public release of the offending priests' files.

### *In Re Crestor Products Liability Cases*
Super. Ct. Los Angeles County, Pending, California JCCP No. 4713.
Appointed Plaintiffs' Co-Liaison Counsel in Judicial Council coordinated proceeding pending before the Los Angeles Superior Court involving personal injury claims arising from use of Crestor pharmaceutical drug. Pending.

### *DePUY ASR Artificial Hip Implants Litigation*
Super. Ct., San Francisco County, Pending, California JCCP No. 4649.
Nationwide personal injury actions on behalf of patients who received the recalled, defective, surgically implanted, metal-on-metal ASR XL Acetabular and ASR Hip Resurfacing systems manufactured by DePuy Orthopedics, a unit of Johnson & Johnson. The complaints allege DePuy Orthopedics was aware its ASR hip implants were failing at a high rate, yet continued to manufacture and sell the product to unsuspecting physicians and patients. Pending.

### *In Re Diet Drug Litigation*
Super. Ct. Los Angeles County, California JCCP 4032.
Appointed Co-Plaintiffs' Liaison Counsel. Claims arose from injuries resulting from the use of the diet drug Phen-Fen. Resolved.

### *Jane Doe v. Garden Grove Unified School District*
Represented a child victim of sexual abuse at school. Resolved.

### *Elena A. et al. v. Casa de Angeles Cal. Corp., d/b/a Healthy Start, et al.*
Super. Ct. Los Angeles County, Pending, No. BC457840.
Case on behalf of developmentally disabled adults who were subjected to serious physical and verbal abuse and neglect while attending an adult day care center. The abuse included sexual molestation which caused rashes, bruises, scratches, abrasions, scarring, and cuts and the contraction of venereal disease. It also included the withholding of medical care, and the failure to provide appropriate meals, leading to dehydration, malnutrition, and anemia. It included rough

Case 2:16-cv-00620-JGB-kk Document 86-6 Filed 05/19/16 Page 76 of 215
Page ID #:1649
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 197 of 215
Page ID #:4892

handling acts of humiliation, and threats to harm family members after clients witnessed inappropriate behavior. Pending.

***In Re: Facebook, Inc. Internet Tracking Litig.***,
N.D. Cal., Pending, MDL No. 2314, No. 5:12-md-02314-EJD.
Appointed Interim Liaison Counsel in this class action lawsuit seeking damages and injunctive relief for the knowing interception of users' Internet communications and activity after logging out of their Facebook accounts, in violation of state and federal laws including the Federal Wiretap Act, the Stored Communications Act, and the Computer Fraud and Abuse Act.

***In Re Galvanized Steel Pipe Litigation***
Super. Ct. Los Angeles County, 2010, No. BC174649
Appointed Lead Counsel (2001). Class action involving construction defects. Settled for an amount in the high eight figures.

***Gillis et al. v. Ralph Wyatt Plastering Company, et al.***
Super. Ct. Los Angeles County, 1999, No. SC034918.
Case to recover for negligent construction leading to water intrusion and an infestation of highly toxigenic mold, resulting in the total loss of the plaintiff's home and all of its contents. Eight-figure settlement.

***Grossman v. Unger Fabrik, LLC***
Super. Ct. Los Angeles County, 2013, No. BC480626.
Breach of contract action on behalf of an executive who made $55 million in sales for a company that then failed to pay her commissions. Resolved.

***Hablian et al. v. Zurich U.S. et al.***
Cal. Comp. Bd. of Appeals
Class action to recover workers' compensation benefits that were due to injured employees, but that employers and their insurers instead kept for themselves. The California Workers Compensation Appeals Board has ruled that a class action may be brought. Case pending.

***Leslie v. Hochman, Salkin & Deroy***
Super. Ct. Los Angeles County, 1997, No. BC127454.
In this legal malpractice case, attorneys arranged to provide the plaintiffs with a tax shelter plan under which a commodities broker would reduce their income tax burden through trades in gold futures, and the attorneys would take $20 for each of the broker's transactions in return for legal representation about the tax consequences of the trades. The Ninth Circuit then ruled that the types of deductions the attorneys advised the plaintiffs to take on their tax returns were not based on genuine losses, such that the plaintiffs were now responsible for unpaid taxes, interest, and penalties. Litigation ensued in which the attorneys represented the plaintiffs before the U.S. Tax Court, promising that they would prevail when all the while they had no reasonable possibility of doing so. Resolved.

Case 2:18-cv-01531-WWW-GEW Document 866-3 Filed 05/13/16 Page 72 of 76 Page ID 1650
Case 5:16-cv-00620-JGB-kk Document 226-3 Filed 04/09/18 Page 198 of 215
Page ID #:4893

***Los Angeles Unified School District Sexual Molestation Cases***
     Represented numerous children who were molested at Miramonte Elementary
     School in the Los Angeles Unified School District.

***Madrid v. Perot Systems Corporation et al.***
Super. Ct. Sacramento County, No. 03AS04763.
     Antitrust and unfair competition action to recover from Perot Systems
     Corporation for aiding and abetting the manipulation, distortion, and corruption of
     California's electricity market, including the design and sale of derivative
     securities, in the wake of the deregulation of California's energy sector. Resolved.

***Martinez et al. v. EMI Music Distribution et al.***
("Compact Disc Minimum-Advertised Price Antitrust Litigation")
C.D. Cal, No. CV-00-05730 RAP (RNBx).
     Suit to recover from recorded-music distributors and retailers for price fixing.
     Resolved.

***Murray v. Belka*** ("*First Pension*")
Super. Ct. Orange County, California JCCP No. 3131.
     Suit against a pension plan administrator, one of the nation's largest law firms,
     and one of the world's largest accounting firms to recover damages and for
     restitution to hundreds of investors who had lost their life savings to a Ponzi
     scheme. Co-tried a four month trial with Michael Aguirre, resulting in a liability
     and punitive damages verdict. The Orange County, California jury in the case
     found that Pricewaterhouse Coopers helped defraud the investors by creating
     fraudulent audits and reviews that First Pension Corporation used in its filings
     with government agencies over nine years. The case resolved on the eve of the
     punitive damage phase for nearly nine figures.

***In re: National Association of Music Merchants, Musical Instruments and Equipment
Antitrust Litigation***
S.D. Cal. MDL No. 2121.
     Class action in antitrust to recover for anticompetitive price fixing.

***Northbridge Homeowners v. The Newhall Land and Farming Co., et al.***
Super. Ct. Los Angeles County, 2010, No. BC174649.
     Recovered $41 million on behalf of 5,000 Santa Clarita Valley residents in a suit
     against real estate developers for the  installation of defective galvanized steel
     pipes which rusted and leaked inside their new homes.

***In Re Northridge Earthquake Litigation***
     Appointed Plaintiffs' Liaison Counsel (2002). Numerous coverage lawsuits
     against State Farm Insurance, 21st Century Insurance, Farmers Insurance, and
     USAA Insurance Company for fraudulent insurance practices arising out of the
     Northridge Earthquake. Resolved.

Raymond Paul Boucher
Curriculum Vitae
Page 10

***In re: Pellicano Cases***
Super. Ct. Los Angeles County, 2014, No. BC316318.
> Appointed as Co-Lead Counsel in class action against AT&T. Cases involved wiretapping in violation of the California Penal Code. Settled.

***Quesada v. Herb Thyme Farms, Inc.***
Super. Ct. Los Angeles, County, No. BC436557.
> Action against the largest grower and marketer of herbs in California for labeling conventionally grown food as "fresh organic" in order to mislead consumers into paying more. Pending in Supreme Court of California.

***Residents of Tucson, Arizona v. Tucson Airport Authority et al.***,
AZ Court of Appeals, No. 2 CA-CV 93-0204.
> Actions on behalf of over 1,600 residents of the Sunnyside community of Tucson against the Tucson Airport Authority and other defendants for dumping a carcinogen, trichloroethylene (TCE), into disposal pools and allowing it to seep into the city's ground water. After an EPA-sponsored researcher found high levels of TCE and other carcinogens in drinking water, experts discovered that several unusual forms of cancer, particularly among children in the area, were at almost epidemic levels. The actions settled for $84.5 million.

***Silver et al. v. Aetna Health Inc., PA, et al.***
N.D. Cal., No. C10-00143.
> Class action against medical insurers who under-reimbursed hundreds of thousands of medical patients for out-of-network care they received. The plaintiffs allege the health insurers manipulated data to artificially depress reimbursements for medical care. Pending.

***Silver v. Del Webb***
Super. Ct. Nevada. No. A437325.
> Appointed Lead Counsel (2001). Certified class construction defect suit involving installation of faulty plumbing systems in new homes. Resolved.

***Sinskey, et al. v. Ernst & Young et al.***
Super. Ct. Los Angeles County, No. BC247851.
> Represented plaintiffs in action for fraud in the sale of securities. Resolved.

***Sister Sledge et al. v. Warner Music Group Corp.***
N.D. Cal., No. 12-CV-0559-RS.
> Appointed Interim Co-Lead Counsel in this suit to recover for the shortchanging of artists in the licensing of their works to third parties for subsequent retail sale as digital downloads and ringtones. Settled for $11.5 Million.

***Skeen, et al. v. BMW of North America LLC, et al.***
Dist. N.J., Pending, No. 2:13-cv-1531-WHW-CLW.
> Appointed Interim Co-Lead Class Counsel in putative class action on behalf of owners and lessees of MINI Cooper vehicles manufactured with defective "timing chain tensioner" parts that cause premature engine damage and failure. Pending.

Case 2:18-cv-01581-WRPW-GLWK  Document 862-3  Filed 05/14/20  Page 7 of 76  Page ID 1652
Case 5:16-cv-00620-JGB-kk  Document 226-2  Filed 04/09/18  Page 200 of 215
Page ID #:4895

Raymond Paul Boucher
Curriculum Vitae
Page 11

***The Temptations et al. v. UMG Recordings, Inc.***
N.D. Cal., No. 12-CV-1289-JCS.
> Suit to recover for shortchanging of artists in the licensing of their works to third parties for subsequent retail sale as digital downloads and ringtones. Pending.

***Terry W. et al. v. Kaiser Foundation Health Plan, Inc. et al.***
Super. Ct., Los Angeles County, No. BC187451.
> Case against Kaiser for failing to take action to protect patients after receiving complaints that one of their doctors was molesting minors. The doctor was later arrested, convicted, and incarcerated for his crimes. Resolved.

***In re Transient Occupancy Tax Cases***
Super. Ct. Los Angeles County, California JCCP 4472.
> Action on behalf of thirty-nine separate California cities to recover unremitted occupancy taxes from online travel companies.

***In re Trasylol Drug Cases***
Super. Ct. Los Angeles County, California JCCP 4593.
> Action on behalf of the people of the State of California against a pharmaceutical company that continued to aggressively market a drug after becoming aware that it significantly increased the risk of renal failure, stroke, and death, and which was ultimately removed from the market. Resolved.

***Welch v. Orkin Exterminating Co.***
Super. Ct. Los Angeles County, No. 516323.
> Orkin's negligent treatment of the plaintiffs' San Diego home for termites caused plaintiffs to develop chemical sensitivities. Orkin argued the plaintiffs were only imagining their injuries, or that the injuries preexisted. Orkin denied that it misapplied the chemicals, and denied that the chemicals could cause any injury. After an eighteen-day trial, a jury awarded plaintiffs approximately $1 Million.

***In re Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation,*** MDL No. 2329.
> Appointed Co-Lead Counsel and state Liaison Counsel in this national MDL involving actions against a manufacturer of defective surgically implanted metal-on-metal hip replacement systems. Pending.

***Yaz, Yasmin and Ocella Contraceptive Cases***
Super. Ct., Los Angeles County, California JCCP 4608.
> Appointed and served as Plaintiffs' Co-Liaison Counsel in cases on behalf of women who were prescribed Yasmin and Yaz oral contraceptives and suffered blood clots, deep vein thrombosis, strokes, or heart attacks. Case involved allegations that Bayer failed to warn.

***Young v. Johnny's Hot Dog Stand et al.***
Super. Ct. Los Angeles County, 1997, No. BC102837.
> Ronald Young, a 57 year-old homeless man who had been a hospital orderly before going on disability, had been frequenting Johnny's Hot Dog Stand for more than twenty years. After Young approached the window of Johnny's with

money in his pocket to purchase a cup of coffee, the waitress shouted insults at him. Minutes later, the waitress walked out of the stand, approached Young, and shot him six times, leaving him permanently disfigured and almost $70,000 in debt to the hospital. The police never recovered the gun and the district attorney declined to prosecute. At trial, the jury found the restaurant negligent and ordered Johnny's to pay nearly $1 million in compensatory damages.

### *Zachary et al. v. ARCO et al.*
Super. Ct. Los Angeles County, No. BC209944.
> Appointed Lead Counsel. Mass tort toxic refinery fire resulting in injury to plaintiffs and their property. Resolved.

Among cases involving published decisions:

### *Bains v. Moores* (2009) 172 Cal. App. 4th 445.
> Action on behalf of investors to recover for fraud in the sale of certain securities.

### *Callahan v. Gibson, Dunn & Crutcher LLP* (2011) 194 Cal. App. 4th 557.
> Represented family members in suit against law firm that drafted a partnership agreement which damaged the family business. Resolved.

### *Harrell v. 20th Century Ins. Co.* (9th Cir. 1991) 934 F.2d 203.
> Suit to recover for fraud in the sale of a small business. Resolved.

### *Ileto v. Glock, Inc.* (C.D. Cal. 2006) 421 F. Supp. 2d 127.
> Action against weapons manufacturers Glock and China North, whose firearms were used by a member of the Aryan Nation to shoot several children and kill a postal worker.

### *Ramirez v. Fox Television Station* (9th Cir. 1993) 998 F.2d 743.
> Suit for unconstitutional employment discrimination based on national origin.

### *Shirk v. Vista Unified School District* (2007) 42 Cal. 4th 201.
> Case to recover for sexual molestation by a public school teacher.

### *Regents of University of California v. Superior Court* (2010) 183 Cal. App. 4th 755.
> Represented relatives of decedents who willed their bodies to a medical school for research and teaching purposes, only to learn the remains had been improperly disposed of in a grotesque and undignified manner after scientific uses were concluded. Donors were told that after use, their remains would be cremated and scattered in a rose garden. Human remains were commingled with other remains and incompletely incinerated, leaving hair and flesh intact. Remains were placed in a mixture of incinerated human bodies, laboratory animal carcasses, and medical waste into garbage dumpsters and then transported to a landfill where they were disposed of with common refuse.

### *Rippon v. Bowen* (2008) 160 Cal. App. 4th 1308.
> Case on behalf of California citizens who challenged the constitutionality of Proposition 140, which imposed lifetime term limits upon state legislators and other state officers.

Case 2:15-cv-01331-WHW-CLW Document 86-6 Filed 05/19/16 Page 7 of 15 PageID: 1654
Case 5:16-cv-00620-JGB-kk Document 226-2 Filed 04/09/18 Page 202 of 215
Page ID #:4897

*Santillan v. Roman Catholic Bishop of Fresno* (2008) 163 Cal. App. 4th 4.
> Case on behalf of a victim of childhood sexual abuse.

*Wallace v. City of Los Angeles* (1993) 12 Cal. App. 4th 1385.
> Demetria Wallace, a teenaged honors student, was shot and killed by a shotgun blast as she sat on a bench waiting for a bus five days before she was to testify against a man accused of fatally shooting a taxi driver. Following granting of non-suit at trial, the appeals court held the police had a duty to warn the victim. The case affirmed the government's responsibility to protect citizens who jeopardize their lives by stepping forward as witnesses to crimes, and prompted changes in police procedures that have saved other witnesses' lives since.

*Wholesale Electricity Antitrust Cases I & II* (2007) 147 Cal. App. 4th 1293.
> Co-lead counsel in suit to recover from energy traders for antitrust and unfair business practices in the wake of the deregulation of California's energy sector. Resolved in conjunction with the Attorney General's office for over $1.1 billion.

## PRESENTATIONS

**Guest Lecturer**
> **Stanford Law School**, Stanford, California
> **Pepperdine University School of Law**, Malibu, California
> **Loyola Law School**, Los Angeles, California

**Continuing Legal Education**
> Delivered hundreds of continuing legal education presentations to organizations including the Los Angeles County Bar Association, the Consumer Attorneys of California, the Consumer Attorneys Association of Los Angeles, the Association of Southern California Defense Counsel, the American Association for Justice, the Orange County Bar Association, the California League of Cities, Pepperdine Law School, Mealey's, the Los Angeles Daily Journal, Glasser Legal Works, and the National College of Advocacy.

# Exhibit 9

2012 U.S. Dist. LEXIS 91069, *



21 of 86 DOCUMENTS

**J. PAUL CHARLEBOIS, Plaintiff, vs. ANGELS BASEBALL LP et al., Defendants.**

**Case No.: SACV 10-0853 DOC(ANx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

*2012 U.S. Dist. LEXIS 91069*

**May 30, 2012, Decided**
**May 30, 2012, Filed**

**PRIOR HISTORY:** *Charlebois v. Angels Baseball, LP, 2011 U.S. Dist. LEXIS 71452 (C.D. Cal., June 30, 2011)*

**COUNSEL:** [*1] For J Paul Charlebois, an individual on behalf of himself and on behalf of all others similarly situated, Plaintiff: Amanda Rose Canning, Schwartz Steinsapir Dohrmann & Summers, Los Angeles, CA; Michael D Seplow, Schonbrun DeSimone Seplow Harris Hoffman & Harrison LLP, Venice, CA; Vincent James DeSimone, Schonbrun DeSimone Seplow Harris and Hoffman LLP, Venice, CA.

For Angels Baseball LP, Defendant: Brent Mathew Giddens, Dawn M Irizarry, Carlton DiSante and Freudenberger LLP, Los Angeles, CA; Timothy M Freudenberger, Carlton DiSante & Freudenberger, Irvine, CA.

For City Of Anaheim, Defendant: Dawn M Irizarry, Carlton DiSante and Freudenberger LLP, Los Angeles, CA.

**JUDGES:** DAVID O. CARTER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DAVID O. CARTER

**OPINION**

**ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**

Before the Court is a Motion for Final Approval of Attorneys Fees, Costs, and Enhancement Fees (Dkt. 95) filed by Plaintiff J Paul Charlebois ("Plaintiff"). After considering the moving papers and oral argument, the Court GRANTS the Motion.

**I. Plaintiff Qualifies As A Party Entitled to Reasonable Attorneys' Fees Under Both Federal and California Statutes**

Plaintiff moves for fees under three statutes: (1) *Section 12205 of Title 42 of the United States Code*; [*2] (2) *California Civil Code Section 55*; and (3) *California Civil Procedure Code Section 1021.5*. Plaintiff qualifies as a party entitled to reasonable attorneys' fees under all three of these statutes.

**a. Federal *Section 12205* provides reasonable attorneys' fees to a prevailing party**

*Section 12205 of Title 42 of the United States Code* provides that a court "may allow the prevailing party" to receive attorneys' fees and costs from defendants in cases brought under the Americans with Disabilities Act of 1990 ("ADA"), *42 U.S.C. §§ 12101 et seq. See 42 U.S.C. § 12205* [1];

2012 U.S. Dist. LEXIS 91069, *

*Barrios v. California Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002).* The Ninth Circuit has reversed as an abuse of discretion the denials of attorneys' fees under *42 U.S.C. § 12205* where the party seeking fees satisfied the statutory criteria. *See e.g., Barrios v. California Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002); Skaff v. Meridien N. Am. Beverly Hills, LLC, 506 F.3d 832, 835, 844 (9th Cir. 2007)* (reversing denial of attorneys' fees under *42 U.S.C. § 12205* in action to improve wheelchair users' access to hotel because statute's requirements were met by "court-enforceable settlement agreement" [*3] that "achieved [plaintiff's] objective of obtaining injunctive relief to make [defendant's hotel] accessible"). This is because a "prevailing plaintiff . . . should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Barrios, 277 F.3d at 1134 (9th Cir. 2002).*

> 1    "In any action . . . commenced pursuant to this chapter, the court . . . in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs." *42 U.S.C. § 12205; see also 28 C.F.R. § 36.505.*

The Ninth Circuit has held that an ADA plaintiff is a prevailing party if she: (1) "achieve[s] a material alteration of the legal relationship of the parties"; and (2) that alteration is "judicially sanctioned." *Jankey v. Poop Deck, 537 F.3d 1122 (9th Cir. 2008).* The second requirement can be met in many ways, including when a party enters into a legally enforceable agreement with the defendant. *Barrios v. California Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002)* (holding that plaintiff was "prevailing party" under *42 U.S.C. § 12205* because he could enforce a settlement against the defendant); *Carbonell v. I.N.S., 429 F.3d 894, 899 (9th Cir. 2005)* [*4] (noting that Ninth Circuit "is in agreement with the vast majority of other circuits" that hold that "a litigant can 'prevail' for the purposes of awarding attorney's fees as a result of judicial action other than a judgment on the merits or a consent decree").

The parties do not dispute that Plaintiff is the prevailing party based on the settlement he reached with Defendants.

**b. California *Section 55* provides reasonable attorneys' fees to a prevailing party**

*California Civil Code Section 55* provides that a "prevailing party . . . shall be entitled" to receive attorneys' fees and costs from defendants in cases brought under the California Disabled Persons Act ("CDPA"), *Cal. Civ. Code § 54. See Cal. Civ. Code § 55* [2]; *Barrios, 277 F.3d at 1137.* As with fees under *Section 12205,* the parties do not dispute that Plaintiff is the prevailing party under this California statute. *See Barrios, 277 F.3d at 1137* (reversing denial of attorneys' fees because plaintiff was "prevailing party" under *Section 55* given that settlement agreement gave plaintiff access to the baseball field and $10,000); *cf. Hubbard v. SoBreck, LLC (Hubbard II), 554 F.3d 742, 745 (9th Cir. 2009)* (explaining that "the proof required [*5] to show a violation of the CDPA and of the ADA is identical" and so "a grant of fees on the California cause of action [under *Section 55*] is necessarily a grant of fees as to the ADA claim [under *Section 12205*]").

> 2    "Any person who is . . . potentially aggrieved by a violation of *Section 54* or *54.1* of this code . . . may bring an action to enjoin the violation. The prevailing party in the action shall be entitled to recover reasonable attorney's fees." *Cal. Civ. Code § 55.*

**c. California *Section 1021.5* provides reasonable attorneys' fees to a successful party whose legal victory transcends her personal interest**

*California Civil Procedure Code Section 1021.5* provides that "a court may award attorneys' fees to a successful [3] party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, [*6] if any." *Cal. Civ. Proc. Code § 1021.5.* These requirements are satisfied, and thus an award under *Section 1021.5* "is appropriate," if "the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the

2012 U.S. Dist. LEXIS 91069, *

lawsuit placed a burden on the plaintiff out of proportion to his individual stake in the matter." *In re Conservatorship of Whitley, 50 Cal. 4th 1206, 1215, 117 Cal. Rptr. 3d 342, 241 P.3d 840, 846 (2010)* (internal quotation marks omitted).

> 3    Unlike the prevailing party fee-shifting statutes of federal law, "California law . . . does not require a judicially recognized change in the legal relationship between the parties as a prerequisite for obtaining attorney fees under Code of Civil Procedure *section 1021.5*." *Tipton-Whittingham v. City of Los Angeles, 34 Cal. 4th 604, 608, 21 Cal. Rptr. 3d 371, 101 P.3d 174 (2004)* (quotation omitted).

Courts have reversed as an abuse of discretion the denials of attorneys' fees under *Section 1021.5* where the party seeking fees satisfied the statutory criteria. *See e.g., Skaff v. Meridien N. Am. Beverly Hills, LLC, 506 F.3d 832, 835, 844 (9th Cir. 2007)* (reversing denial of attorneys' fees under *Section 1021.5* in action to improve wheelchair users' access to [*7] hotel because statute's requirements were met by "court-enforceable settlement agreement" that "achieved [plaintiff's] objective of obtaining injunctive relief to make [defendant's hotel] accessible"); *Hull v. Rossi, 13 Cal.App.4th 1763, 1765, 17 Cal. Rptr. 2d 457 (1993)*.

Each of the requirements of *Section 1021.5* has been met in the instant case. First, this lawsuit has resulted in the enforcement of an important right affecting the public interest, namely, the right of wheelchair users to have affordable access to facilities. Second, there has been a significant benefit to a large class of persons because this lawsuit was successful in enforcing the civil rights of Plaintiff and the certified class of wheelchair users. *See Estrada v. FedEx Ground Package System, Inc., 154 Cal. App. 4th 1, 16-17, 64 Cal. Rptr. 3d 327 (2007)* (plaintiff was entitled to attorneys' fees under *Section 1021.5* where he "pursued this public interest class action not only for himself but on behalf of a class comprised of [defendant's] past and present drivers"). Third, because this action was for injunctive relief alone, no fees can be paid out of the recovery.

Finally, the necessity and financial burden requirement "seeks economic equalization of representation [*8] in cases where private

enforcement is necessary." *In re Conservatorship of Whitley, 50 Cal. 4th at 1214*. This requirement asks the court to examine: (1) the "adequacy of public enforcement" (necessity prong); and (2) the financial disincentives and incentives of private action (financial burden prong). *Id.* As with most lawsuits brought under the CDPA to improve disabled people's access to facilities, the necessity prong is satisfied because the California legislature recognized the *inadequacy* of public enforcement when it provided for a private right of action and the recovery of attorneys' fees under *Section 55*. *Donald v. Cafe Royale, Inc., 218 Cal. App. 3d 168, 179, 266 Cal. Rptr. 804 (1990)* (extensively reviewing the repeated expansion of the CDPA's enforcement mechanisms and concluding that it "is plain [that] the Legislature's purpose in imposing increased penalties and additional enforcement methods is to guarantee compliance with equal access requirements."). Similarly, the financial burden prong is satisfied because the $18,000 that Plaintiff seeks as his enhancement fee is not sufficient incentive to take on this litigation, which spanned more than two years. *See Jones v. Pasta Pelican, Inc., C 05-04245 WHA, 2010 U.S. Dist. LEXIS 46506, 2010 WL 1465699 (N.D. Cal. Apr. 13, 2010)* [*9] (granting attorneys' fees in action to improve wheelchair users' access to restaurant under both *42 U.S.C. § 12205* and *Cal. Civ. Proc. Code § 1021.5* and rejecting defendant's argument that necessity and financial burden requirement was not met).

#### d.  Conclusion regarding entitlement to reasonable fees

In sum, Plaintiff qualifies as a party entitled to reasonable attorneys' fees under all three of these statutes under which he moves for fees: (1) *Section 12205 of Title 42 of the United States Code*; (2) *California Civil Code Section 55*; and (3) *California Civil Procedure Code Section 1021.5*. Thus, the only dispute is whether the amount of fees sought is reasonable.

### II. Reasonableness of Fees

A "reasonable" fee is a fee that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn,     U.S.    , 130 S.Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010)*

2012 U.S. Dist. LEXIS 91069, *

(discussing analogous civil rights statute). [4] All three statutes under which Plaintiff moves calculate the reasonableness of attorneys' fees using the "lodestar" method, which is obtained by multiplying the number of hours reasonably [*10] expended on litigation by a reasonable hourly rate. *See Blackwell v. Foley, 724 F. Supp. 2d 1068, 1081 (N.D. Cal. 2010)* (applying lodestar method to *Section 12205*, *Section 55*, and *Section 1021.5* in action to improve accessibility for physically disabled people); *Serrano v. Unruh (Serrano IV), 32 Cal. 3d 621, 643, 186 Cal. Rptr. 754, 652 P.2d 985 (1982)* (upholding lodestar method to calculate fees under *section 1021.5*); *Perdue, 130 S.Ct. at 1672* (explaining that, generally, the lodestar formula should be used to determine a reasonable figure for an award of attorneys' fees).

4    Courts in the Ninth Circuit often apply the rules used in the fee-shifting civil rights statutes to motions for attorneys' fees in ADA and CDPA action under *42 U.S.C. § 12205* and *Cal. Civ. Code § 55. See e.g., Barrios v. Cal. Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir.2002)* (applying the holding in *Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)*, which governed attorneys' fees in civil rights actions under *42 U.S.C. § 1988*, to decision on attorneys' fees in ADA and CDPA action under *42 U.S.C. § 12205* and *Cal. Civ. Code § 55*); *see also Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1118 (9th Cir. 2000)*.

Under the Lodestar method, Plaintiff's [*11] attorneys are entitled to be compensated for "all hours reasonably spent on the matter." *Serrano IV, supra, 32 Cal. 3d at 635, 186 Cal. Rptr. 754, 652 P.2d 985*; *Sundance v. Municipal Court, 192 Cal.App.3d 268, 273-274, 237 Cal.Rptr. 269 (1987)*. The lodestar figure is presumed to represent an appropriate fee, but the Court may adjust the figure upward or downward to take into account special factors. *See Blum v. Stenson, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*;

*Jordan v. Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987)*. Adjustments to this presumptively reasonable amount may then be made based upon the factors set forth in *Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir. 1975)* to the extent that those factors are not reflected in the lodestar calculation. *See Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028-29 (9th Cir. 2000)*. The *Kerr* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) [*12] time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *See Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir.2006)*.

Plaintiff seeks a total of $725,000 in attorneys' fees and costs, which is the maximum available under the parties' settlement agreement, as well as an $18,000 enhancement fee, which is within the range proscribed by the settlement agreement. *See* Reply at 24. The $725,000 figure is a reduction from the $1,165,448.08 to which Plaintiff argues that his attorneys ("Class Counsel") are entitled, that is, the sum of $1,118,280.56 in attorneys' fees and $47,167.52 in costs. *See* Reply at 24. The attorneys' fees are calculated by multiplying the $745,520.37 lodestar figure by a 1.5 multiplier. The $745,520.37 lodestar figure reflects a reduction from Plaintiff's original figure based on Plaintiff's acquiesce to Defendants' criticisms of some hours. *See* Feldman Decl. at ¶¶ 11-12; DeSimone Reply Decl. at ¶¶ 21-23.   [*13] The following chart reflects how Plaintiff calculated Class Counsel's figures and also indicates the bar admission year, rates, total hours, and fees incurred by each biller involved in litigating this action:

| Attorney/Legal Worker | Bar Admittance: | Rate: | Hours: | Fees: | % of Fees: |
|---|---|---|---|---|---|
| V. James DeSimone | 1985 | $695.00 | 401.20 | $278,834.00 | 35% |
| Michael D. Seplow | 1990 | $630.00 | 68.80 | $43,344.00 | 5% |
| Amanda Canning | 2006 | $450.00 | 724.30 | $325,935.00 | 41% |

2012 U.S. Dist. LEXIS 91069, *

| Attorney/Legal Worker | Bar Admittance: | Rate: | Hours: | Fees: | % of Fees: |
|---|---|---|---|---|---|
| Eugene Feldman[1] | 1985 | $600.00 | 136.70 | $82,020.00 | 10% |
| Courtney Abrams | 2009 | $375.00 | 19.00 | $7,125.00 | 1% |
| Menaka Fernando | 2010 | $325.00 | 6.10 | $1,982.50 | 0.25% |
| David Sarnoff | 2005 | $460.00 | 15.50 | $7,130.00 | 1% |
| Paralegals | n/a | $150.00 | 337.55 | $50,632.50 | 6% |
| Law Student Interns | n/a | $200.00 | 480.00 | N/A | 0% |
| | | | **Total Hours:** | **Total Fees:** | |
| | | | 1709.15 | $797,003.00 | |

| | |
|---|---|
| **Internal Conference Time ("CT") Fees Pre-Mediation:** | **$107,952.50** |
| **Internal CT Fees Post-Mediation:** | **$14,755.00** |
| **Total CT Fees:** | **$122,707.50** |
| **25% Billing Judgment Reduction:** | **$30,676.88** |
| **Total CT Fees after 25% Billing Judgment Reduction:** | **$92,030.63** |
| **Judgment Billing Reduction of 100% of Law Clerk Hours:** | **$96,000.00** |
| **Total Complaint Time Fees:** | **$40,981.50** |
| **50% Billing Judgment Reduction:** | **$20,490.75** |
| **Total Complaint Time Fees after 50% Billing Judgment Reduction:** | **$20,490.75** |
| **Total Reduction:** | **$147,167.63** |
| **Total Percent Reduction:** | **18.47%** |
| **Total Fees with Billing Judgment:** | **$745,835.37** |

*See* [*14] DeSimone Reply Decl. Ex. K. [5]

5   Plaintiff's Motion originally reduced the lodestar figure to $712,995.63 as a sort of olive branch to Defendants. *See* DeSimone Decl. at ¶ 54. However, when Defendants Opposition refused to acknowledge that this reduction demonstrated any business judgment by Plaintiff and instead sought to further reduce Class Counsel's fees, Plaintiff withdrew some of these reductions and sought $745,520.37.

**a. Reasonableness of Class Counsel's fee rates**

Both the United States Supreme Court and California Supreme Court have held that fee awards to public interest attorneys who do not charge their clients--such as Class Counsel--are "calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*; *Folsom v. Butte County Ass'n of Govt's, 32 Cal.3d 668, 683-84, 186 Cal. Rptr. 589, 652 P.2d 437 (1982)* (same). "The

proper reference point in determining an appropriate fee award is the rates charged by private attorneys in the same legal market as prevailing counsel." *Trevino v. Gates, 99 F.3d 911, 925 (9th Cir.1996)*; *Blum, 465 U.S. at 895, fn. 11* ("[R]ates charged in private representations [*15] may afford relevant comparisons.").

Plaintiff has established the reasonableness of Class Counsel's fee rates through the declarations by Class Counsel and three other attorneys who practice civil rights litigation in Southern California. *See United Steelworkers of Am. v. Phelps Dodge Co., 896 F.2d 403, 407 (9th Cir. 1990)* ("Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determination in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."); *Bouman v. Block, 940 F.2d 1211, 1235 (9th Cir. 1991)* (the submission of "declarations stating that the rate was the prevailing market rate in the relevant community [was] ... sufficient to establish the appropriate rate for lodestar purposes"). In addition, Plaintiff has established the reasonableness of Class Counsel's

2012 U.S. Dist. LEXIS 91069, *

fee rates through comparison with other cases. *See Nadarajah v. Holder, 569 F.3d 906, 917 (9th Cir. 2009)* (affirming award of attorneys' fees at rate of $500 per hour where party had submitted a declaration describing her experience and attached copies of fee awards in the same geographical [*16] area where counsel had comparable experience).

For example, *Californians for Disability Rights v. Cal. DOT (Caltrans)* is a case from 2010 in which the court awarded attorneys' fees in an action to improve accessibility for people with mobility disabilities. *See No. C 06-05125 SBA (MEJ), 2010 U.S. Dist. LEXIS 141030, *3 (N.D.Cal. Dec. 13, 2010).* The court found reasonable $730/hour for a 1985 graduate and $740/hour for a 1984 graduate, which is $35/hour greater than the rate requested by Mr. DeSimone, a 1985 graduate. *Id. at *39.* Similarly, the court found reasonable $660/hour and $650/hour for a 1991 and 1992 graduate respectively, while Mr. Seplow, a 1990 graduate, is only requesting $630/hour. *Id.* Likewise, an attorney with six years experience, the same number of years of practice as Ms. Canning, was awarded $500/hour, and a five year attorney was awarded $475. *Id.* By contrast, Ms. Canning is only requesting $450/hour. Given that the *Caltrans* rates were approved in 2010 and it is now 2012, Class Counsel's requested rates are below the high end of the market. *See also Pereira v. Ralph's Grocery Co., CV 07-841 PA(FFMX), 2010 U.S. Dist. LEXIS 142802, 2010 WL 6510346, *1, 7 (C.D. Cal. July 1, 2010)* (awarding attorneys' [*17] fees under ADA and CDPA and finding reasonable fee rates of $700/hour in class action settlement); *Elder v. Nat'l Conference of Bar Examiners, C 11-00199 SI, 2011 U.S. Dist. LEXIS 102205, 2011 WL 4079623, *1, 4 n.4 (N.D. Cal. Sept. 12, 2011)* (awarding attorneys' fees under ADA and finding reasonable fee rates of $730/hour for a 1985 graduate, $640/hour for a 1993 graduate, $535/hour for a 2003 graduate).

Because Plaintiff established reasonableness of Class Counsel's fee rates, the burden shifts to Defendants to rebut with evidence challenging the accuracy and reasonableness of the rates. [6] *See Gates, 987 F.2d at 1397-98.* Defendants argue that Class Counsel's fee rates are unreasonable because: (1) one of the three attorneys who submitted declarations in support of Class Counsel is not an appropriate comparator; (2) some of the firms to

which Class Counsel compares itself are not peer firms; (3) one court in a different case decided more than four years ago reduced the fee rate of one member of Class Counsel; and (4) Defendants' attorneys billed at lower rates than Class Counsel. All four arguments fail as a matter of law to meet Defendants' burden on rebuttal.

6   Class Counsel requested compensation for the work in [*18] this case at their regular hourly rates for the year 2012. This is appropriate because, for the fee award to be reasonable, it must be based on current, rather than historic, hourly rates. *Missouri v. Jenkins, 491 U.S. 274, 284, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989)* (court may account for delay in payment through use of current rates); *Cruz ex rel. Cruz v. Alhambra Sch. Dist., 601 F. Supp. 2d 1183, 1195 (C.D. Cal. 2009).* Furthermore, while the currently requested rates reflect an increase from Class Counsel's 2011 rates of up to, such an increase is justified by comparable increases in the market. *See Coles v. City of Oakland, No. C03-2961 TEH, 2007 U.S. Dist. LEXIS 100533, 2007 WL 39304, *7 (N.D. Cal. Jan. 4, 2007)* (rejecting defendants' argument that rate increases should not surpass the rate of inflation and stating "the focus of the rate analysis is to ensure that fees are awarded at 'prevailing market rates in the relevant community,' and such rates may be affected by factors other than inflation, such as attorneys' additional years of experience or changes in the legal market") (quoting *Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*; *Parker v. Vulcan Materials Co. Long Term Disability Plan, No. EDCV 07-1512 ABC (OPx), 2012 U.S. Dist. LEXIS 36724, 2012 WL 843623, *7 (C.D. Cal. Feb. 16, 2012)* [*19] (approving as reasonable an approximate 10 percent increase between 2011 rates and 2012 rates and because "[i]t is common practice for attorneys to periodically increase their rates for various reasons, such as to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice"); *LaPeter v. Canada Life Ins. Co. of Am., No. CV06-121-S-BLW, 2009 U.S. Dist. LEXIS 40263, 2009 WL*

2012 U.S. Dist. LEXIS 91069, *

*1313336 *3 (D. Idaho May 11, 2009)* ("It is typical for rates to increase on a yearly basis and, also, for associates' and paralegals' rates to increase as they gain more experience.").

**i. Sobel is valid comparator to Class Counsel**

Plaintiff's Motion included three declarations from lawyers who practice in the Southern California region attesting to the reasonableness of Class Counsel's fee rates. All three declarations are from litigators in class action litigation and civil rights law with comparable experience to Class Counsel. However, Defendants argue that one of these attorneys, Carol Sobel, is not an appropriate comparator because she "specializes in *First Amendment* Rights and police litigation," which is a "completely different area of law" from the disability rights law "at issue in this case." [*20] Defendants argue, without authority, that such specialization renders Sobel inapposite because "the relevant market in this case is comprised of attorneys in Los Angeles or Orange County who specialize in disability rights cases under Titles II and 11 of the ADA." Opp'n at 11.

First, Defendants are incorrect as matter of law that the relevant market is limited only to attorneys who specialize in the specific disability rights laws at issue here. Defendants' unsubstantiated argument is contradicted by the Federal and California fee-shifting statutes at issue here, which "specifically offer[] statutory attorney fees as incentive to encourage attorneys to handle these important cases." *Blackwell v. Foley, 724 F. Supp. 2d 1068, 1077 (N.D. Cal. 2010)* (discussing ADA and CDPA); *Donald v. Cafe Royale, Inc., 218 Cal. App. 3d 168, 179, 266 Cal. Rptr. 804 (1990)* ("[T]he [California] Legislature's purpose in imposing increased penalties and additional enforcement methods is to guarantee compliance with equal access requirements."). This legislative purpose is thwarted if the relevant market is limited only to disability rights specialists; where the prevailing market rate for non-specialists is greater than the rate [*21] for disability rights specialists, non-specialists will lack the incentive to litigate these cases and thus the pool of available attorneys will shrink. Perhaps for this reason, Congress did not limit the relevant market as narrowly as Defendants would wish; in fact, in other fee-shifting statutes, Congress expressly stated it "intended that the

amount of fees awarded . . . be governed by the same standards which prevail in other types of complex Federal litigation, such as antitrust cases." *City of Riverside v. Rivera, 477 U.S. 561, 575, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986)* (internal quotations omitted). [7]

> 7 Furthermore, Defendants' rule is troubling as a matter of policy. Historically, civil rights activists and public interest attorneys have benefitted from a cross-pollination of ideas between various social movements; indeed, the incorporation of fee-shifting statutes in the ADA can be ascribed to their success in other civil rights statutes. Thus, the Court is highly skeptical that the Federal or California legislatures intended to create a fee award system that ghettoized the disability rights field within the civil rights law.

Alternatively, even if Defendants were correct that *one* of three declarations provides [*22] an inapt comparator, the Court can not reduce Class Counsel's fee rates because the *other two* declarations alone satisfy Plaintiff's burden to show the reasonableness of Class Counsel's fee rates. Defendants' opposition is entirely silent as to these other two declarations in support of Class Counsel's fees. Such silence is insufficient to meet Defendants' burden to rebut the reasonableness of these rates with specific evidence. *See Gates, 987 F.2d at 1397-98*.

In sum, the Court is not persuaded by Defendants' argument that Class Counsel's rate should be reduced simply because one of three comparators is not a disability rights specialist.

**ii. Attorneys at large, prestigious firms are valid comparators to Class Counsel**

Defendants argue that the fee rates at some of the firms to which Class Counsel compares itself are inappropriate because these firms are "the most prestigious international law firms in the country," and thus have "the highest hourly rates," whereas Class Counsel work at a 12-attorney boutique. Opp'n at 11. Defendant submitted two declarations from attorneys at elite firms that aver that their fee rate is lower than some of the fee rates of Class Counsel. Defendants offer [*23] no authority to explain why the size of a firm or the firm's

reputation renders comparisons to Class Counsel inappropriate.

Courts have rejected similar arguments under similar fee-shifting statutes. *See e.g., Cruz ex rel. Cruz v. Alhambra Sch. Dist., 601 F. Supp. 2d 1183, 1194-95 (C.D. Cal. 2009)* (rejecting defendant's argument "that it is inappropriate to determine rates for Plaintiffs' attorneys using data from large law firms because such firms generally do work in areas of federal litigation that garner higher rates than those charged for civil rights litigation"). The reasoning is two-fold. First, the Supreme Court and Ninth Circuit have expressly endorsed comparisons to "*lawyers* of reasonably comparable skill, experience, and reputation" and have never required prevailing party's counsel to *also* prove that their *firm* is the same size or has the same level of prestige as that of comparator attorneys. *See Blum v. Stenson, 465 U.S. 886, 896 n. 11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)* (emphasis added); *Trevino v. Gates, 99 F.3d 911, 925 (9th Cir.1996)* ("[R]ates charged by private *attorneys* in the same legal market as prevailing counsel.") (emphasis added). Indeed, a rule requiring a comparison of firms would be  [*24] artificially depress attorney fee awards, as few civil rights firms can afford to employ hundreds of associates given the uncertainty of contingency-fee litigation. Second, attorneys at large, prestigious law firms are valid comparators because they do, in fact, sometimes litigate civil rights cases; indeed, courts have awarded attorneys fees to attorneys at Skadden Arps, one of the firms to which Class Counsel compares themselves, in disabilities rights cases. *See e.g., Californians for Disability Rights v. Cal. DOT (Caltrans No. C 06-05125 SBA (MEJ), 2010 U.S. Dist. LEXIS 141030, *3 (N.D.Cal. Dec. 13, 2010)* (finding reasonable a $730/hour fee awarded to a Skadden Arps attorney in an action to improve accessibility for people with mobility disabilities).

Moreover, Class Counsel's firm reputation *is* prestigious and thus on par with its comparator firms. Class Counsel's firm is a major player in litigating cutting edge international human rights cases, as exemplified by law partner Paul Hoffman's February 2012 argument before the U.S. Supreme Court in *Kiobel v. Royal Dutch Petroleum*, Case No.1 0-1491. *See* DeSimone Reply Dec at ¶19. One of the members of Class Counsel, DeSimone, has been  [*25] named by the Daily Journal among the

Top 50 Employment Lawyers in the State of California, inclusive of lawyers from top international law firms, for three years in a row. *Id.*

Alternatively, even if Defendants were correct that attorneys from some law firms were inapt comparators, the Court can not reduce Class Counsel's fee rates because the declarations from three civil rights attorneys alone satisfy Plaintiff's burden to show the reasonableness of Class Counsel's fee rates. As noted previously, Defendants' opposition is entirely silent as to two of these declarations. Such silence is insufficient to meet Defendants' burden to rebut the reasonableness of these rates with specific evidence. *See Gates, 987 F.2d at 1397-98.*

In sum, the Court is not persuaded by Defendants' argument that Class Counsel's rate should be reduced simply because some of the fee rates cited in support of Class Counsel's fees are from attorneys working at firms of a different size or reputation than Class Counsel's firm.

### iii. A different court's decision to reduce DeSimone's fees in a different case decided more than four years ago is not sufficient evidence to reduce DeSimone's fees in this case

Defendants argue  [*26] that this Court should reduce the fee rate of one member of Class Counsel, DeSimone, because one state court in a different case decided more than four years ago reduced DeSimone's fee rate. Defendants rely on *Benham v. S&J Sec. & Investigation*, in which a California Court of Appeals held that the "trial court did not act arbitrarily or capriciously in setting rates" of $425/hour rather than DeSimone's requested $600/hour because the "trial court explained that the rate determinations were based on the simplicity of the facts and the lower level of expertise required in this case." *2010 Cal. App. Unpub. LEXIS 1616, *29, *33 (Cal. App. 2d Dist. Mar. 8, 2010)*.

First, Defendants' argument to reduce fee rates to the rates awarded in cases prior to the action for which fees are sought fails as a matter of law because, as courts have recognized when rejecting identical arguments, such "cases do not necessarily reflect the *prevailing* market rate, which is the appropriate standard." *Salinas v. Rite Aid Lease Mgmt. Co., CV-10-7499-SVW-FMO, 2011 U.S. Dist. LEXIS 36093, 2011 WL 1107213, *1-2 (C.D.*

2012 U.S. Dist. LEXIS 91069, *

*Cal. Mar. 17, 2011)* (awarding attorneys' fees in ADA action to improve wheelchair users' access to chain store). While *past* fee [*27] rates may be useful evidence to show a *floor* below which a court's fee calculations should not drop, past fee rates in no way support the conclusion that a court should *reduce* the fees in the present case to the rates awarded in the past. Defendants' logic would produce the absurd result of fee rates flat lining at the rate set by the first court to award fees. In fact, courts routinely recognize that fee rates increase over time based on a variety of factors. *See e.g., Parker v. Vulcan Materials Co. Long Term Disability Plan, No. EDCV 07-1512 ABC (OPx), 2012 U.S. Dist. LEXIS 36724, 2012 WL 843623, *7 (C.D. Cal. Feb. 16, 2012)* (approving as reasonable an approximate 10 percent increase between 2011 rates and 2012 rates and because "[i]t is common practice for attorneys to periodically increase their rates for various reasons, such as to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice"); *LaPeter v. Canada Life Ins. Co. of Am., No. CV06-121-S-BLW, 2009 U.S. Dist. LEXIS 40263, 2009 WL 1313336 *3 (D. Idaho May 11, 2009)* ("It is typical for rates to increase on a yearly basis and, also, for associates' and paralegals' rates to increase as they gain more experience.").

Alternatively, even [*28] if Defendants were correct that fee rates could be reduced to past rates, the Court can not reduce Class Counsel's fee rates because Defendants' evidence that one court reduced DeSimone's fee rate four years ago is insufficient to defeat DeSimone's evidence that other courts have awarded him higher fee rates. [8] DeSimone's declaration provides the names and case numbers of five cases from more recent years-- at least two of which are from this Court's district-- awarding DeSimone an hourly rate of $600 to $650 per hour. *See* DeSimone Decl. ¶ 36 (citing two 2009 cases awarding $600/hour and $625/hour; a 2010 case and two 2011 cases awarding $650/hour). [9] It is Defendants' burden to rebut Plaintiff's evidence, and this burden is not met given Defendants' failure to distinguish DeSimone other five cases.

[8] The rates approved in *Benham* were based on 2008 rates, when the trial court originally granted Plaintiffs fees, not 2012 rates--nor even, as Defendants suggest, the rates when the matter was up on appeal in 2010. *See*

DeSimone Reply Decl. at 20.

[9] The Court overrules Defendants' objection to DeSimone's declaration. Defendants assert that a declaration under penalty of perjury from an attorney who [*29] was counsel of record on a case in which he and his firm were awarded attorneys fees by the Court, and who has personal knowledge of the hourly rate awarded, somehow is not competent to set forth the hourly rate. Defendants are wrong. DeSimone's declaration, which is based on personal knowledge, properly sets forth the basis for the requested hourly rates for himself and his co-counsel, including the name and case numbers. His declaration is not hearsay and satisfies all of the necessary foundational requirements for this Court to consider the requested hourly rate. Further, the "best evidence rule" deals with the contents of a written document and simply does not apply to the declaration of an attorney with personal knowledge of the rates he and his firm were awarded by the Court. There is simply no requirement that Plaintiff has to clutter the docket by attaching all of the actual orders setting forth the hourly rates awarded in cases in which DeSimone and his firm were counsel of record. *See United Steelworkers of Am. v. Phelps Dodge Co., 896 F.2d 403, 407 (9th Cir. 1990)* ("Affidavits of the plaintiffs' attorney . . . regarding prevailing fees in the community, and rate determination [*30] in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate.").

In sum, the Court is not persuaded by Defendants' argument that DeSimone's fee rate should be reduced simply because one state court in a different case decided more than four years ago reduced DeSimone's fee rate.

### iv. The lower fee rates of Defendants' attorneys are not valid bases for reducing Class Counsel's fee rates

Defendants argue that Class Counsel's fee rate should be reduced because Defendants' attorneys billed at lower rates than Class Counsel. Defendants' argument fails as a matter of law

because Defendants' attorneys' hourly rate charged to clients is not the standard by which Class Counsel's fees are measured. *See Trevino, supra, 99 F.3d at 925* (holding defense counsel's rates to be an improper starting point in determining plaintiff counsel's reasonable hourly rate). *See also EEOC. v. Harris Farms, Inc., 2006 U.S. Dist. LEXIS 36903, 2006 WL 1028755, *19 (E.D. Cal. Mar. 1, 2006)* (court declined to compare a plaintiff attorney's requested hourly rate to the hourly rate of a defense attorney). Non-contingent rates such as those charged by Defendants' attorneys do not [*31] account for the inherent risks associated with contingent work and delay in payment. *See Welch v. Metro. Life Ins. Co., 480 F.3d 942, 946-47 (9th Cir. 2007)*. Furthermore, Defendants' attorneys have not shown that their experience or reputation is comparable to that of Class Counsel.

### v. Conclusion regarding fee rates

In sum, the Court rejects as a matter of law all of Defendants' arguments to reduce Class Counsel's fee rates. Accordingly, the Court holds that Class Counsel's fee rates are reasonable.

### b. Reasonableness of hours worked

The court "should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008)*; *Blackwell v. Foley, 724 F. Supp. 2d 1068, 1081 (N.D. Cal. 2010)* ("An attorney's sworn testimony that, in fact, [she] took the time claimed . . . is evidence of considerable weight on the issue of the time required."). To reduce the number of hours worked, "it must appear that the time claimed is obviously and convincingly excessive under the circumstances." *Blackwell, 724 F. Supp. 2d at 1081* (awarding attorneys fees under the same three statutes at issue here, *Section 12205*, [*32] *Section 55*, and *Section 1021.5*). This is true because "the purposes of the [fee-shifting] statutes will not be met" unless Plaintiff's attorneys are "reasonably compensated for all their time." *Id.; Moreno, 534 F.3d at 1112* ("It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee.").

Plaintiff's moving papers and declarations show that Class Counsel efficiently staffed this matter by primarily assigning one associate to handle the bulk of the discovery and motion drafting with oversight by an experienced partner. *See DeSimone Decl. at ¶ 54; Canning Decl. at ¶ 9.* In addition, Class Counsel exercised billing judgment by reducing the total billing for conferences by 25% and not billing at all for the 480 hours worked by law clerks to account for any inefficiencies. *See DeSimone Decl. at ¶ 54; Canning Decl. at ¶ 9; Ex. K DeSimone Reply Decl. at ¶ 22* (reduction of time on complaint), ¶ 23 (conference time reduction).

Because Plaintiff established reasonableness of Class Counsel's hours, the burden shifts to Defendants to rebut [*33] with evidence challenging the accuracy and reasonableness of the hours. *See Gates, 987 F.2d at 1397-98.* Defendants, relying primarily on the conclusions of their fee consultant, [10] argue that Class Counsel's hours are unreasonable because: (1) hours worked by one member of Class Counsel should not be paid because he is not counsel of record; (2) hours billed on the complaint and on a summary judgment motion that was never filed are excessive; and (3) hours worked by one attorney reviewing another's work or on internal communications are duplicative. All three arguments fail to meet Defendants' burden on rebuttal.

> 10   Defendants' fee consultant only reviewed billing records through October 18, 2011.

### i. Feldman's hours can not be reduced simply because he is not counsel of record or did not make an appearance

Defendants argue that the hours worked by one member of Class Counsel, Feldman, should not be paid because he is not counsel of record and has "never made a single appearance in this case." Opp'n at 13. Defendants' argument fails as a matter of law because they cite no authority and precedent supports a contrary conclusion. In *Invision Media Services*, for example, the Ninth Circuit overturned [*34] the lower court and awarded fees to an attorney who had not made a formal appearance prior to the fee motion. *Invision Media Servs. v.Glen J Lerner, 175 Fed.Appx. 904, 907 (9th Cir. Apr. 23, 2006)*. The court held that there was "no basis for requiring an attorney who actually

contributed to the work product of another attorney" to be required to "enter appearances." *Id.; see also Wells Fargo Bank, N.A. v. Jones, CIV.A. 07-3599, 2009 U.S. Dist. LEXIS 35185, 2009 WL 911011 (E.D. La. Mar. 31, 2009)* (following *Invision Media* to award attorneys fees for work done by attorney "prior to formal enrollment as counsel"). Similarly, other courts have found that the hours of contract attorneys--who, like Feldman, are not counsel of record-- nonetheless merit inclusion in the lodestar hours. *See In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 272 (D.N.H. 2007)* (like paralegal time, it is "appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."). [11]

> [11] The Court need not address Defendants' other argument that 2.6 hours billed by Feldman should not be counted due to a lack of work description because Plaintiff has withdrawn those hours. *See* Feldman Decl. [*35] at ¶¶ 11.

**ii. Hours worked on the complaint and summary judgment motion were not excessive**

Defendants argue that the hours worked on the complaint and on a summary judgment motion that was never filed are excessive and thus should be excluded from the lodestar figure.

Defendants argue that the 78 hours billed on the complaint are excessive because the complaint contained only 3 pages of facts and five causes of action. Defendant cites two cases which reduced the hours worked on the complaint: *Johnson v. Curtis O. Barnes, PC, 2010 U.S. Dist. LEXIS 143286 (C.D. Cal. Dec. 13, 2010)* and *Cyr v. Reliance Std. Life Ins. Co., 2008 U.S. Dist. LEXIS 110336 (C.D. Cal. Jan. 16, 2008)*.

Plaintiff has reduced by half the hours devoted to researching and drafting the complaint. *See* Reply at 20 n.14; DeSimone Reply Decl. Ex. K. Even if Plaintiff had not done so, the Court declines to follow Defendants' cases. Frankly, the Court suspects that several of the complaints it dismisses every week fail to state a claim because attorneys spend too *little* time researching the grounds for their case; the Court sees no reason why it should punish the attorney that researches the law and facts before putting paper [*36] to pen. Furthermore,

Defendants'cases are distinguishable. Unlike the present case, *Cyr* was not a class action and did not involve the substantive law at issue here. *Cyr, 2008 U.S. Dist. LEXIS 110336 at *16* (reducing hours spent drafting an ERISA complaint). *Johnson*, also unlike the present case, "presented a narrow, straight-forward factual and legal issue" and the complaint was only eight pages. *Johnson, 2010 U.S. Dist. LEXIS 143286 at *5-6*.

Defendants also argue that the hours worked on the summary judgment motion should be reduced because the motion was never filed. However, extensive authority supports awarding fees for time spent on unfiled motions. *See Marbled Murrelet v. Pacific Lumber Co., 163 F.R.D. 308, 327 (N.D. Cal. 1995)* (rejecting defendant's argument that plaintiffs should not be awarded fees for time spent on a second amended complaint and possible motion for reconsideration, both of which were never filed, where the court found that it had no reason to doubt plaintiffs' representation that the work was reasonably related to the case at hand); *ExperExchange, Inc. v. Doculex, Inc., No. C-08-03875 JCS, 2010 U.S. Dist. LEXIS 54530, 2010 WL 1881484, *9 (N.D. Cal. May 10, 2010)* (awarding party fees [*37] for time spent preparing a *Daubert* motion that was never filed and stating "[t]he fact that the motion was not, ultimately, filed, does not mean that the time spent preparing the motion was unreasonable."); *Rux v. Starbucks Corp., 2007 U.S. Dist. LEXIS 30180, 2007 WL 1098550, *3-4 (E.D. Cal. Apr. 12, 2007)* (granting attorneys' fees for time spent drafting plaintiff's portion of a related joint statement regarding a discovery dispute which was ultimately not filed in light of defendant's last minute agreement to produce the requested deponent).

Furthermore, Defendants neglect to recognize that Defendants choose to negotiate a settlement days before the deadline for filing summary judgment motions; if Defendants had wished to not pay Class Counsel's fees, Defendants could have settled earlier. In addition, Plaintiff avers that it was only after Class Counsel met and conferred with Defense counsel on the motion for summary judgment that Defendants agreed to set a mediation date. Therefore, Class Counsel had no assurance that the matter would settle. Given the looming motion cut-off deadline, Class Counsel was diligent in representing the certified class by preparing a

motion. In sum, the Court is not persuaded by [*38] Defendants' argument to reduce the fees incurred in writing the complaint or summary judgment motion.

### iii. Hours billed for reviewing another's work or on internal communications were not duplicative

Defendants argue that the hours billed by one attorney reviewing another's work or on internal communications are duplicative and thus should be excluded from the lodestar figure. As the Court previously noted, this was a leanly-staffed case where more than 75% of the hours were billed by only two attorneys. Thus, the Court declines to reduce the hours simply because Class Counsel kept each other informed about the case and double-checked each other's work; indeed, many motions this Court denies would have benefitted from a second read and more strategizing by the attorneys involved.

### iv. Conclusion regarding hours

In sum, the Court rejects all of Defendants' arguments to reduce Class Counsel's hours. Accordingly, the Court holds that Class Counsel's hours are reasonable. Furthermore, the Court notes that Class Counsel's hours are reasonable because they litigated this case for two years, after class certification and up to the eve of summary judgment. Courts have awarded significant fees for [*39] success achieved at much earlier stages of litigation. *See Elder v. Nat'l Conference of Bar Examiners, C 11-00199 SI, 2011 U.S. Dist. LEXIS 102205, 2011 WL 4079623, *4, 4 n.4 (N.D. Cal. Sept. 12, 2011)* (awarding $215,361.05 in attorneys' fees under *Section 12205* for merely obtaining a preliminary injunction); *Pereira v. Ralph's Grocery Co., CV 07-841 PA(FFMX), 2010 U.S. Dist. LEXIS 142802, 2010 WL 6510346, *1, 7 (C.D. Cal. July 1, 2010)* (awarding $649,037 in attorneys' fees under ADA and CDPA in class action settlement and finding reasonable multiplier that increased "by two-thirds of the lodestar").

### c. Conclusion

Under the parties' settlement agreement, Class Counsel can not recover more than $725,000 in attorneys' fees and costs. Because the Court concludes that the lodestar figure of 745,520.37 in attorneys' fees and $47,167.52 in costs is reasonable, the Court need not consider additional arguments by Plaintiff to increase this figure by a multiplier. [12]

> 12    Although Defendants offer post-hoc criticisms of the settlement agreement that appear to question hours billed given the lack of complexity of this case, this argument is too underdeveloped to constitute a basis for reducing Plaintiff's fees under the *Kerr* factors. Furthermore, courts have [*40] awarded fees even where the case was incredibly simple and straightforward. *Hull v. Rossi, 13 Cal. App. 4th 1763, 1769, 17 Cal. Rptr. 2d 457 (1993)* (reversing denial of attorneys' fees under *Section 1021.5* even though lower court was "correct" that the opponent to the party seeking fees offered arguments that were "minor, inconsequential and a 'piffle'" because the lower court "abused its discretion in holding that any court would have so found [for the successful party] without the aid of [movant's] attorneys").

In addition, the Court finds Plaintiff's enhancement award of $18,000 to be reasonable.

### IV. Disposition

For the foregoing reasons, the Court GRANTS Plaintiff's motion. The Court AWARDS: (1) Class Counsel $725,000 in attorneys' fees and costs; and (2) Plaintiff $18,000 as an enhancement award.

DATED: May 30, 2012

/s/ David O. Carter

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE